# Syllabus

Chief Justice:
Bridget M. McCormack

Chief Justice Pro Tem:
David F. Viviano

Justices:
Stephen J. Markman
Brian K. Zahra
Richard H. Bernstein
Elizabeth T. Clement
Megan K. Cavanagh

**This syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader.**

Reporter of Decisions:
Kathryn L. Loomis

MAYS v GOVERNOR

Docket Nos. 157335 through 157337 and 157340 through 157342. Argued March 4, 2020 (Calendar No. 2). Decided July 29, 2020.

Melissa Mays and other water users and property owners in Flint, Michigan (plaintiffs) brought a class action in the Court of Claims against defendants Governor Rick Snyder, the state of Michigan, the Michigan Department of Environmental Quality (the MDEQ), and the Michigan Department of Health and Human Services (collectively, the state defendants) and against defendants Darnell Earley and Jerry Ambrose (the city defendants), who are former emergency managers for the city of Flint. Plaintiffs' complaint alleged that from 1964 through late April 2014, the Detroit Water and Sewerage Department (DWSD) supplied Flint water users with their water, which was drawn from Lake Huron. On April 16, 2013, the Governor authorized a contract to explore the development of an alternative water delivery system, and at the time of the contract, the Governor and various state officials knew that the Flint River would serve as an interim source of drinking water for the residents of Flint. Plaintiffs alleged that the Governor and these officials had knowledge of a 2011 study commissioned by Flint officials that cautioned against the use of Flint River water as a source of drinking water. On April 25, 2014, under the direction of Earley and the MDEQ, Flint switched its water source from the DWSD to the Flint River, and Flint water users began receiving Flint River water from their taps. Plaintiffs alleged that the switch occurred despite the fact that the water treatment plant's laboratory and water-quality supervisor warned officials that the water treatment plant was not fit to begin operations and despite the fact that the 2011 study had noted that the water treatment plant would require facility upgrades costing millions of dollars. Less than a month after the switch, state officials began to receive complaints from Flint water users about the quality of the water coming out of their taps. In June 2014, residents complained that they were becoming ill after drinking the tap water. In October 2014, General Motors announced that it was discontinuing the use of Flint water in its Flint plant due to concerns about the corrosive nature of the water, and in the same month, Flint officials expressed concern about a legionellosis outbreak and possible links between the outbreak and Flint's switch to the river water. In February 2015, the United States Environmental Protection Agency (the EPA) advised the MDEQ that the Flint water supply was contaminated with iron at levels so high that the testing instruments could not measure the exact level, and in the same month, the MDEQ was advised that black sediment found in some of the tap water was lead. Plaintiffs alleged that during this time, state officials failed to take any significant remedial measures to address the growing health threat and instead continued to downplay the health risk, advising Flint water users that it was safe to drink the tap

water while simultaneously arranging for state employees in Flint to drink water from water coolers installed in state buildings.  Additionally, plaintiffs alleged that the MDEQ advised the EPA that Flint was using a corrosion-control additive with knowledge that the statement was false.  Through the summer and fall of 2015, state officials allegedly continued to cover up the health emergency, discredit reports that confirmed the presence of lead in the water system and a spike in the percentage of Flint children with elevated blood lead levels, and advise the public that the drinking water was safe despite knowledge to the contrary.  In early October 2015, the Governor acknowledged that the Flint water supply was contaminated with dangerous levels of lead.  On October 8, 2015, the Governor ordered Flint to reconnect to the DWSD, and the reconnection occurred on October 16, 2015.  On January 21, 2016, plaintiffs brought a four-count class-action complaint against all defendants in the Court of Claims for state-created danger, violation of plaintiffs' due-process right to bodily integrity, denial of fair and just treatment during executive investigations, and unconstitutional taking via inverse condemnation.  The state and city defendants separately moved for summary disposition on all four counts, arguing that plaintiffs had failed to satisfy the statutory notice requirements in MCL 600.6431 of the Court of Claims Act, MCL 600.6401 *et seq*., failed to allege facts to establish a constitutional violation for which a judicially inferred damages remedy is appropriate, and failed to allege facts to establish the elements of any of their claims.  The Court of Claims, MARK T. BOONSTRA, J., granted defendants' motions for summary disposition on plaintiffs' causes of action under the state-created-danger doctrine and the Fair and Just Treatment Clause of the 1963 Michigan Constitution, art 1, § 17, after concluding that neither cause of action is cognizable under Michigan law.  However, the Court of Claims denied summary disposition on all of defendants' remaining grounds, concluding that plaintiffs satisfied the statutory notice requirements and adequately pleaded claims of inverse condemnation and a violation of their right to bodily integrity.  In Court of Appeals Docket No. 335555, the state defendants appealed, and the city defendants and plaintiffs cross-appealed; in Court of Appeals Docket No. 335725, the Court of Appeals granted the city defendants' application for leave to appeal; and in Court of Appeals Docket No. 335726, the Court of Appeals granted the state defendants' application for leave to appeal.  The Court of Appeals consolidated the appeals.  In its judgment, the Court of Appeals, JANSEN, P.J., and FORT HOOD, J. (RIORDAN, J., dissenting), affirmed the Court of Claims' rulings on the statutory notice requirements, plaintiffs' claim of violation of their right to bodily integrity, and plaintiffs' claim of inverse condemnation. 323 Mich App 1 (2018).  Both the state defendants and the city defendants sought leave to appeal in the Supreme Court.  The Supreme Court granted the applications for leave to appeal.  503 Mich 1030 (2019).

In a lead opinion by Justice BERNSTEIN, joined by Chief Justice MCCORMACK and Justice CAVANAGH, and a separate opinion by Justice VIVIANO, concurring in part and dissenting in part, the Supreme Court *held*:

Plaintiffs sufficiently alleged a claim of inverse condemnation to survive a motion for summary disposition brought under MCR 2.116(C)(8).  Viewed in the light most favorable to plaintiffs and accepting their factual allegations as true, the pleadings established that defendants' actions were a substantial cause of the decline in plaintiffs' property value, that defendants took affirmative actions directed at plaintiffs' property, and that plaintiffs suffered a unique or special injury different in kind, not simply in degree, from the harm suffered by all persons similarly situated.  While state and municipal agencies performing governmental functions are generally immune from tort liability, the government may voluntarily subject itself

to liability, which also means that it may place conditions or limitations on the liability imposed. One condition on the right to sue state governmental agencies is the notice provision of the Court of Claims Act, MCL 600.6431. But it would be premature to grant summary disposition regarding the inverse-condemnation claim on the basis of the six-month notice period because questions of fact remain as to when plaintiffs' claims accrued.

Court of Appeals judgment regarding plaintiffs' inverse-condemnation claim expressly affirmed; Court of Appeals judgment otherwise affirmed by equal division, including with regard to whether plaintiffs presented a cognizable claim for violation of their right to bodily integrity under Michigan's Due Process Clause; case remanded to the Court of Claims for further proceedings.

In the lead opinion, Justice BERNSTEIN, joined by Chief Justice MCCORMACK and Justice CAVANAGH, stated that plaintiffs adequately alleged a claim of inverse condemnation. A plaintiff alleging inverse condemnation must establish that the government's actions were a substantial cause of the decline of the property's value and that the government abused its powers in affirmative action directly aimed at the property. The right to just compensation in the context of an inverse-condemnation suit for diminution in value exists only when the landowner can allege a unique or special injury, i.e., an injury that is different in kind, not simply in degree, from the harm suffered by all persons similarly situated. In this case, plaintiffs met the first element of an inverse-condemnation claim because they alleged that switching the water source from the DWSD to the Flint River resulted in physical damage to pipes, service lines, and water heaters and that the contaminated water limited the use of their property and substantially impaired its value and marketability because after the water crisis became public knowledge, lenders were hesitant to authorize loans for the purchase of realty within Flint and property values decreased. Plaintiffs met the second element of an inverse-condemnation claim because they alleged that defendants committed an affirmative act directed at their property when the state defendants authorized the city defendants to use the Flint River as an interim water source while both sets of defendants knew that using the river could result in harm to property. Defendants then allegedly concealed or misrepresented data and made false statements about the safety of the river water in an attempt to downplay the risk of its use and consumption. Following United States Supreme Court precedent in comparing plaintiffs to a generalized group of similar individuals—other municipal water users who generally experience harms such as service disruptions and externalities associated with construction—plaintiffs alleged injuries that were different in kind, not just degree, from other municipal water users when they alleged that water contaminated with Legionella bacteria and toxic levels of iron and lead flowed through their pipes, service lines, and water heaters, which damaged the infrastructure and diminished their property's value. Accordingly, plaintiffs' allegations were sufficient to conclude that plaintiffs had alleged a claim of inverse condemnation to survive a motion for summary disposition. With regard to defendants' argument that plaintiffs failed to satisfy the statutory notice requirements, MCL 600.6431 provides that in actions for property damage or personal injuries, the claimant must file with the clerk of the court of claims a notice of intention to file a claim or the claim itself within six months following the happening of the event giving rise to the cause of action. Under MCL 600.5827, a claim accrues at the time the wrong upon which the claim is based was done, which is the date on which the defendant's breach harmed the plaintiff. In this case, questions of fact remained as to when plaintiffs sustained their injuries; therefore, summary disposition at this stage of the litigation was premature. With regard to plaintiffs'

constitutional-tort claim, plaintiffs sufficiently pleaded a claim for violation of their substantive due-process right to bodily integrity under Const 1963, art 1, § 17. While the Legislature has never created an exception to immunity for a constitutional tort, *Smith v Dep't of Pub Health*, 428 Mich 540 (1987), aff'd sub nom *Will v Mich Dep't of State Police*, 491 US 58 (1989), held that when a plaintiff brings a constitutional-tort claim against the state, in certain instances, the government is not immune from liability for violations of its Constitution. Michigan courts have recognized the existence of constitutional torts as outlined in *Smith* and, in certain circumstances, have allowed constitutional-tort claims to survive motions for summary disposition. Accordingly, plaintiffs sufficiently alleged a constitutional tort for violation of their right to bodily integrity when they alleged that defendants' decision to switch the city of Flint's water source to the Flint River, which defendants knew was contaminated, resulted in a nonconsensual entry of toxic water into plaintiffs' bodies. Plaintiffs' allegations painted a picture of a public health crisis of the government's own making, intentionally concealed by state actors despite their knowledge that Flint residents were being harmed. Those actions, if proven, were shocking to the conscience. With regard to inferred damages, while no test for assessing a damages inquiry for a constitutional violation has ever been endorsed, the multifactor test outlined in Justice BOYLE's separate opinion in *Smith* provided a framework for assessing a damages inquiry. Under that test, various factors are weighed, including: (1) the existence and clarity of the constitutional violation itself; (2) the degree of specificity of the constitutional protection; (3) support for the propriety of a judicially inferred damages remedy in any text, history, and previous interpretations of the specific provision; (4) the availability of another remedy; and (5) various other factors militating for or against a judicially inferred damages remedy. In considering each of the five factors in that test, the first and fifth factors weighed in favor of inferring a damages remedy, the second and third factors weighed somewhat against recognizing a damages remedy, and the fourth factor was neutral regarding the propriety of an inferred damages remedy. Recognizing that discovery had not yet occurred and accepting plaintiffs' allegations as true, at this stage of the litigation, holding that monetary damages were unavailable for this claim would have been premature.

In a separate concurrence, Justice BERNSTEIN wrote to counter Justice MARKMAN's arguments about plaintiffs' purported failure to adhere to the Court of Claims Act's statutory notice requirements and to counter Justice VIVIANO's argument that plaintiffs should be denied the right to sue for their personal injuries that resulted from a violation of their right to bodily integrity and should be denied a damages remedy. Justice BERNSTEIN agreed with the Court of Appeals' application of the harsh-and-unreasonable-consequences exception to the MCL 600.6431 notice requirement in the event that plaintiffs' claims are proved but untimely. While *Rowland v Washtenaw Co Rd Comm*, 477 Mich 197 (2007), *Trentadue v Buckler Automatic Lawn Sprinkler Co*, 479 Mich 378 (2007), and *McCahan v Brennan*, 492 Mich 730 (2012), each demanded strict compliance with statutory limitations and notice requirements in the context of legislatively granted rights, no Supreme Court case has ever held that constitutional claims against the state should be treated like those legislatively granted rights. Justice BERNSTEIN also would affirm the Court of Appeals' ruling that the fraudulent-concealment exception of MCL 600.5855 applies to MCL 600.6431 and that this exception may provide an alternative basis to deny defendants' motions for summary disposition if plaintiffs' claims are proved but untimely. The omission of a fraudulent-concealment exception to MCL 600.6431 is not reconcilable with the Legislature's intent to provide claimants with two years from the date of discovery to bring suit for harm that was fraudulently concealed, as expressed in MCL 600.6452(2). Adopting

defendants' arguments as they relate to fraudulent concealment would result in reading out MCL 600.6452(2) entirely, because plaintiffs would never be able to use the fraudulent-concealment exception. Finally, the Michigan Supreme Court is the only institution that determines the meaning of the Michigan Constitution, and it does so independently of the Legislature's action or inaction in a given area. Justice BERNSTEIN therefore would have held that an examination of the text of Michigan's Due Process Clause and case precedents pertaining to this provision revealed that Michigan's Due Process Clause plainly encompasses a right to bodily integrity.

Chief Justice MCCORMACK, joined by Justice CAVANAGH, fully concurred with the lead opinion but wrote separately to respond to Justice VIVIANO's critique of *Smith*. Chief Justice MCCORMACK disagreed with Justice VIVIANO's argument that *Smith*'s foundations have been eroded by the United States Supreme Court's partial retreat from *Bivens v Six Unknown Fed Bureau of Narcotics Agents*, 403 US 388 (1971), which held that a plaintiff may obtain monetary damages for injuries sustained as a result of federal agents' violation of the Fourth Amendment. It was not clear that the relevant holding of *Smith* was at all or exclusively based on *Bivens*. *Smith* never cited or referred to *Bivens*. Additionally, like *Smith*, *Bivens* established that monetary damages may be available to remedy a constitutional violation even in the absence of statutory authorization for such a claim. Though the United States Supreme Court has declined to extend *Bivens* to new contexts and claims in recent years, its fundamental principles are good law. Even assuming that *Smith* was a state Constitution, *Bivens*-like decision, the Michigan Supreme Court decides the meaning of the Michigan Constitution and does not take its cue from any other court, including the United States Supreme Court. Furthermore, the critiques of *Bivens* were far less weighty here because there are no corresponding federalism concerns. Perhaps most importantly, there was no federal analogue for the type of action here, which diminishes the relevance of the Supreme Court's *Bivens* jurisprudence. The typical *Bivens* scenario arises from errant conduct by a rogue federal official, but plaintiffs in this case alleged that the government itself was responsible for a conscience-shocking constitutional tort committed against the citizens of an entire city. This action—against these particular defendants—could not have been brought in federal court. However, *Smith* held that Michiganders can sue the government directly for violating their Michigan constitutional rights. These meaningful differences between federal *Bivens* claims and Michigan constitutional-tort actions made the United States Supreme Court's *Bivens* jurisprudence of limited value when determining how to approach state constitutional torts.

Justice VIVIANO, concurring in part and dissenting in part, agreed with the lead opinion's analysis of plaintiffs' inverse-condemnation claim and with the lead opinion's remand for further factual development to determine when that claim accrued. But he would have reversed the Court of Appeals' denial of defendants' motion for summary disposition concerning plaintiffs' claim for a violation of bodily integrity because he did not believe that substantive due process encompasses a right to be protected from exposure to contaminated water and he did not believe that plaintiffs alleged conscience-shocking conduct on the part of defendants. A substantive due-process analysis must begin with a careful description of the asserted right and a determination of whether that right is deeply rooted in this country's history. In this case, the right that plaintiffs asserted in their amended complaint was a right not to be exposed to contaminated water, and no caselaw existed holding that such a right is encompassed in substantive due process. Several cases explicitly hold that there is no right to a contaminant-free environment. The Court of Appeals in this case did not follow this analysis and erred by describing the right so

generally. Furthermore, plaintiffs did not allege conscience-shocking behavior. The bar for conduct that shocks the conscience is so high that it has been described as virtually insurmountable. In this case, plaintiffs alleged that defendants switched Flint's water source despite a study cautioning against using the Flint River, but additional studies stated that the initial study was unreliable. The studies and expert opinions plaintiffs cited in their complaint were not sufficient to show that defendants' behavior was deliberately indifferent. Other evidence had to be weighed in the balance: former Governor Snyder testified that he was repeatedly assured by the MDEQ that the water was safe, and there was no broad consensus that using the Flint River as a water source would cause a serious public health crisis. While mistakes had been made, plaintiffs did not allege actions that surmounted the high bar of conscience-shocking behavior. Furthermore, Justice VIVIANO would not have inferred a damages remedy even if plaintiffs did allege a substantive due-process claim for two reasons: even if *Smith* applied, the factors that Justice BOYLE listed in her partial concurrence for implying an inferred damages remedy weighed against the creation of a claim for damages, and Justice VIVIANO had doubts about whether *Smith* was correctly decided and whether it should be extended. Additionally, Justice VIVIANO stated that an implied claim for damages arising from a state constitutional violation would raise serious separation-of-powers concerns.

Justice MARKMAN, joined by Justice ZAHRA, dissenting, would have reversed the decision of the Court of Appeals and remanded the case to the Court of Claims for entry of an order disposing of all of plaintiffs' claims and dismissing the case because plaintiffs failed to comply with MCL 600.6431(3), which required plaintiffs to file a notice of intention to file a claim or the claim itself within six months following the happening of the event giving rise to the cause of action. The period of limitations begins to run when a plaintiff suffers harm, not when a plaintiff first learns of that harm. In this case, plaintiffs filed their complaint on January 21, 2016, and thus the event giving rise to the cause of action must have happened on or after July 21, 2015, for plaintiffs' action to have been filed in a timely manner under MCL 600.6431(3). Because plaintiffs alleged in their complaint and in their amended complaint that the event giving rise to the cause of action was the switching of the water supply on April 25, 2014, Justice MARKMAN would have held that plaintiffs' action was untimely. Furthermore, Justice MARKMAN would have held that the harsh-and-unreasonable-consequences exception and the fraudulent-concealment exception of MCL 600.5855 were each clearly inapplicable.

Justice CLEMENT did not participate because of her prior involvement as chief legal counsel for Governor Rick Snyder.

©2020 State of Michigan

# OPINION

Chief Justice:
  Bridget M. McCormack

Chief Justice Pro Tem:
  David F. Viviano

Justices:
Stephen J. Markman
Brian K. Zahra
Richard H. Bernstein
Elizabeth T. Clement
Megan K. Cavanagh

FILED  July 29, 2020

STATE OF MICHIGAN

SUPREME COURT

MELISSA MAYS, MICHAEL ADAM
MAYS, JACQUELINE PEMBERTON,
KEITH JOHN PEMBERTON, ELNORA
CARTHAN, RHONDA KELSO, and ALL
OTHERS SIMILARLY SITUATED,

              Plaintiffs-Appellees,

v                                                          Nos. 157335-7

GOVERNOR OF MICHIGAN, STATE OF
MICHIGAN, DEPARTMENT OF
ENVIRONMENTAL QUALITY, and
DEPARTMENT OF HEALTH AND
HUMAN SERVICES,

              Defendants-Appellants,
and

DARNELL EARLEY and JERRY
AMBROSE,

              Defendants-Appellees.

MELISSA MAYS, MICHAEL ADAM
MAYS, JACQUELINE PEMBERTON,
KEITH JOHN PEMBERTON, ELNORA
CARTHAN, RHONDA KELSO, and ALL
OTHERS SIMILARLY SITUATED,

        Plaintiffs-Appellees,

v                                       Nos. 157340-2

GOVERNOR OF MICHIGAN, STATE OF
MICHIGAN, DEPARTMENT OF
ENVIRONMENTAL QUALITY, and
DEPARTMENT OF HEALTH AND
HUMAN SERVICES,

        Defendants-Appellees,

and

DARNELL EARLEY and JERRY
AMBROSE,

        Defendants-Appellants.

BEFORE THE ENTIRE BENCH (except CLEMENT, J.)

BERNSTEIN, J.

      This putative class action involves a series of events commonly referred to as the "Flint water crisis." Plaintiffs, who are water users and property owners in the city of Flint, sued former Governor Rick Snyder, the state of Michigan, the Michigan Department of Environmental Quality (MDEQ), and the Michigan Department of Health and Human

Services (DHHS) (collectively, the state defendants).[1]  Plaintiffs also sued former city of

Flint emergency managers Darnell Earley and Jerry Ambrose (collectively, the city

defendants).[2]  The state defendants and the city defendants brought separate motions for

summary disposition under MCR 2.116(C)(4), (7), and (8).  Defendants argued that

plaintiffs' lawsuit should be dismissed because plaintiffs failed to provide timely notice

and did not sufficiently plead their claims.  The Court of Claims granted partial summary

disposition to defendants on claims not relevant to the issues presented in this Court.  The

Court of Claims denied defendants' motions for summary disposition with respect to

---

[1] The name of the MDEQ was changed to the Michigan Department of Environment, Great Lakes, and Energy (EGLE) after the filing of this lawsuit.  See Executive Order No. 2019-06.  For consistency's sake, in this case we refer to the Department as the MDEQ.  We note that the Department of Human Services and the Department of Community Health were combined to form DHHS during the pendency of this case.  See Executive Order No. 2015-04.

[2] An emergency manager is an official appointed by the governor "to address a financial emergency" within a local government.  MCL 141.1549(1).  Under our state's law, emergency managers effectively replace locally elected government officials and have broad powers to address financial emergencies:

> Upon appointment, an emergency manager shall act for and in the place and stead of the governing body and the office of chief administrative officer of the local government.  The emergency manager shall have broad powers in receivership to rectify the financial emergency and to assure the fiscal accountability of the local government and the local government's capacity to provide or cause to be provided necessary governmental services essential to the public health, safety, and welfare.  Following appointment of an emergency manager and during the pendency of receivership, the governing body and the chief administrative officer of the local government shall not exercise any of the powers of those offices except as may be specifically authorized in writing by the emergency manager or as otherwise provided by this act and are subject to any conditions required by the emergency manager.  [MCL 141.1549(2).]

3

plaintiffs' claim for violation of their right to bodily integrity under the Due Process Clause of the 1963 Michigan Constitution, art 1, § 17, and plaintiffs' claim of inverse condemnation. The state defendants appealed, and cross-appeals followed. The Court of Appeals affirmed the Court of Claims. Both sets of defendants filed applications for leave to appeal in this Court. We granted leave to appeal, and after hearing oral argument on defendants' applications, a majority of this Court expressly affirms the Court of Appeals' conclusion regarding plaintiffs' inverse-condemnation claim. The Court of Appeals opinion is otherwise affirmed by equal division. See MCR 7.315(A).

## I. FACTS

The trial court record is limited because defendants brought their motions for summary disposition before discovery could be conducted. The facts of the case are disputed. However, because this is an appeal from an opinion that mainly concerns motions for summary disposition under MCR 2.116(C)(7) and (8), we accept the contents of the complaint as true unless contradicted by documentation submitted by the movant[3] and we construe the factual allegations in a light most favorable to plaintiffs.[4] See *Maiden v Rozwood*, 461 Mich 109, 119-120; 597 NW2d 817 (1999). The Court of Claims summarized plaintiffs' pleadings as follows:

> From 1964 through late April 2014, the Detroit Water and [Sewerage] Department ("DWSD") supplied Flint water users with their water, which

---

[3] We conclude that defendants have not produced sufficient evidence at this stage of litigation to contradict plaintiffs' allegations.

[4] Later in this opinion, we review defendants' motions for summary disposition on plaintiffs' procedural compliance with statutory notice requirements under MCR 2.116(C)(4) and (7).

was drawn from Lake Huron. Flint joined Genesee, Sanilac, and Lapeer Counties and the City of Lapeer, in 2009, to form the Karegondi Water Authority ("KWA") to explore the development of a water delivery system that would draw water from Lake Huron and serve as an alternative to the Detroit water delivery system. On March 28, 2013, the State Treasurer recommended to [former Governor Snyder] that he authorize the KWA to proceed with its plans to construct the alternative water supply system. The State Treasurer made this decision even though an independent engineering firm commissioned by the State Treasurer had concluded that it would be more cost efficient if Flint continued to receive its water from the DWSD. Thereafter, on April 16, 2013, the Governor authorized then-Flint Emergency Manager Edward Kurtz to contract with the KWA for the purpose of switching the source of Flint's water from the DWSD to the KWA beginning in mid-year 2016.

At the time Emergency Manager Kurtz contractually bound Flint to the KWA project, the Governor and various state officials knew that the Flint River would serve as an interim source of drinking water for the residents of Flint. Indeed, the State Treasurer, the emergency manager and others developed an interim plan to use Flint River water before the KWA project became operational. They did so despite knowledge of a 2011 study commissioned by Flint officials that cautioned against the use of Flint River water as a source of drinking water and despite the absence of any independent state scientific assessment of the suitability of using water drawn from the Flint River as drinking water.

On April 25, 2014, under the direction of then Flint Emergency Manager Earley and the [MDEQ,] Flint switched its water source from the DWSD to the Flint River and Flint water users began receiving Flint River water from their taps. This switch was made even though Michael Glasgow, the City of Flint's water treatment plant's laboratory and water quality supervisor, warned that Flint's water treatment plant was not fit to begin operations. The 2011 study commissioned by city officials had noted that Flint's long dormant water treatment plant would require facility upgrades costing millions of dollars.

Less than a month later, state officials began to receive complaints from Flint water users about the quality of the water coming out of their taps. Flint residents began complaining in June of 2014 that they were becoming ill after drinking the tap water. On October 13, 2014, General Motors announced that it was discontinuing the use of Flint water in its Flint plant due to concerns about the corrosive nature of the water. That same month, Flint officials expressed concern about a Legionellosis outbreak and possible

5

links between the outbreak and Flint's switch to the river water. On February 26, 2015, the United States Environmental Protection Agency ("EPA") advised the MDEQ that the Flint water supply was contaminated with iron at levels so high that the testing instruments could not measure the exact level. That same month, the MDEQ was also advised of the opinion of Miguel Del Toral of the EPA that black sediment found in some of the tap water was lead.

During this time, state officials failed to take any significant remedial measures to address the growing public health threat posed by the contaminated water. Instead, state officials continued to downplay the health risk and advise Flint water users that it was safe to drink the tap water while at the same time arranging for state employees in Flint to drink water from water coolers installed in state buildings. Additionally, the MDEQ advised the EPA that Flint was using a corrosion control additive with knowledge that the statement was false.

By early March 2015, state officials knew they faced a public health emergency involving lead poisoning and the presence of the deadly Legionella bacteria, but actively concealed the health threats posed by the tap water, took no measures to effectively address the dangers, and publicly advised Flint water users that the water was safe and that there was no widespread problem with lead leaching into the water supply despite knowledge that these latter two statements were false.

Through the summer and into the fall of 2015, state officials continued to cover up the health emergency, discredit reports from Del Toral of the EPA and Professor Marc Edwards of Virginia Tech confirming serious lead contamination in the Flint water system, conceal critical information confirming the presence of lead in the water system, and advise the public that the drinking water was safe despite knowledge to the contrary. In the fall of 2015, various state officials attempted to discredit the findings of Dr. Mona [Hanna]-Attisha of Hurley Hospital, which reflected a "spike in the percentage of Flint children with elevated blood lead levels from blood drawn in the second and third quarter of 2014."

In early October of 2015, however, the Governor acknowledged that the Flint water supply was contaminated with dangerous levels of lead. He ordered Flint to reconnect to the Detroit water system on October 8, 2015, with the reconnection taking place on October 16, 2015. This suit followed. [*Mays v Governor*, unpublished opinion of the Court of Claims, issued October 26, 2016 (Docket No. 16-000017-MM), pp 3-6 (citation omitted).]

Plaintiffs brought suit against defendants in the Court of Claims, alleging, in part, a claim for inverse condemnation and seeking economic damages both for the physical harm done to their property as well as the diminution of their property's value. Plaintiffs alleged that despite both sets of defendants knowing that the Flint River water was toxic and corrosive, the state defendants authorized the city defendants to service their property with the Flint River water. As a result, plaintiffs alleged that their pipes, service lines, and water heaters were damaged. Plaintiffs also alleged that after the water crisis had become public knowledge, their property's value substantially declined.

Plaintiffs additionally brought a claim for violation of their right to bodily integrity under the Michigan Constitution's Due Process Clause, Const 1963, art 1, § 17. Plaintiffs alleged that despite knowing the dangers associated with switching the city of Flint's water source to the Flint River, defendants made the switch with indifference to the known serious medical risks and then misled and deceived the public while concealing information about the toxicity and corrosiveness of the water. Plaintiffs alleged that they sustained personal injury from using and ingesting the Flint water as a result of defendants' actions. Specifically, plaintiffs alleged that as a result of ingesting the tainted water, they have suffered physical symptoms, such as neuropathy, sleepiness, gastrointestinal discomfort, dermatological disorders, hair loss, and other symptoms, as well as substantial economic losses from their medical expenses and lost wages. Plaintiffs also alleged that some Flint citizens suffered life-threatening and irreversible bodily injuries.

The state defendants and the city defendants brought separate motions for summary disposition under MCR 2.116(C)(4), (7), and (8). Both sets of defendants argued that plaintiffs failed to satisfy the statutory notice requirements in MCL 600.6431 of the Court

7

of Claims Act (COCA), MCL 600.6401 *et seq*.; that plaintiffs failed to allege facts to establish a constitutional claim under the Michigan Constitution's Due Process Clause for violation of their right to bodily integrity; that a judicially inferred damages remedy for such a claim is inappropriate; and that plaintiffs otherwise failed to allege sufficient facts to establish the legal elements of their claims.

In an opinion and order, the Court of Claims granted partial summary disposition to defendants and in other respects denied defendants' motions for summary disposition. The Court of Claims determined that plaintiffs satisfied the statutory notice requirements and adequately pleaded claims of inverse condemnation and a violation of their right to bodily integrity. The state defendants appealed, and the city defendants and plaintiffs filed cross-appeals.

In a published opinion, the Court of Appeals affirmed the Court of Claims' rulings on the statutory notice requirements, plaintiffs' claim of violation of their right to bodily integrity, and plaintiffs' claims of inverse condemnation. *Mays v Governor*, 323 Mich App 1; 916 NW2d 227 (2018). Both the state defendants and the city defendants then filed applications for leave to appeal in this Court. We granted leave to appeal and heard oral argument on defendants' applications. *Mays v Governor*, 503 Mich 1030 (2019).

## II. ANALYSIS

### A. INVERSE CONDEMNATION[5]

#### 1. STANDARD OF REVIEW

Defendants moved for summary disposition of plaintiffs' inverse-condemnation claim under MCR 2.116(C)(8). This Court reviews a motion for summary disposition under MCR 2.116(C)(8) for the legal sufficiency of a claim. *El-Khalil v Oakwood Healthcare, Inc*, 504 Mich 152, 159; 934 NW2d 665 (2019). We accept all factual allegations in the complaint as true, deciding the motion on the pleadings alone. *Id*. at 160. "A motion under MCR 2.116(C)(8) may only be granted when a claim is so clearly unenforceable that no factual development could possibly justify recovery." *Id*.

#### 2. LEGAL BACKGROUND

The Fifth Amendment of the United States Constitution and Article 10, § 2 of Michigan's 1963 Constitution prohibit the taking of private property without just compensation. US Const, Am V; Const 1963, art 10, § 2. A claim of inverse condemnation is "a cause of action against a governmental defendant to recover the value of property which has been taken . . . even though no formal exercise of the power of eminent domain has been attempted by the taking agency." *Merkur Steel Supply, Inc v Detroit*, 261 Mich App 116, 129; 680 NW2d 485 (2004) (quotation marks and citation omitted). "Inverse condemnation can occur without a physical taking of the property; a diminution in the value of the property or a partial destruction can constitute a 'taking.' " *Id*. at 125.

---

[5] We address plaintiffs' claim of inverse condemnation first because it is the sole claim in which a majority exists to expressly affirm the Court of Appeals.

9

"[A] plaintiff alleging inverse condemnation must prove a causal connection between the government's action and the alleged damages." *Hinojosa v Dep't of Natural Resources*, 263 Mich App 537, 548; 688 NW2d 550 (2004). Government actions directed at a plaintiff's property must have "the effect of limiting the use of the property." *Charles Murphy, MD, PC v Detroit*, 201 Mich App 54, 56; 506 NW2d 5 (1993). "[A]ll of the [defendants'] actions in the aggregate, as opposed to just one incident, must be analyzed to determine the extent of the taking." *Merkur Steel Supply, Inc*, 261 Mich App at 125. A plaintiff "must establish (1) that the government's actions were a substantial cause of the decline of the property's value and (2) that the government abused its powers in affirmative actions directly aimed at the property." *Blue Harvest, Inc v Dep't of Transp*, 288 Mich App 267, 277; 792 NW2d 798 (2010). In *Spiek v Dep't of Transp*, 456 Mich 331, 348; 572 NW2d 201 (1998), this Court opined:

> The right to just compensation, in the context of an inverse condemnation suit for diminution in value . . . exists only where the landowner can allege a unique or special injury, that is, an injury that is different in kind, not simply in degree, from the harm suffered by all persons similarly situated.

### 3. PLAINTIFFS ADEQUATELY ALLEGED A CLAIM OF INVERSE CONDEMNATION

With respect to the first element of an inverse-condemnation claim, plaintiffs allege that switching the water source from the DWSD to the Flint River resulted in physical damage to pipes, service lines, and water heaters. Plaintiffs also allege that the contaminated water limited the use of their property and substantially impaired its value and marketability because after the water crisis became public knowledge, lenders were hesitant to authorize loans for the purchase of realty within Flint and property values

10

"plummeted." Taking these factual allegations as true, as we are required to do, we conclude that plaintiffs sufficiently alleged that defendants' actions were a substantial cause of the decline of their property's value. See MCR 2.116(C)(8); *El-Khalil*, 504 Mich at 160.

With respect to the second element of an inverse-condemnation claim, defendants argue that plaintiffs have failed to allege that they abused their powers and took affirmative actions directed at plaintiffs' property. Again, we disagree. Plaintiffs allege that defendants committed an affirmative act directed at their property when the state defendants authorized the city defendants to use the Flint River as an interim water source while both sets of defendants knew that using the river could result in harm to property. Defendants then allegedly concealed or misrepresented data and made false statements about the safety of the river water in an attempt to downplay the risk of its use and consumption. The state defendants argue that if there were an affirmative act that was directed at the plaintiffs' property, it was the city defendants who effectuated the act, not the state defendants. While discovery may bear evidence that supports this conclusion, at this stage of proceedings, we must accept all of plaintiffs' allegations as true. See MCR 2.116(C)(8); *El-Khalil*, 504 Mich at 160. If true, plaintiffs' allegations are sufficient to conclude that the state defendants abused their powers and took affirmative actions directly aimed at plaintiffs' property.

Finally, defendants argue that plaintiffs have not alleged a unique or special injury different in kind from the harm suffered by those similarly situated. In their analysis, defendants attempt to define those similarly situated to plaintiffs as other Flint water users. Defendants then contend that plaintiffs' injury is no different in kind from the harm

11

suffered by those individuals and, thus, plaintiffs' inverse-condemnation claim fails.  The Court of Appeals rejected defendants' arguments, determining that plaintiffs are similarly situated to municipal water users generally and that they suffered a unique or special injury when compared to those similarly situated.  We agree that defendants' analysis is flawed.

Fundamentally, we disagree with defendants as to how to define those who are similarly situated to plaintiffs.  In *Richards v Washington Terminal Co*, 233 US 546, 554; 34 S Ct 654; 58 L Ed 1088 (1914), the United States Supreme Court held that residents whose homes were located near a railroad tunnel could not state a claim of inverse condemnation for cracks in their homes caused by vibrations from adjacent trains, because anyone living near a railroad risked similar harm.  However, the Court concluded that the plaintiffs could state a claim of inverse condemnation for damage caused by a fanning system within the tunnel that blew pollutants into their homes, because that harm was unique to the plaintiffs given how the plaintiffs' property was particularly situated in relation to the rail tunnel.  *Id*. at 556.  In other words, when compared with anyone living near train tracks, the harms allegedly caused by the train tunnel's fanning system were unique to the plaintiffs.  *Id*.

Similarly, in *Thom v State Highway Comm'r*, 376 Mich 608, 628; 138 NW2d 322 (1965), this Court concluded that compensation must be awarded to a farmer whose property was "destroy[ed] or . . . interfere[d] [with] seriously" by a change in the grade of an improved road passing by his land.  In reaching this conclusion, the Court determined that the farmer's injury was different from the injuries of other property owners whose property was adjacent to improved roads that were constructed in a customary fashion.  *Id*. at 622-623, 628.  See also *Hill v State Hwy Comm*, 382 Mich 398, 404; 170 NW2d 18

12

(1969) (holding that property owners whose right of ingress and egress of their neighborhood was closed in two directions because of highway construction could not bring a claim of inverse condemnation because they could not show that their injuries were different from "members of the traveling public or property owners whose use of these streets ha[d] been restricted by the construction of the . . . expressway"); *Spiek*, 456 Mich at 332-333 (holding that owners of residential property who sought compensation for damages to their property from the noise, dust, vibrations, and fumes produced by vehicles traveling on adjacent roadways could not bring a claim for inverse condemnation because the harm to their property was no different than the harm "incurred by all property owners who reside adjacent to freeways or other busy highways").

When taken together, in determining whether the plaintiffs suffered a unique or special injury, the United States Supreme Court and this Court have compared the plaintiffs to a generalized group of individuals who experience a similar but not identical harm. In parsing this inquiry, the United States Supreme Court and this Court have analyzed whether the harm the plaintiff suffers is part of the "common burden" shared among all, which, if not imposed, would halt a socially necessary activity, or whether the harm "naturally and unavoidably result[s]" in a taking unique to that plaintiff. *Richards*, 233 US at 554.

In *Richards*, the United States Supreme Court explained that railroads are a public necessity, much like highways, so proprietors are immune to suit for "incidental damages accruing to owners of nonadjacent land through the proper and skillful management and operation of the railways." *Id*. When diminution of value to private property is not "peculiar[]" but is merely "sharing in the common burden of incidental damages arising from the legalized nuisance," there is no "taking" in the constitutional sense. *Id*. Damages

13

that are part of the "common burden" are "such damages as naturally and unavoidably result from the proper conduct of the road and are shared generally by property owners whose lands lie within range of the inconveniences necessarily incident to proximity to a railroad." *Id*. Absent such a distinction, the "practical result would be to bring the operation of railroads to a standstill." *Id*. at 555. The doctrine, "being founded upon necessity, is limited accordingly." *Id*.

In *Richards*, the United States Supreme Court compared the plaintiffs to all property owners who lived next to the railway, not those whose property was also in close proximity to the rail tunnel's fan system. *Id*. at 556. Although members of the public share a "common burden" for the benefit of railroads that includes noise and vibration, the direct fanning of train pollution into a home was deemed to be a unique and uncommon burden that rendered the harm a compensable taking. *Id*. at 554, 556.

This Court has ruled similarly. In *Thom* and *Hill*, this Court reasoned that no taking occurs when a property owner's use of streets is limited in the same way as the rest of the traveling public but that a taking does occur when a property owner's individual access to an abutting highway is completely foreclosed. *Thom*, 376 Mich at 622-623, 628; *Hill*, 382 Mich at 403-404. The former is a common burden, while the latter is not. In *Spiek*, this Court compared the plaintiffs to others whose property abutted highways, not to property owners who lived adjacent to the exact expressway at issue in that case. *Spiek*, 456 Mich at 332-333. The plaintiffs' allegations involving noise, dust, vibrations, and fumes were common burdens shared by all members of the public in return for receiving the social benefit of public roadways. Rather than comparing plaintiffs to other Flint water users, we agree with the Court of Appeals that plaintiffs are similarly situated to municipal water

14

users generally. We therefore compare plaintiffs to a generalized group of similar individuals—other municipal water users—and consider what "common burden" the public bears from the provision of water.[6]

We recognize that users of public water systems may routinely experience gaps in service and externalities associated with system construction and maintenance. These types of frustrations are common burdens shared by members of society for the provision of water. However, in their amended complaint, plaintiffs allege that the state defendants authorized the city defendants to use the Flint River as an interim water source despite both sets of defendants knowing the potential harm of doing so. Plaintiffs contend that after the switch to the Flint River was effectuated, water contaminated with Legionella bacteria and toxic levels of iron and lead flowed through their pipes, service lines, and water heaters, which damaged the infrastructure and diminished their property's value. These alleged injuries are clearly different in kind, not just degree, from harms that municipal water users experience generally, e.g., service disruptions and externalities associated with construction. Moreover, plaintiffs' allegations do not "naturally and unavoidably result" from the provision of public water. *Richards*, 233 US at 554.

In sum, we conclude that plaintiffs have sufficiently alleged a claim of inverse condemnation to survive a motion for summary disposition brought under MCR 2.116(C)(8). Viewed in the light most favorable to plaintiffs and accepting their factual allegations as true, we hold that the pleadings establish that defendants' actions were a

---

[6] In the context of this unique case, the analysis is somewhat ill-fitting because we do not normally consider delivery of water to the public as a "legalized nuisance." See *Richards*, 233 US at 554.

15

substantial cause of the decline in plaintiffs' property value, that defendants took affirmative actions directed at plaintiffs' property, and that plaintiffs suffered a unique or special injury different in kind, not simply in degree, from the harm suffered by all persons similarly situated.

## B. STATUTORY NOTICE REQUIREMENTS

The Court of Appeals also concluded that a genuine issue of material fact existed regarding whether plaintiffs satisfied the statutory notice requirements of MCL 600.6431.[7] We agree. On this issue, the Court of Appeals is affirmed by equal division.

### 1. STANDARD OF REVIEW

Defendants argue that the Court of Claims erred when it denied their motions for summary disposition under MCR 2.116(C)(4) and (7) because plaintiffs failed to satisfy the statutory notice requirements of MCL 600.6431. We disagree.

A motion for summary disposition under MCR 2.116(C)(4) tests the trial court's subject-matter jurisdiction. We review a trial court's decision on a motion for summary disposition under MCR 2.116(C)(4) de novo. *Travelers Ins Co v Detroit Edison Co*, 465 Mich 185, 205; 631 NW2d 733 (2001). "[W]hether MCL 600.6431 requires dismissal of a plaintiff's claim for failure to provide the designated notice raises questions of statutory interpretation," which we also review de novo. *McCahan v Brennan*, 492 Mich 730, 736; 822 NW2d 747 (2012).

---

[7] This provision was amended after plaintiffs filed their suit. See 2020 PA 42 (effective March 3, 2020). We analyze the version of the statute in effect when plaintiffs filed their lawsuit in 2016.

16

A motion for summary disposition brought under MCR 2.116(C)(7) may be granted when a claim is barred by immunity. *Maiden*, 461 Mich at 118. "When reviewing a motion under MCR 2.116(C)(7), this Court must accept all well-pleaded factual allegations as true and construe them in favor of the plaintiff, unless other evidence contradicts them." *Dextrom v Wexford Co*, 287 Mich App 406, 428; 729 NW2d 211 (2010).

## 2. LEGAL BACKGROUND

State and municipal agencies performing governmental functions are generally immune from tort liability. *McCahan*, 492 Mich at 736. However, the government may voluntarily subject itself to liability, which also means that it may place conditions or limitations on the liability imposed. *Id*. For example, the Legislature may impose procedural requirements on a plaintiff's available remedies, such as a statutory limitations period or notice obligation. *Rusha v Dep't of Corrections*, 307 Mich App 300, 307; 859 NW2d 735 (2014).

One condition on the right to sue state governmental agencies is the notice provision of the COCA. The pertinent provisions of the COCA, MCL 600.6431(1) and (3), provide:

> (1) No claim may be maintained against the state unless the claimant, *within 1 year after such claim has accrued*, files in the office of the clerk of the court of claims either a written claim or a written notice of intention to file a claim against the state or any of its departments, commissions, boards, institutions, arms or agencies, stating the time when and the place where such claim arose and in detail the nature of the same and of the items of damage alleged or claimed to have been sustained, which claim or notice shall be signed and verified by the claimant before an officer authorized to administer oaths.
>
> * * *
>
> (3) In all actions for property damage or personal injuries, claimant shall file with the clerk of the court of claims a notice of intention to file a

claim or the claim itself *within 6 months following the happening of the event giving rise to the cause of action*. [Emphasis added.]

For purposes of statutory limitations periods, our Legislature has stated that a claim accrues "at the time the wrong upon which the claim is based was done," MCL 600.5827, and this Court has clarified that "the wrong . . . is the date on which the defendant's breach harmed the plaintiff, as opposed to the date on which defendant breached his duty," *Frank v Linkner*, 500 Mich 133, 147; 894 NW2d 574 (2017) (quotation marks and citation omitted). A claim does not accrue until each element of the cause of action, including some form of damages, exists. See *Henry v Dow Chem Co*, 319 Mich App 704, 720; 905 NW2d 422 (2017), rev'd in part on other grounds 501 Mich 965 (2018). Thus, determining the time when plaintiffs' claims accrued requires us to determine when plaintiffs were first harmed. See *id*.

### 3. QUESTIONS OF FACT REMAIN AS TO WHEN PLAINTIFFS SUSTAINED THEIR INJURIES

As noted by the Court of Appeals, plaintiffs filed their complaint on January 21, 2016, without having filed a separate notice of intention to file a claim. In their complaint, plaintiffs assert that their constitutional-tort claim accrued on October 16, 2015,[8] when defendants reconnected the Flint water system to the water supplied by DWSD. Defendants argue that plaintiffs' claims accrued, and the statutory notice period thus began to run, in either June 2013, when plaintiffs allege that the state authorized the use of the

_____

[8] While plaintiffs' amended complaint states that their claim "accrued on October 16, **2016**, when Defendants re-connected the Flint water system to water supplied by the [DWSD]," elsewhere in their complaint plaintiffs acknowledge that defendants actually reconnected Flint to the DWSD on October 16, **2015**. (Emphasis added.) In reviewing the complaint as a whole, we conclude that plaintiffs' mention of that event occurring in 2016 was made in error.

Flint River water, or on April 25, 2014, when Flint's water source was actually switched to the Flint River. On this basis, defendants suggest that regardless of which date is chosen, plaintiffs' complaint was not filed within the six-month statutory notice period required by MCL 600.6431(3). We disagree.

In *Henry v Dow Chem Co*, this Court held that the relevant statutory limitations period began running "from 'the time the claim accrues,' " which is when " 'the wrong upon which the claim is based was done regardless of the time when damage results.' " *Henry v Dow Chem Co*, 501 Mich 965, 965 (2018), quoting MCL 600.5827 and citing *Trentadue v Buckler Automatic Lawn Sprinkler Co*, 479 Mich 378, 387; 738 NW2d 664 (2007). This Court concluded that because the claimed harm was the presence of dioxin in the soil of the plaintiffs' properties, the accrual date was tied to the occurrence of this wrong. *Henry*, 501 Mich at 965.

Justice MARKMAN's dissent argues that our holding in *Henry* means that the accrual date here should be April 25, 2014, when plaintiffs were first exposed to water from the Flint River. However, we note that *Henry* was decided by order and contained no in-depth analysis; instead, the order relied heavily on language from *Trentadue*. *Henry* cites *Trentadue* for the proposition that "[t]he wrong is done when the plaintiff is harmed," *Henry*, 501 Mich at 965, citing *Trentadue*, 479 Mich at 388, and *Trentadue* itself further explains that " '[t]he wrong is done when the plaintiff is harmed *rather than when the defendant acted*,' " *Trentadue*, 479 Mich at 388, quoting *Boyle v Gen Motors Corp*, 468 Mich 226, 231 n 5; 661 NW2d 557 (2003) (emphasis added).

To the extent that *Henry* can be read to support the proposition that the accrual date began at the point when dioxin reached the plaintiffs' properties, the order in *Henry* noted

that "the claimed harm to the plaintiffs in this case is the presence of dioxin in the soil of their properties." *Henry*, 501 Mich at 965. In the instant case, plaintiffs do not allege that their claimed harms resulted *at the time* Flint's water source was switched. As explained by the Court of Appeals, plaintiffs allege various affirmative actions taken by defendants that resulted in distinct harms to plaintiffs. The economic damage plaintiffs allege from the diminution of their properties' value could not have occurred on the date the water source was switched. Plaintiffs' property diminished in value at a later date, yet to be determined, when a buyer or bank had the requisite information to be disinclined to buy or finance the purchase of property in Flint. At this stage of litigation, it is not yet clear when plaintiffs suffered actionable personal injury as a result of their use and consumption of the contaminated water; in other words, it remains uncertain whether the personal injuries alleged would have occurred after just one sip of Flint River water. Plaintiffs have also alleged injuries that might include plaintiffs who suffered in vitro exposure to toxic water.[9] It would simply be illogical to foreclose a plaintiff's suit if the plaintiff had been exposed to the Flint water in the womb and thus suffered harm but had not yet been born as of April 2014. Therefore, questions of fact remain as to when plaintiffs suffered injury to person

---

[9] Justice MARKMAN asserts that plaintiffs do not allege injuries from in vitro exposure to Flint water. We disagree. While plaintiffs do not mention in vitro exposure explicitly, they make allegations regarding personal injury from exposure to and ingestion of Flint water on behalf of themselves and *other* Flint water users. In our view, it is reasonable to assume that plaintiffs exist in this putative class who were exposed to Flint water in the womb, suffered injury, and were born after April 2014.

and property and as to when each plaintiff's claims accrued relative to the filing of the complaint.[10]  At this juncture, summary disposition is therefore premature.

Because we agree that whether plaintiffs' complaint was timely filed and when their specific claims accrued are questions to be resolved in further proceedings, we conclude

---

[10] Plaintiffs' amended complaint alleges *numerous* harms resulting from *separate* tortious acts.  These allegations are different from a continuing harm resulting from a *single* tortious act.  For purposes of determining the accrual date of plaintiffs' claims, each of plaintiffs' individual causes of action must be considered separately.  See *Joliet v Pitoniak*, 475 Mich 30, 42; 715 NW2d 60 (2006).

Moreover, we disagree with Justice MARKMAN's characterization of *Hart v Detroit*, 416 Mich 488; 331 NW2d 438 (1982), as no longer good law.  Justice MARKMAN notes that plaintiffs rely on *Hart* to argue that their inverse-condemnation claim was timely filed.  In *Hart*, this Court recognized that with regard to an inverse-condemnation claim in which plaintiffs allege that their property was taken via a continuous wrong, the statute of limitations does not begin to run "until the consequences of the condemnor's actions have stabilized." *Id*. at 504.  Justice MARKMAN argues that "*Hart* is no longer good law because this Court in *Garg v Macomb Co Community Mental Health Servs*, 472 Mich 263; 696 NW2d 646 (2005) [(analyzing a discrimination claim)], later abolished the 'continuing violations' doctrine because it was inconsistent with the language of the statute of limitations."  In our view, Justice MARKMAN misapplies the continuing-violations doctrine to plaintiffs' claim of inverse condemnation.  The continuing-violations doctrine is often applied by the federal courts in the context of Title VII, civil-rights actions, and other discrimination claims.  See, e.g., *Hunt v Bennett*, 17 F3d 1263, 1266 (CA 10, 1994); *Lockridge v Univ of Maine Sys*, 597 F3d 464, 474 (CA 1, 2010); *Kovacevich v Kent State Univ*, 224 F3d 806, 829 (CA 6, 2000).  In contrast, the stabilization doctrine was developed in the context of inverse-condemnation claims.  See, e.g., *United States v Dickinson*, 331 US 745, 749; 67 S Ct 1382; 91 L Ed 1789 (1947); *Hart*, 416 Mich at 504; *Etchegoinberry v United States*, 114 Fed Cl 437, 475 (2013); *Banks v United States*, 741 F3d 1268, 1281 (CA Fed, 2014).  We have found no instance in which our Court has applied the continuing-violations doctrine to a claim of inverse condemnation.  We also note that this Court's decision in *Garg* never mentioned *Hart*, nor did it abolish the stabilization doctrine.  We believe that *Hart* remains good law because this Court has never overruled it.

that it is unnecessary to address whether any exceptions to the MCL 600.6431(3) notice requirement apply.[11]

## C. INJURY TO BODILY INTEGRITY

Defendants argue that the Court of Appeals erred by determining that plaintiffs sufficiently pleaded a claim for violation of their substantive due-process right to bodily integrity under Const 1963, art 1, § 17. Defendants also argue that the Court of Appeals erred by recognizing the availability of a damages remedy for plaintiffs' claim. We again disagree. Instead, we believe that the Court of Appeals properly held that plaintiffs pleaded a cognizable claim for violation of their right to bodily integrity under the Due Process Clause of Michigan's Constitution. Given that this case is still in the very early stages of the proceedings, we decline to hold at this point that monetary damages are unavailable for this claim. On this issue, the Court of Appeals is again affirmed by equal division.

### 1. STANDARD OF REVIEW

Defendants moved for summary disposition of plaintiffs' violation-of-bodily-integrity claim under MCR 2.116(C)(7) and (8). Summary disposition is appropriate under MCR 2.116(C)(7) when a claim is barred by immunity. *Maiden*, 461 Mich at 118. When reviewing a motion under MCR 2.116(C)(7), we must accept all well-pleaded factual allegations as true and construe them in favor of plaintiffs, unless other evidence

---

[11] Plaintiffs argue that the harsh-and-unreasonable-consequences doctrine and the fraudulent-concealment doctrine also support their claims that satisfactory notice was filed. Because we believe that there still remain questions of fact about when plaintiffs' harms accrued, we see no need to look to these doctrines at this point in the proceedings. Once discovery is completed, the applicability of these doctrines may be reconsidered as necessary.

22

contradicts them. *Dextrom*, 287 Mich App at 428. We review a motion for summary disposition under MCR 2.116(C)(8) for the legal sufficiency of a claim, accepting all factual allegations in the complaint as true and deciding the motion on the pleadings alone. *El-Khalil*, 504 Mich at 159-160.

## 2. LEGAL BACKGROUND

The Legislature has never created an exception to immunity for a constitutional tort. Nonetheless, this Court has recognized that when a plaintiff brings a "constitutional tort" against the state, in certain instances, the government is not immune from liability for violations of its Constitution. *Smith v Dep't of Pub Health*, 428 Mich 540, 544; 410 NW2d 749 (1987), aff'd sub nom *Will v Mich Dep't of State Police*, 491 US 58 (1989). Plaintiffs contend that their claims arise under these circumstances.

*Smith* was a divided memorandum opinion, but two of the pertinent tenets that a majority of four were able to agree on were the following:

> 5) Where it is alleged that the state, by virtue of custom or policy, has violated a right conferred by the Michigan Constitution, governmental immunity is not available in a state court action.
>
> 6) A claim for damages against the state arising from violation by the state of the Michigan Constitution may be recognized in appropriate cases. [*Smith*, 428 Mich at 544.]

The *Smith* opinion was silent as to why a majority of the Court had agreed on these tenets. A later Court of Appeals panel noted that this lack of analysis was due to the justices' differing views, given that "the Court was only able to agree on the bare proposition that '[a] claim for damages against the state arising from violation by the state of the Michigan

23

Constitution may be recognized in appropriate cases.' " *77th Dist Judge v Michigan*, 175 Mich App 681, 693; 438 NW2d 333 (1989) (citation omitted).

After *Smith*, courts have cited Justice BOYLE's separate opinion in *Smith* to explain the reasoning behind the majority's holding that constitutional torts may be recognized in certain circumstances. See, e.g., *Jones v Powell*, 462 Mich 329, 336-337; 612 NW2d 423 (2000); *Reid*, 239 Mich App at 628. While Justice BOYLE's reasoning is not binding, it is, in our view, persuasive. Justice BOYLE postulated that because the state's Constitution is preeminent, immunity does not bar recovery for violations of the state Constitution perpetrated by custom or policy. *Smith*, 428 Mich at 641 (BOYLE, J., concurring in part and dissenting in part). Justice BOYLE wrote:

> Assuming the plaintiff proves an unconstitutional act by the state which is otherwise appropriate for a damage remedy, the question which confronts this Court is whether sovereign or governmental immunity shields the state from liability for damages for its alleged acts which violate our state constitution. We would hold that neither common-law sovereign immunity nor the governmental immunity found in MCL 691.1407; MSA 3.996(107) bars recovery.
>
> In our constitutional form of government, the sovereign power is in the people, and "[a] Constitution is made for the people and by the people." *Michigan Farm Bureau v Secretary of State*, 379 Mich 387, 391; 151 NW2d 797 (1967) (quoting Cooley, Constitutional Limitations [6th ed], p 81). The Michigan Constitution is a limitation on the plenary power of government, and its provisions are paramount. See, generally, *Dearborn Twp v Dearborn Twp Clerk*, 334 Mich 673, 688; 55 NW2d 201 (1952). It is so basic as to require no citation that the constitution is the fundamental law to which all other laws must conform. . . .
>
> In light of the preeminence of the constitution, statutes which conflict with it must fall. . . .
>
> MCL 691.1407; MSA 3.996(107) does not, by its terms, declare immunity for unconstitutional acts by the state. The idea that our Legislature would indirectly seek to "approve" acts by the state which violate the state

24

constitution by cloaking such behavior with statutory immunity is too far-fetched to infer from the language of MCL 691.1407; MSA 3.996(107). We would not ascribe such a result to our Legislature.

Neither does common-law sovereign immunity immunize the state from liability for its alleged unconstitutional acts. This Court abrogated common-law sovereign immunity in *Pittman v City of Taylor*, 398 Mich 41; 247 NW2d 512 (1976). Even absent such general abrogation, however, we would decline to apply sovereign immunity to violations by the state of our state constitution. The curious doctrine of sovereign immunity in America, subject to great criticism over the years, see, generally, Jaffe, *Suits against governments and officers: Sovereign immunity*, 77 Harv L R 1 (1963), should, as a matter of public policy, lose its vitality when faced with unconstitutional acts of the state. The primacy of the state constitution would perforce eclipse the vitality of a claim of common-law sovereign immunity in a state court action for damages.

. . . For "constitutional torts," liability should only be imposed on the state in cases where a state "custom or policy" mandated the official or the employee's actions. . . .

The state's liability should be limited to those cases in which the state's liability would, but for the Eleventh Amendment, render it liable under the 42 USC 1983 standard for local governments articulated in *Monell v New York City Dep't of Social Services*, 436 US 658; 98 S Ct 2018; 56 L Ed 2d 611 (1978).[12] Liability should be imposed on the state only where the action of a state agent "implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers . . . [or] governmental 'custom' even though such a custom has not received formal approval through the body's official decisionmaking channels." *Id*., pp 690-691. [*Smith*, 428 Mich at 640-643 (BOYLE, J., concurring in part and dissenting in part).]

## 3. HISTORICAL RECOGNITION OF CONSTITUTIONAL TORTS

Defendants contend that historically, courts have not recognized actions against the state when no waiver of immunity has occurred. Although defendants' general assertion

---

[12] The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." US Const, Am XI.

might be true, our precedent with regard to constitutional torts is more nuanced. Michigan courts have indeed recognized the existence of constitutional torts as outlined in *Smith* and, in certain circumstances, have allowed constitutional-tort claims to survive motions for summary disposition.

The Court of Appeals has repeatedly relied on *Smith* to recognize that immunity is not available in a state-court action in which it is alleged that the state has violated a right conferred by the Michigan Constitution. See *Burdette v Michigan*, 166 Mich App 406, 408-409; 421 NW2d 185 (1988) (recognizing that constitutional torts are viable but holding that the plaintiff had not brought a viable constitutional-tort claim against the state); *Marlin v Detroit*, 177 Mich App 108, 114; 441 NW2d 45 (1989) (remanding the case to the trial court "for a determination of whether plaintiff has pled a violation of the Michigan Constitution by virtue of governmental custom or policy"), lv den 448 Mich 900 (1995); *Pawlak v Redox Corp*, 182 Mich App 758, 764; 453 NW2d 304 (1990) (recognizing constitutional claims against the state described in *Smith* as law); *Johnson v Wayne Co*, 213 Mich App 143, 150; 540 NW2d 66 (1995) (recognizing that *Smith* stood for the proposition that a claim for damages against the state for a violation of the Michigan Constitution may be recognized in appropriate cases but holding that the plaintiff did not adequately allege which constitutional provision the government had violated), lv den 554 NW2d 903 (1996); *Carlton v Dep't of Corrections*, 215 Mich App 490, 504, 510; 546 NW2d 671 (1996) (recognizing claims against the state for violations of the Michigan Constitution but concluding that the plaintiff's claim failed), lv den 453 Mich 969 (1996); *Reid*, 239 Mich App at 628 (recognizing the viability of constitutional-tort claims under *Smith*); *Co Rd Ass'n of Mich v Governor*, 287 Mich App 95, 121; 782 NW2d 784 (2010)

26

(noting instances in which constitutional-tort theories were applied), lv den 488 Mich 877 (2010), recon den 488 Mich 1019 (2010); *LM v Michigan*, 307 Mich App 685, 694-695; 862 NW2d 246 (2014) (recognizing that constitutional torts exist but declining to apply the doctrine); *Rusha*, 307 Mich App at 305 (recognizing that this Court has held that a claim against the state for violations of the Michigan Constitution exists under certain circumstances).

In *Jones*, 462 Mich at 336-337, this Court declined to apply a constitutional-tort theory to claims made against a municipality but nevertheless recognized that the theory provided a remedy, albeit a "narrow remedy" against the state. In *Lewis v Michigan*, 464 Mich 781, 786; 629 NW2d 868 (2001), this Court again recognized the *Smith* majority's holding as to the viability of certain constitutional-tort claims.

## 4. PLAINTIFFS SUFFICIENTLY ALLEGE A CONSTITUTIONAL TORT FOR VIOLATION OF THEIR BODILY INTEGRITY

We also recognize that when a plaintiff alleges a constitutional tort like the one alleged in this case, recovery is available for constitutional violations pursuant to a state custom or policy and may survive the state's claims of immunity. *Smith*, 428 Mich at 544.

The Court of Appeals provided an extensive history of the development of the right to bodily integrity:

> Violation of the right to bodily integrity involves "an egregious, nonconsensual entry into the body which was an exercise of power without any legitimate governmental objective." *Rogers v Little Rock, Arkansas*, 152 F3d 790, 797 (CA 8, 1998), citing *Sacramento Co v Lewis*, 523 US 833, 847 n 8; 118 S Ct 1708; 140 L Ed 2d 1043 (1998). . . . [T]o survive dismissal, the alleged "violation of the right to bodily integrity must be so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *Villanueva v City of Scottsbluff*, 779 F3d 507, 513 (CA 8, 2015) (quotation marks and citation omitted); see also *Mettler Walloon, LLC v Melrose Twp*,

27

281 Mich App 184, 198; 761 NW2d 293 (2008) (explaining that in the context of individual governmental actions or actors, to establish a substantive due-process violation, "the governmental conduct must be so arbitrary and capricious as to shock the conscience").

> "Conduct that is merely negligent does not shock the conscience, but 'conduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level.'" *Votta v Castellani*, 600 F Appx 16, 18 (CA 2, 2015), quoting *Sacramento Co*, 523 US at 849. At a minimum, proof of deliberate indifference is required. *McClendon v City of Columbia*, 305 F3d 314, 326 (CA 5, 2002). A state actor's failure to alleviate "a significant risk that he should have perceived but did not" does not rise to the level of deliberate indifference. *Farmer v Brennan*, 511 US 825, 838; 114 S Ct 1970; 128 L Ed 2d 811 (1994). To act with deliberate indifference, a state actor must " 'know[] of and disregard[] an excessive risk to [the complainant's] health or safety.'" *Ewolski v City of Brunswick*, 287 F3d 492, 513 (CA 6, 2002), quoting *Farmer*, 511 US at 837. "The case law . . . recognizes official conduct may be more egregious in circumstances allowing for deliberation . . . than in circumstances calling for quick decisions . . . ." *Williams v Berney*, 519 F3d 1216, 1220-1221 (CA 10, 2008). [*Mays*, 323 Mich App at 60-61.]

With this framing of the elements of plaintiffs' claim in mind, we affirm the Court of Appeals and conclude that plaintiffs have alleged facts that, if proved, support a claim for a constitutional violation by defendants.

Plaintiffs allege that defendants' decision to switch the city of Flint's water source to the Flint River, which defendants knew was contaminated, resulted in a nonconsensual entry of toxic water into plaintiffs' bodies. Plaintiffs contend that defendants neglected to upgrade Flint's water-treatment system before switching to the Flint River despite knowing and being warned that the system was inadequate. After receiving information that suggested the Flint River was contaminated with bacteria, toxic levels of lead, and other contaminants, defendants allegedly concealed scientific data and made misleading statements about the safety of the Flint River water.

28

There is obviously no legitimate governmental objective in poisoning citizens. Plaintiffs' allegations, if true, are so egregious and outrageous that they shock the contemporary conscience and support a finding of defendants' deliberate indifference to plaintiffs' health and safety. See *Villanueva*, 779 F3d at 513; *Mettler Walloon, LLC*, 281 Mich App at 198; *McClendon*, 305 F3d at 326. Plaintiffs' allegations make out more than a negligent decision to switch water sources. They allege that "Defendants had time for deliberation in their decisions to expose Flint residents to toxic water, and their decision to do so was made with deliberate indifference to the known serious medical risks." Their allegations paint a picture of a public health crisis of the government's own making, intentionally concealed by state actors despite their knowledge that Flint residents were being harmed so long as the untreated water continued to flow through their pipes. We find it difficult to characterize the actions that defendants allegedly took as anything short of shocking to the conscience. "When such extended opportunities to do better are teamed with protracted failure even to care, indifference is truly shocking." *Sacramento Co v Lewis*, 523 US 833, 853; 118 S Ct 1708; 140 L Ed 2d 1043 (1998).

Plaintiffs have also alleged that a state "custom or policy" mandated the actions that led to the violation of their substantive due-process right to bodily integrity. *Smith*, 428 Mich at 544. The state and its officials will only be held liable for violation of the state Constitution " 'in cases where a state "custom or policy" mandated the official or employee's actions.' " *Carlton*, 215 Mich App at 505, quoting *Smith*, 428 Mich at 642 (BOYLE, J., concurring in part and dissenting in part). As the Court of Appeals noted:

> Official governmental policy includes "the decisions of a government's lawmakers" and "the acts of its policymaking officials." *Johnson v VanderKooi*, 319 Mich App 589, 622; 903 NW2d 843 (2017) (quotation

29

marks and citation omitted). See also *Monell*, 436 US at 694 (stating that a governmental agency's custom or policy may be "made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy"). A "single decision" by a policymaker or governing body "unquestionably constitutes an act of official government policy," regardless of whether "that body had taken similar action in the past or intended to do so in the future[.]" *Pembaur v Cincinnati*, 475 US 469, 480; 106 S Ct 1292; 89 L Ed 2d 452 (1986). . . . The [United States Supreme] Court clarified that not all decisions subject governmental officers to liability. *Id*. at 481. Rather, it is "where—and only where—a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." *Id*. at 483. [*Mays*, 323 Mich App at 63-64.]

Plaintiffs allege that the city of Flint's choice to provide Flint residents with the Flint River water was approved and implemented by the state defendants, arguing that both sets of defendants were decision-makers in the adoption of a plan that, once effectuated, resulted in violations of their substantive due-process rights. Defendants then purportedly made decisions to conceal the consequences of the water-source switch and misled the public about the safety of the Flint River water. Plaintiffs allege that defendants' aforementioned actions exposed them to unnecessary harm for months after the switch was made. Plaintiffs' allegations, if proved, support a conclusion that defendants considered an array of options and made a deliberate choice to effectuate the Flint River switch despite knowing the potential harms of doing so.

Having reviewed plaintiffs' allegations in their totality, we conclude that plaintiffs pleaded a recognizable due-process claim under Michigan's Constitution for a violation of their right to bodily integrity.

## 5. DAMAGES REMEDY

Because we have determined that plaintiffs' allegations, if proved, are sufficient to sustain a constitutional tort against defendants, we must next determine whether it is appropriate to recognize a damages remedy for the constitutional violation. Not every constitutional violation merits damages. However, at this point in the litigation, we are not prepared to foreclose the possibility of monetary damages.[13]

This Court has never explicitly endorsed a test for assessing a damages inquiry for a constitutional violation. However, we agree with the Court of Claims and the Court of Appeals that the multifactor test elaborated in Justice BOYLE's separate opinion in *Smith* provides a framework for assessing the damages inquiry. Under that test, we weigh various factors, including (1) the existence and clarity of the constitutional violation itself; (2) the degree of specificity of the constitutional protection; (3) support for the propriety of a judicially inferred damages remedy in any text, history, and previous interpretations of the specific provision; (4) the availability of another remedy; and (5) various other factors militating for or against a judicially inferred damages remedy. See *Smith*, 428 Mich at 648-652 (BOYLE, J., concurring in part and dissenting in part). At this stage of the proceedings, we accept plaintiffs' allegations as true and review them in a light most favorable to plaintiffs.

---

[13] We conclude that Justice VIVIANO's arguments to the contrary are premature. Plaintiffs should be permitted to develop their factual allegations through discovery before it is determined whether monetary damages are available.

31

As to the first factor, we have already determined that plaintiffs set forth allegations to establish a clear violation of the Michigan Constitution. We therefore conclude that the first factor weighs in favor of a judicially inferred damages remedy.

As to the second and third factors, in *Smith*, Justice BOYLE recognized that the protections of the Due Process Clause are not as "clear-cut" as specific protections found elsewhere in the Constitution. *Id*. at 651. Indeed, we have not found a decision of a Michigan appellate court expressly recognizing a protection under the Due Process Clause of the Michigan Constitution or an independent constitutional tort for violation of the right to bodily integrity. We therefore conclude that the second and third factors weigh somewhat against recognition of a damages remedy.

As to the fourth factor, the availability of an alternative remedy, we must determine whether plaintiffs have any available alternative remedies for their constitutional-tort claim against these specific defendants. Defendants argue that this fourth factor is dispositive and that the availability of any other remedy forecloses the possibility of a judicially inferred damages remedy in this case. Citing *Jones*, 462 Mich at 337, defendants highlight that "*Smith* only recognized a narrow remedy against the state on the basis of the unavailability of any other remedy." Like the Court of Appeals and the Court of Claims, we conclude that defendants err in their reading of *Jones*. The *Jones* Court's use of the word "only" referred to a sentence that followed, distinguishing claims against the state and specifically limiting the Court's holding to cases involving a municipality or an individual defendant. *Id*. We decline to hold that the availability of an alternative remedy

32

acts as an absolute bar to a judicially inferred damages remedy. The existence of alternative remedies is given considerable weight, *Smith*, 428 Mich at 647, but it is not dispositive.[14]

We conclude that because defendants enjoy expansive immunity under federal and state law, plaintiffs have no alternative recourse to vindicate their rights beyond bringing a constitutional-tort claim under Michigan's Constitution. Any suit brought in federal court for monetary damages under 42 USC 1983 for violation of rights granted under the federal Constitution or a federal statute cannot be maintained in any court against a state, a state agency, or a state official sued in his or her official capacity because the Eleventh Amendment affords the state and its agencies immunity from such liability. See *Howlett v Rose*, 496 US 356, 365; 110 S Ct 2430; 110 L Ed 2d 332 (1990).

Generally, under state law, state-government employees acting within the scope of their authority are immune from tort liability unless their actions constitute gross negligence, MCL 691.1407(2), and even if governmental employees are found liable for gross negligence, the state may not be held vicariously liable unless an exception to governmental immunity applies under the governmental tort liability act, MCL 691.1401 *et seq.* State agencies are also "immune from tort liability if the governmental agency is engaged in the exercise or discharge of a governmental function." MCL 691.1407(1).

---

[14] We note that plaintiffs seek injunctive relief against several of the named defendants in a related federal-court action. Plaintiffs seek an order to remediate the harm caused by defendants' conduct, including repairs to property and the establishment of a medical-monitoring fund. Plaintiffs seek an award of compensatory and punitive damages. Although plaintiffs may seek alternative remedies in federal court, that fact does not affect our decision regarding the *availability* of alternative remedies. The availability of these remedies remains to be seen. If those remedies materialize, they, of course, may affect any future consideration of appropriate remedies in this action.

Moreover, the Local Financial Stability and Choice Act, MCL 141.1541 *et seq.*, grants emergency managers immunity from liability as provided in MCL 691.1407. MCL 141.1560(1).

Defendants suggest that plaintiffs' injuries can be vindicated under the federal Safe Drinking Water Act (SDWA), 42 USC 300f *et seq.*, and the Michigan Safe Drinking Water Act (MSDWA), MCL 325.1001 *et seq.* We disagree. The SDWA and MSDWA do not provide a right to address constitutional violations. As the United States Court of Appeals for the Sixth Circuit recognized in a federal case arising from the Flint water crisis, the protections of the SDWA and the federal Constitution "are 'not . . . wholly congruent' " and would not foreclose constitutional claims arising under the federal Constitution. See *Boler v Earley*, 865 F3d 391, 408-409 (CA 6, 2017) (citation omitted). We conclude that the same is true for the MSDWA. Neither the SDWA nor the MSDWA addresses the alleged conduct at issue in this case, which includes knowingly and deliberately distributing contaminated water as well as fraudulent concealment of the hazardous consequences of consuming and using the Flint River water. The SDWA and MSDWA largely address the regulation of water quality by municipalities. These statutes do not provide an alternative remedy for plaintiffs' claim of injury to bodily integrity. We therefore conclude that the fourth factor is neutral regarding the propriety of an inferred damages remedy.

Finally, as to the fifth factor, which directs us to assess all other relevant considerations, we agree with the Court of Appeals that it is appropriate to give substantial weight to the shocking and outrageous nature of defendants' alleged conduct. Plaintiffs present allegations involving one of the most troublesome breaches of public trust in this

state's history, with catastrophic consequences for Flint citizens' health, well-being, and property. If plaintiffs' allegations are proved true, we agree that the nature of defendants' alleged constitutional violations weighs markedly in favor of recognizing a damages remedy.

In considering each of these five factors, recognizing that discovery has yet to take place and accepting plaintiffs' allegations as true, we believe that a damages remedy for plaintiffs' claim of violation of their right to bodily integrity under Const 1963, art 1, § 17 might be the appropriate remedy for plaintiffs' harms.

## III. CONCLUSION

We expressly affirm the Court of Appeals with regard to plaintiffs' inverse-condemnation claim. In all other aspects, the Court of Appeals opinion is affirmed by equal division. MCR 7.315(A). We remand to the Court of Claims for further proceedings consistent with this opinion.

Richard H. Bernstein
Bridget M. McCormack
Megan K. Cavanagh

STATE OF MICHIGAN

SUPREME COURT

MELISSA MAYS, MICHAEL ADAM
MAYS, JACQUELINE PEMBERTON,
KEITH JOHN PEMBERTON, ELNORA
CARTHAN, RHONDA KELSO, and ALL
OTHERS SIMILARLY SITUATED,

        Plaintiffs-Appellees,

v                                                    Nos. 157335-7

GOVERNOR OF MICHIGAN, STATE OF
MICHIGAN, DEPARTMENT OF
ENVIRONMENTAL QUALITY, and
DEPARTMENT OF HEALTH AND
HUMAN SERVICES,

        Defendants-Appellants,

and

DARNELL EARLEY and JERRY
AMBROSE,

        Defendants-Appellees.

_____

MELISSA MAYS, MICHAEL ADAM
MAYS, JACQUELINE PEMBERTON,
KEITH JOHN PEMBERTON, ELNORA
CARTHAN, RHONDA KELSO, and ALL
OTHERS SIMILARLY SITUATED,

        Plaintiffs-Appellees,

v                                                    Nos. 157340-2

GOVERNOR OF MICHIGAN, STATE OF
MICHIGAN, DEPARTMENT OF
ENVIRONMENTAL QUALITY, and
DEPARTMENT OF HEALTH AND
HUMAN SERVICES,

                Defendants-Appellees,

and

DARNELL EARLEY and JERRY
AMBROSE,

                Defendants-Appellants.

_____

BERNSTEIN, J. (*concurring*).

This Court should never elevate adherence to convoluted legalism and procedure over the well-being of Michigan's people. Plaintiffs in this case raise some of the most disturbing allegations of malfeasance by government actors in Michigan's history.

Before highlighting the facts of this case, it is hard not to acknowledge the unique natural resources Michigan possesses. The state of Michigan holds the largest freshwater reserves of any state in our nation. Yet, plaintiffs allege that in an effort to save a relatively small amount of money in the context of sizable municipal budgets, the state of Michigan and former Governor Snyder's administration disregarded the known dangers of switching Flint's municipal water source, used without incident for nearly 60 years, to the Flint River. At the time of plaintiffs' alleged injuries, the city of Flint was under the financial management of the state, purportedly for the city's own benefit. Plaintiffs contend that the state defendants authorized state-appointed emergency managers to provide them with water that was contaminated with toxic levels of lead, E. coli, and Legionella bacteria. Before the switch, defendants purportedly knew that the Flint River was contaminated and

2

that water from the Flint River was dangerous to consume and use. Without taking the proper steps to ensure that Flint's drinking water was safe, defendants nevertheless initiated the water-source switch to the Flint River. Defendants then allegedly misled the public and obfuscated the extent of the water crisis to quell its potential fallout. After the water switch was initiated, plaintiffs contend that they suffered significant personal injury and economic loss from damage to their property. They allege that their properties' values diminished after the full extent of the water crisis became public. This lawsuit followed.

After nearly six years of litigation, this Court is tasked with answering one simple question: do plaintiffs possess the right to sue the government and its actors in their official capacities for their injuries? I believe the answer to that question is obvious. It is particularly important to note that this Court's decision will affect not only the named plaintiffs in this case but thousands of other citizens who experienced similar injuries and losses from the use and ingestion of contaminated Flint River water. The putative class surely includes seniors with preexisting health conditions, pregnant individuals, and, of course, young children who will likely experience the most significant and life-altering effects of lead poisoning.

Even when presented with this context, two of my dissenting colleagues would dismiss plaintiffs' claims because of purported procedural defects in their pleadings. By way of highly legalistic analyses, they would deny plaintiffs the opportunity to conduct any discovery, proceed with their case, and prove their claims. I write this separate opinion, in part, to counter Justice MARKMAN's arguments about plaintiffs' purported failure to adhere to the Court of Claims Act's (COCA) statutory notice requirements. As the lead opinion explains, I believe that questions of fact remain as to when plaintiffs' claims

3

accrued. Dismissing plaintiffs' claims at this juncture, in my view, would therefore be premature. However, regardless of which dates the harms plaintiffs allege are later determined to have occurred and accrued, I believe that two exceptions to the COCA's statutory notice requirement might still apply.

I write also to briefly counter Justice VIVIANO's argument that this Court should deny plaintiffs the right to sue for their personal injuries and deny a damages remedy because the Legislature has not explicitly created a right to bodily integrity with such a remedy. It is well known that this Court is the sole institution that may interpret and define the parameters of Michigan's Constitution. That being the case, I am completely unfazed that the Legislature has not explicitly created a statutory right to bodily integrity. In my opinion, plaintiffs may proceed with their claim because the Michigan Constitution's Due Process Clause, Const 1963, art 1, § 17, encompasses the right to bodily integrity.

## I. ANALYSIS

### A. STATUTORY NOTICE REQUIREMENTS

Plaintiffs allege that defendants attempted to conceal the water crisis from the public and misled them for months before acknowledging the toxic and corrosive nature of the water from the Flint River. Defendants argue that plaintiffs' claims should be dismissed because plaintiffs failed to file the claims in a timely manner. The irony of defendants' argument, given that defendants are accused of concealing the existence of plaintiffs' potential claims, is not lost on me.

4

## 1. THE HARSH-AND-UNREASONABLE-CONSEQUENCES EXCEPTION

Justice MARKMAN argues that the Court of Appeals erred in applying the harsh-and-unreasonable-consequences exception, see *Rusha v Dep't of Corrections*, 307 Mich App 300, 312; 859 NW2d 735 (2014), and by applying it to this case. I disagree. In my view, if plaintiffs' allegations are proved, the harsh-and-unreasonable-consequences exception releases them from the notice requirements of MCL 600.6431.

In *Rusha*, the plaintiff alleged constitutional claims against the state for failing to treat his multiple sclerosis during his incarceration, but he failed to file a notice of intent to file a claim within six months of the alleged injury pursuant to MCL 600.6431. *Rusha*, 307 Mich App at 301. The Court of Appeals noted that "Michigan courts routinely enforce statutes of limitations where constitutional claims are at issue." *Id*. at 311. However, the Court of Appeals also held that there exists an exception to such enforcement when strict enforcement of a limitations period would be so harsh and unreasonable in its consequences that it "effectively divest[s]" a plaintiff "of the access to the courts intended by the grant of [a] substantive right." *Id*. (quotation marks and citation omitted). More specifically, the Court of Appeals then extended this exception to also relieve a plaintiff of statutory notice requirements, like the one found in MCL 600.6431(3). Defendants argue that the *Rusha* Court's recognition of this exception conflicts with this Court's holdings in *Rowland v Washtenaw Co Rd Comm*, 477 Mich 197, 200; 731 NW2d 41 (2007), *Trentadue v Buckler Automatic Lawn Sprinkler Co*, 479 Mich 378, 386-387; 738 NW2d 664 (2007), and *McCahan v Brennan*, 492 Mich 730, 733; 822 NW2d 747 (2012).

5

But I would not find such conflict to exist and would instead find our past precedent to be distinguishable. *Rowland*,[1] *Trentadue*,[2] and *McCahan*[3] each demanded strict compliance with statutory limitations and notice requirements in the context of legislatively granted rights rather than rights granted under the Constitution. However, this Court has never held that constitutional claims against the state—and due-process claims in particular—should be treated like the personal-injury claims raised in *Rowland* and *McCahan*. Indeed, a separate concurrence in *Bauserman v Unemployment Ins Agency*, 503 Mich 169, 194; 931 NW2d 539 (2019) (MCCORMACK, C.J., concurring), questioned whether the strict-notice rules from *Rowland* and *McCahan* should apply to constitutional claims against the state. The concurrence noted:

> [W]e have not held that the same [rules from *Rowland* and *McCahan* are] true of constitutional claims generally, or due-process claims in particular. And I'm not sure we should: *Rowland*'s governmental-immunity rationale is less persuasive in the constitutional context. The *Rowland* and *McCahan* plaintiffs' substantive claims (for personal injuries resulting from a defective highway condition in *Rowland*, and for automobile tort liability in *McCahan*) existed only by legislative grace—there is no constitutional guarantee of safe

---

[1] In *Rowland*, a personal-injury case against a municipality in which the plaintiff fell and was injured while crossing a street, this Court ruled that a suit may be dismissed for failure to comply with a statutory notice requirement even if the defendant was not prejudiced by the lack of notice. The Court explained, "[I]nasmuch as the Legislature is not even required to provide a defective highway exception to governmental immunity, it surely has the authority to allow such suits only upon compliance with rational notice limits." *Rowland*, 477 Mich at 212.

[2] *Trentadue*, 479 Mich at 386-387 (considering the statute of limitations for a wrongful-death action).

[3] In *McCahan*, 492 Mich at 732-733, the Court determined that the notice requirement of MCL 600.6431 is a "condition precedent to sue the state," *McCahan v Brennan*, 291 Mich App 430, 433; 804 NW2d 906 (2011), aff'd 492 Mich 730 (2012), and that a claimant's failure to strictly comply warrants dismissal of the claim, *McCahan*, 492 Mich at 746-747.

6

roads or payment of personal injury benefits. The state enjoys broad immunity from suit unless it waives its immunity by creating a statutory right of action; the Legislature may place whatever conditions it wishes on rights of its own creation, including a notice requirement. And courts shouldn't undermine those legislatively created conditions.

But it is the Constitution that forbids the government from depriving a person of his property without due process of law. The Legislature is not the source of the due-process right (more often its target), so the fundamental principle that animated our decisions in *Rowland* and *McCahan* isn't implicated here. Whether and how much the Legislature can limit a person's ability to pursue a due-process claim is a first-principles question: A strict-compliance interpretation of the MCL 600.6431(3) notice requirement applied to a due-process claim will permit the Legislature to burden or curtail constitutional rights. How much of a burden is too much?

To be sure, the due-process right, like any other constitutional right, is not absolute. "A constitutional claim can become time-barred just as any other claim can. Nothing in the Constitution requires otherwise." *Block v North Dakota*, 461 US 273, 292; 103 S Ct 1811; 75 L Ed 2d 840 (1983) (citations omitted). Constitutional remedies may be "subject to a reasonable time bar designed to protect other important societal values." *Hair v United States*, 350 F3d 1253, 1260 (CA Fed, 2003). The Legislature may, at its discretion, restrict or change "the forms of action or modes of remedy . . . provided adequate means of enforcing the right remain. In all such cases, the question is one of reasonableness, and we have, therefore, only to consider whether the time allowed in this statute is, under all the circumstances, reasonable." *Terry v Anderson*, 95 US 628, 633; 24 L Ed 365 (1877).

But that's the question: is the six-month, no-exceptions notice provision reasonable when the government has taken a person's property without due process? . . . Hypotheticals show why it's a hard question: If the Legislature enacted a statute that required me to notice my intent to challenge a local ordinance that limits gun ownership to one weapon per household within 24 hours of having my weapon confiscated, we would surely be troubled by that barrier to my ability to vindicate my Second Amendment rights. And likewise if I wait 50 years to complain that denial of a park permit for my annual church picnic violated the First Amendment, we would think it unfair for the government to be on the hook when there is likely no information available or witnesses around to contest the complaint. I don't know where this six-month notice period for a claim that the state has

7

taken my tax refund without due process falls on that continuum. [*Bauserman*, 503 Mich at 195-197.]

In this case, even if it is later determined that plaintiffs failed to timely file a notice of intention to file a claim under MCL 600.6431(3), I agree with the Court of Appeals that, consistent with *Rusha*, the application of this procedural requirement to bar plaintiffs' claims would not be reasonable under the circumstances. See *Terry*, 95 US at 633. As the Court of Appeals noted:

> [T]his is not a case in which an ostensible, single event or accident has given rise to a cause of action, but one in which the event giving rise to the cause of action was not readily apparent at the time of its happening. Similarly, a significant portion of the injuries alleged to persons and property likely became manifest so gradually as to have been well established before becoming apparent to plaintiffs because the evidence of injury was concealed in the water supply infrastructure buried beneath Flint and in the bloodstreams of those drinking the water supplied via that infrastructure. Plaintiffs in this case did not wait more than two years after discovering their claims to file suit. Rather, they filed suit within six months of the state's public acknowledgment and disclosure of the toxic nature of the Flint River water to which plaintiffs were exposed.
>
> Further supporting the application of the harsh-and-unreasonable-consequences exception to the requirement of statutory notice are plaintiffs' allegations of affirmative acts undertaken by numerous state actors, including named defendants, between April 25, 2014 and October 2015 to conceal both the fact that the Flint River water was contaminated and hazardous and the occurrence of any event that would trigger the running of the six-month notice period. Under these unique circumstances, to file statutory notice within six months of the date of the water source switch would have required far more than ordinary knowledge and diligence on the part of plaintiffs and their counsel. It would have required knowledge that defendants themselves claim not to have possessed at the time plaintiffs' causes of action accrued. [*Mays v Governor*, 323 Mich App 1, 35-36; 916 NW2d 227 (2018) (quotation marks and citations omitted).]

To foreclose plaintiffs' claims at this stage of the litigation would effectively divest plaintiffs of the opportunity to vindicate their constitutional rights. Plaintiffs should be

afforded the opportunity to conduct discovery and support their allegations before their claims are dismissed. If their claims are proved but untimely, plaintiffs should be able to utilize the harsh-and-unreasonable-consequences exception.

## 2. THE FRAUDULENT-CONCEALMENT EXCEPTION

Justice MARKMAN and defendants argue that the Court of Appeals erred in reading the fraudulent-concealment exception of MCL 600.5855 to relieve plaintiffs from the notice requirements of MCL 600.6431. I disagree and would affirm the Court of Appeals' ruling that the fraudulent-concealment exception of MCL 600.5855 applies to MCL 600.6431. If plaintiffs prove the allegations in their complaint, the exception may provide an alternative basis to deny defendants' motions for summary disposition.

The Legislature created the fraudulent-concealment exception to relieve certain plaintiffs of statutes of limitations. The exception is codified in the Revised Judicature Act (RJA), MCL 600.101 *et seq*., specifically MCL 600.5855, which states:

> If a person who is or may be liable for any claim fraudulently conceals the existence of the claim or the identity of any person who is liable for the claim from the knowledge of the person entitled to sue on the claim, the action may be commenced at any time within 2 years after the person who is entitled to bring the action discovers, or should have discovered, the existence of the claim or the identity of the person who is liable for the claim, although the action would otherwise be barred by the period of limitations.

MCL 600.5855 allows for the tolling of a statutory limitations period for two years if a defendant has fraudulently concealed the existence of a claim for which that defendant is liable.[4] A "plaintiff must plead in the complaint the acts or misrepresentations that comprised the fraudulent concealment" and "prove that the defendant committed

---

[4] I note that the RJA has no statutory notice requirement. See MCL 600.101 *et seq*.

affirmative acts or misrepresentations that were designed to prevent subsequent discovery." *Sills v Oakland Gen Hosp*, 220 Mich App 303, 310; 559 NW2d 348 (1996).

In crafting the COCA, the Legislature imported the RJA's fraudulent-concealment exception, MCL 600.5855, into the COCA's statute-of-*limitations* provision. See MCL 600.6452(2). MCL 600.6452(2) thus permits the commencement of an action within two years after a claimant discovers or should have discovered a fraudulently concealed claim. Yet, the statutory notice period of MCL 600.6431 prohibits the commencement of an action unless notice is filed within six months following the event giving rise to the cause of action or one year of the date on which the claim accrued. The Legislature did not create a fraudulent-concealment exception for the statutory *notice* provision in the COCA. See MCL 600.6431.

I conclude that the omission of a fraudulent-concealment exception to MCL 600.6431 is not reconcilable with the Legislature's intent to provide claimants with two years from the date of discovery to bring suit for harm that was fraudulently concealed, as expressed in MCL 600.6452(2). The filing of a notice of intent to sue often occurs before the actual filing of a complaint. If the fraudulent-concealment exception is not applied to the statutory notice period in MCL 600.6431 and a claim is fraudulently concealed from a plaintiff for more than six months, a plaintiff's otherwise justiciable claim would always be dismissed on notice grounds. The plaintiff would never have an ability to utilize the Legislature's fraudulent-concealment exception in MCL 600.6452(2) to toll the statutory notice period. "[S]tatutory provisions are *not* to be read in isolation; rather, context matters, and thus statutory provisions are to be read as a whole." *Robinson v Lansing*, 486 Mich 1, 15; 782 NW2d 171 (2010). "A statute is rendered nugatory when an interpretation fails to

10

give it meaning or effect." *Apsey v Mem Hosp*, 477 Mich 120, 131; 730 NW2d 695 (2007). Adopting defendants' arguments as they relate to fraudulent concealment would result in reading out MCL 600.6452(2) entirely, because plaintiffs would never be able to utilize the fraudulent-concealment exception. I agree with the Court of Appeals and reject the contentions of both Justice MARKMAN and defendants.

The application of the fraudulent-concealment exception to statutory notice periods does not undermine or frustrate the purpose of requiring timely statutory notice. As this Court has previously recognized, the purpose of the notice provision in MCL 600.6431 is to "establish[] a clear procedure" for pursuing a claim against the state and "eliminate[] any ambiguity" about whether a claim will be filed. *McCahan*, 492 Mich at 744 n 24. But when defendants, who allegedly have knowledge of an event giving rise to liability, actively conceal information to prevent litigation, the state suffers no ambiguity or shock when those harmed sue. In those cases, I would hold that the fraudulent-concealment exception indeed applies to toll the statutory notice period.

As the lead opinion states, whether plaintiffs can satisfy the exception is a factual question that necessitates further discovery. At this stage of the litigation, summary disposition on this ground would be inappropriate. If plaintiffs' claims are proved but untimely, plaintiffs should be able to utilize a fraudulent-concealment exception to the COCA's notice requirements.

B. A RIGHT TO BODILY INTEGRITY EXISTS IN MICHIGAN'S CONSTITUTION

Justice VIVIANO writes at length that a right to bodily integrity does not exist and that our Legislature has not enumerated and created a damages remedy for such a right in

11

Michigan law. But his analysis misses a fundamental point: this Court is the only institution that determines what our state's Constitution means, and it does so independently of the Legislature's action or inaction in a given area. It is this Court alone that may interpret our Constitution to encompass a right to bodily integrity. I believe that if our state's Constitution is to hold any tangible meaning, surely *this* is the case in which a remedy for such a constitutional violation must be recognized. I would hold that the Due Process Clause of Michigan's Constitution includes a right to bodily integrity.

Michigan's Due Process Clause states, "No person shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty or property, without due process of law." Const 1963, art 1, § 17. When the Court construes our Constitution, it is "a fundamental principle of constitutional construction that we determine the intent of the framers of the Constitution and of the people adopting it," *Holland v Heavlin*, 299 Mich 465, 470; 300 NW 777 (1941), and we do this principally by examining its language, *Bond v Pub Sch of Ann Arbor Sch Dist*, 383 Mich 693, 699-700; 178 NW2d 484 (1970). "In interpreting our Constitution, we are not bound by the United States Supreme Court's interpretation of the United States Constitution, even where the language is identical." *People v Goldston*, 470 Mich 523, 534; 682 NW2d 479 (2004). Instead, "[this Court] must determine what law ' "the people have made." ' " *Id*. (citation omitted). "We are obligated to interpret our own organic instrument of government." *Sitz v Dep't of State Police*, 443 Mich 744, 763; 506 NW2d 209 (1993). Accordingly, this Court must independently examine the text of Michigan's Due Process Clause as well as this Court's precedents pertaining to this provision to ascertain whether a right to bodily integrity exists.

12

As I recognize in the lead opinion, this Court has not previously recognized a right to bodily integrity. Thus, my focus lies on the language of the Due Process Clause itself. "The primary objective in interpreting a constitutional provision is to determine the text's original meaning to the ratifiers, the people, at the time of ratification [in 1963]." *Wayne Co v Hathcock*, 471 Mich 445, 468; 684 NW2d 765 (2004). "In applying this principle of construction, the people are understood to have accepted the words employed in a constitutional provision in the sense most obvious to the common understanding and to have 'ratified the instrument in the belief that that was the sense designed to be conveyed.'" *People v Nutt*, 469 Mich 565, 573-574; 677 NW2d 1 (2004) (citation omitted).

The United States Supreme Court has recognized for over a century that "[n]o right is held more sacred, or is more carefully guarded by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law." *Union Pac R Co v Botsford*, 141 US 250, 251; 11 S Ct 1000; 35 L Ed 734 (1891). Plaintiffs allege a substantive due-process claim based on defendants' conduct that caused their severe bodily injuries and impaired their liberty. Plaintiffs frame these allegations as a violation of their constitutional right to bodily integrity. Although this Court has not opined on the right before, I believe that it is one of the most fundamental rights ensured by Michigan's Constitution. The right is implicit in our Due Process Clause and would have been obvious to those who ratified our Constitution. I conclude that common notions of liberty in this state are so inextricably entwined with physical freedom and freedom from state incursions into the body that Michigan's Due Process Clause plainly encompasses a right to bodily

13

integrity. See *Cruzan v Dir, Missouri Dep't of Health*, 497 US 261, 287; 110 S Ct 2841; 111 L Ed 2d 224 (1990) (O'CONNOR, J., concurring) ("Because our notions of liberty are inextricably entwined with our idea of physical freedom and self-determination, the Court has often deemed state incursions into the body repugnant to the interests protected by the Due Process Clause."). In my view, given the extensive history and strong prominence of the right to bodily autonomy in our society, the Constitution's ratifiers would agree.

## II. CONCLUSION

Plaintiffs have waited for years for this Court to make a final determination as to whether they even have a right to sue for their injuries. For the reasons expressed in this concurrence and the lead opinion, I resoundingly answer "yes."

Plaintiffs allege that defendants failed to acknowledge their own mistakes and then compounded those mistakes by failing to provide basic solutions for the harms they caused. To add insult to injury, in the context of these legal proceedings, defendants have acted as a roadblock to any equitable resolution. Defendants have fought plaintiffs *every* step of the way by attempting to foreclose their lawsuit through procedural grounds. Yet the people of Flint have endured, and they now ask for an opportunity to be heard. The judiciary should be the *one* governmental institution that hears their grievances and affords them the opportunity to at least proceed with their case.

The world continues to turn, and new crises are ever present, but Flint remains much the same as it was shortly after the water crisis began. Many of those who were injured remain irreparably harmed—properties remain damaged, property values remain depressed, and some Flint residents continue to distrust the safety of the water coming from

14

their taps. After a litany of indignities suffered at the hands of their government, the citizens of Flint should not have to wait any longer for the opportunity to prove their allegations.

Richard H. Bernstein

STATE OF MICHIGAN

SUPREME COURT

MELISSA MAYS, MICHAEL ADAM
MAYS, JACQUELINE PEMBERTON,
KEITH JOHN PEMBERTON, ELNORA
CARTHAN, RHONDA KELSO, and ALL
OTHERS SIMILARLY SITUATED,

        Plaintiffs-Appellees,

v                                             Nos. 157335-7

GOVERNOR OF MICHIGAN, STATE OF
MICHIGAN, DEPARTMENT OF
ENVIRONMENTAL QUALITY, and
DEPARTMENT OF HEALTH AND
HUMAN SERVICES,

        Defendants-Appellants,

and

DARNELL EARLEY and JERRY
AMBROSE,

        Defendants-Appellees.
_____

MELISSA MAYS, MICHAEL ADAM
MAYS, JACQUELINE PEMBERTON,
KEITH JOHN PEMBERTON, ELNORA
CARTHAN, RHONDA KELSO, and ALL
OTHERS SIMILARLY SITUATED,

        Plaintiffs-Appellees,

v                                             Nos. 157340-2

GOVERNOR OF MICHIGAN, STATE OF
MICHIGAN, DEPARTMENT OF
ENVIRONMENTAL QUALITY, and
DEPARTMENT OF HEALTH AND
HUMAN SERVICES,

        Defendants-Appellees,

and

DARNELL EARLEY and JERRY
AMBROSE,

        Defendants-Appellants.

_____

MCCORMACK, C.J. (*concurring*).

I concur fully with the lead opinion and agree that the plaintiffs have adequately

pled a conscience-shocking violation of their fundamental right to bodily integrity.[1] I write

---

[1] I respectfully disagree with Justice VIVIANO's framing of the right in question as the right "not to be exposed to contaminated water." Plaintiffs' substantive due-process claim is based on the alleged violation of their constitutional right to bodily integrity. This well-established right is among the most fundamental. "Because our notions of liberty are inextricably entwined with our idea of physical freedom and self-determination, the Court has often deemed state incursions into the body repugnant to the interests protected by the Due Process Clause." *Cruzan v Dir, Missouri Dep't of Health*, 497 US 261, 287; 110 S Ct 2841; 111 L Ed 2d 224 (1990) (O'Connor, J., concurring). See also *Union Pac R Co v Botsford*, 141 US 250, 251; 11 S Ct 1000; 35 L Ed 734 (1891) ("No right is held more sacred, or is more carefully guarded by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law."); *Schmerber v California*, 384 US 757, 772; 86 S Ct 1826; 16 L Ed 2d 908 (1966) ("The integrity of an individual's person is a cherished value of our society.").

Justice VIVIANO relies on *Washington v Glucksberg*, 521 US 702, 720-721; 117 S Ct 2258; 138 L Ed 2d 772 (1997), to define the right at such a level of specificity. But the viability of *Glucksberg*'s specificity prong is in serious question. In *Obergefell v Hodges*, the Court acknowledged *Glucksberg*'s call for a "careful description" of the asserted right but concluded that "while that approach may have been appropriate for the asserted right

separately to respond to Justice VIVIANO's critique of *Smith v Dep't of Pub Health*, 428 Mich 540; 410 NW2d 749 (1987). This Court is ultimately responsible for enforcing our state's Constitution, and remedies are how we do that. In *Smith*, a majority of justices agreed that "[a] claim for damages against the state arising from violation by the state of the Michigan Constitution may be recognized in appropriate cases." *Id*. at 544.

Justice VIVIANO believes that *Smith*'s foundations have been eroded by the United States Supreme Court's partial retreat from *Bivens v Six Unknown Fed Bureau of Narcotics Agents*, 403 US 388; 91 S Ct 1999; 29 L Ed 2d 619 (1971). I respectfully disagree. First, it is not at all clear that the relevant holding of *Smith* is at all or exclusively based on *Bivens*.

---

there involved (physician-assisted suicide), it is inconsistent with the approach this Court has used in discussing other fundamental rights, including marriage and intimacy." *Obergefell v Hodges*, 576 US ___, ___; 135 S Ct 2584, 2602; 192 L Ed 2d 609 (2015). Dissenting Chief Justice Roberts asserted that "the majority's position requires it to effectively overrule *Glucksberg*, the leading modern case setting the bounds of substantive due process." *Id*. at ___; 135 S Ct at 2621 (Roberts, C.J., dissenting). See also *Lawrence v Texas*, 539 US 558, 566; 123 S Ct 2472; 156 L Ed 2d 508 (2003) (rejecting the framing of the issue presented, as described in *Bowers v Hardwick*, 478 US 186, 190; 106 S Ct 2841; 92 L Ed 2d 140 (1986), as " 'whether the Federal Constitution confers a fundamental right upon homosexuals to engage in sodomy,' " because it "fail[s] to appreciate the extent of the liberty at stake"); Yoshino, *A New Birth of Freedom?:* Obergefell v Hodges, 129 Harv L Rev 147, 154-159 (2015) (describing the development of *Glucksberg*'s "careful description" requirement and the "*battle royale* over how abstractly an alleged liberty interest could be defined"); Tribe, *Equal Dignity: Speaking Its Name*, 129 Harv L Rev F 16, 17 (2015) ("[T]here is no doubt that *Glucksberg*'s cramped methodology cast a significant pall that Justice Kennedy's *Lawrence v. Texas* opinion in 2003 only partially swept away . . . and that his *Obergefell* opinion in 2015 finally displaced decisively.") (citation omitted). The alleged exposure to contaminated water is *how* the plaintiffs' fundamental right to bodily integrity was violated; indeed, this is precisely what the plaintiffs alleged in their complaint. In the same way that the *Obergefell* Court defined the fundamental right as "the right to marry" rather than the "right to same-sex marriage," *Obergefell*, 576 US at ___; 135 S Ct at 2602, the fundamental right asserted here is the right to bodily integrity, not the right to contaminant-free water.

*Smith* was a memorandum opinion, signed by the six participating justices, and *Smith* did not cite *Bivens* or refer to it at all. All we know is that at least four justices agreed that monetary damages may be available for state constitutional-tort claims. See *Smith*, 428 Mich at 545 (stating that "at least four Justices concur in every holding, statement and disposition of this memorandum opinion" but not identifying which justices agreed with which of the seven propositions or why they agreed). Maybe this holding was informed by *Bivens*, but maybe not.

Second, like *Smith*, *Bivens* established that monetary damages may be available to remedy a constitutional violation even in the absence of statutory authorization for such a claim. Although United States Supreme Court Justices Thomas and Gorsuch have expressed their willingness to overrule *Bivens*, no other justice has expressed any interest in that path. To the contrary, the United States Supreme Court has reaffirmed *Bivens* as recently as three years ago. See *Ziglar v Abbasi*, 582 US ___, ___; 137 S Ct 1843, 1856-1857; 198 L Ed 2d 290 (2017) ("And it must be understood that this opinion is not intended to cast doubt on the continued force, or even the necessity, of *Bivens* in the search-and-seizure context in which it arose. *Bivens* does vindicate the Constitution by allowing some redress for injuries, and it provides instruction and guidance to federal law enforcement officers going forward. The settled law of *Bivens* in this common and recurrent sphere of law enforcement, and the undoubted reliance upon it as a fixed principle in the law, are powerful reasons to retain it in that sphere."). Though the Supreme Court has declined to *extend Bivens* to new contexts and claims in recent years, its fundamental principles are good law.

Of course, there are other reasons to conclude that monetary damages are available in state constitutional-tort actions. When our sister state courts have so held, they have typically based their decisions on the common law, the Restatement of Torts,[2] an analogy to *Bivens*, or a combination of all three. See, e.g., *Brown v New York*, 89 NY2d 172, 187; 674 NE2d 1129 (1996). If and when the appropriate time (and case) comes along, we can debate whether *Smith* was correctly decided and what rationale we would use to justify the conclusion that monetary damages are available (or not) in constitutional-tort actions.

But even assuming that *Smith* was a state Constitution, *Bivens*-like decision, I do not believe that this Court should feel compelled to abandon it simply because some members of the United States Supreme Court have grown sour on *Bivens*-style remedies in a different context altogether. There are a number of reasons why. For one, we are separate sovereigns. We decide the meaning of the Michigan Constitution and do not take our cue from any other court, including the highest Court in the land.

And there is more that makes *Bivens* apples to *Smith*'s oranges. For example, the critiques of *Bivens* are far less weighty here because there are no corresponding federalism concerns. As Justice Harlan explained in his *Bivens* concurrence, the question in that case was rooted not in the separation of powers, but in federalism: whether the liability of federal

---

[2] Restatement Torts, 2d, § 874A provides: "When a legislative provision protects a class of persons by proscribing or requiring certain conduct but does not provide a civil remedy for the violation, the court may, if it determines that the remedy is appropriate in furtherance of the purpose of the legislation and needed to assure the effectiveness of the provision, accord to an injured member of the class a right of action, using a suitable existing tort action or a new cause of action analogous to an existing tort action." This section makes clear that the term "legislative provision" includes a constitutional provision. See *id*. at comment *a*.

5

officers should depend on "the vagaries of [state] common-law actions," *Bivens*, 403 US

at 409 (Harlan, J., concurring in the judgment), or one uniform body of federal law.  Even

the government in *Bivens* did not argue that the judiciary lacked the power to fashion a

remedy.  Instead, the government claimed that those remedies should be found only in the

state courts, not the federal courts.  *Id*. at 390 (opinion of the Court) ("Respondents do not

argue that petitioner should be entirely without remedy for an unconstitutional invasion of

his rights by federal agents.  In respondents' view, however, the rights that petitioner

asserts—primarily rights of privacy—are creations of state and not of federal law.

Accordingly, they argue, petitioner may obtain money damages to redress invasion of these

rights only by an action in tort, under state law, in the state courts.").

Principles of federalism and comity have continued to animate the Supreme Court's

*Bivens* and 42 USC 1983[3] jurisprudence.[4]  As then Judge Gorsuch observed in *Browder v*

*Albuquerque*, 787 F3d 1076, 1084 (CA 10, 2015) (Gorsuch, J., concurring), "[o]ften, after

all, there's no need to turn federal courts into common law courts and imagine a whole new

tort jurisprudence under the rubric of § 1983 and the Constitution in order to vindicate

---

[3] Section 1983 of the Civil Rights Act of 1871 authorizes suits for monetary damages for federal civil-rights violations committed under color of state law.

[4] "Examples of the influence of federalism include: the existence and scope of absolute and qualified individual immunities; the 'official policy or custom' requirement for local government liability; and the various 'procedural' defenses the Court has applied to section 1983, such as statutes of limitations, preclusion and abstention."  Nahmod, *State Constitutional Torts:* DeShaney*, Reverse-Federalism and Community*, 26 Rutgers L J 949, 950 (1995) (citations omitted).  See also Friesen, *Recovering Damages for State Bills of Rights Claims*, 63 Tex L Rev 1269, 1275 (1985) (arguing that state-court judges "should not suffer from the conservatizing influences, which affect federal courts, of the need to make nationally uniform rules, which often bind the officials of another sovereign").

6

fundamental rights when we have state courts ready and willing to vindicate those same rights using a deep and rich common law that's been battle tested through the centuries." Indeed, one of the "happy incidents" of our federalist system is that it permits states to forge their own paths in this area and function as laboratories of experiments. *New State Ice Co v Liebmann*, 285 US 262, 310-311; 52 S Ct 371; 76 L Ed 747 (1932) (Brandeis, J., dissenting). See also Sutton, *51 Imperfect Solutions: States and the Making of American Constitutional Law* (New York: Oxford University Press, 2018), p 18 ("A mistaken or an ill-conceived constitutional decision is also easier to correct at the state level than it is at the federal level. Not only do state court decisions cover a narrower jurisdiction and affect fewer individuals, but the people at the state level also have other remedies at their disposal: an easier constitutional amendment process and, for richer or poorer, judicial elections. State courts, like state legislatures, thus have far more freedom to 'try novel social and economic experiments without risk to the rest of the country' than the U.S. Supreme Court."), quoting *New State Ice Co*, 285 US at 311.

Perhaps most importantly, there is no federal analogue for the type of action here, which diminishes the relevance of the Supreme Court's *Bivens* jurisprudence. The plaintiffs allege more than a constitutional violation committed by a single rogue officer that often serves as the basis for a *Bivens* claim. See *Turkmen v Hasty*, 789 F3d 218, 265 (CA 2, 2015) (Raggi, J., concurring in part and dissenting in part) (noting that "the typical *Bivens* scenario" arises from "errant conduct by a rogue official"); *Correctional Servs Corp v Malesko*, 534 US 61, 70; 122 S Ct 515; 151 L Ed 2d 456 (2001) ("The purpose of *Bivens* is to deter individual federal officers from committing constitutional violations."). Instead, the plaintiffs here allege that our government itself is responsible for a conscience-shocking

7

constitutional tort committed against the citizens of an entire city. They sued the governor in his official capacity, the state of Michigan, the Michigan Department of Environmental Quality, the Michigan Department of Health and Human Services, and two emergency managers in their official capacities. This action—against these particular defendants—could not be brought in federal court, even if the plaintiffs based their constitutional-tort claim on the federal Due Process Clause. A nonconsenting state is generally immune from suits by its own citizens in federal court. *Hans v Louisiana*, 134 US 1, 13; 10 S Ct 504; 33 L Ed 842 (1890). This bar applies to suits seeking monetary damages against a governor in his or her official capacity. See *Governor of Georgia v Madrazo*, 26 US 110, 123-124; 7 L Ed 73 (1828); *Edelman v Jordan*, 415 US 651, 663; 94 S Ct 1347; 39 L Ed 2d 662 (1974). It also applies to governmental entities that are considered "arm[s] of the State" for Eleventh Amendment purposes, such as state agencies. See, e.g., *Mt Healthy City Sch Dist Bd of Ed v Doyle*, 429 US 274, 280; 97 S Ct 568; 50 L Ed 2d 471 (1977).

Nor could this action be brought as a § 1983 action in state or federal court. That statute only authorizes suits against a *person*, and neither the state nor a state official is considered a "person" for purposes of a damages suit under § 1983. *Will v Mich Dep't of State Police*, 491 US 58, 63-65; 109 S Ct 2304; 105 L Ed 2d 45 (1989). *Bivens* actions cannot be brought against federal agencies, *Fed Deposit Ins Corp v Meyer*, 510 US 471, 486; 114 S Ct 996; 127 L Ed 2d 308 (1994), or against the President of the United States, *Nixon v Fitzgerald*, 457 US 731, 749; 102 S Ct 2690; 73 L Ed 2d 349 (1982) (holding that a former president "is entitled to absolute immunity from damages liability predicated on his official acts").

In *Smith*, the Court held that Michiganders can sue the government directly for violating their Michigan constitutional rights. *Smith*, 428 Mich at 544 ("Where it is alleged that the state, by virtue of custom or policy, has violated a right conferred by the Michigan Constitution, governmental immunity is not available in a state court action."). They can sue the governor in his or her official capacity. They can sue state agencies. They can sue the state of Michigan itself. These meaningful differences between federal *Bivens* claims and Michigan constitutional-tort actions make the United States Supreme Court's *Bivens* jurisprudence of limited value as we determine how to approach state constitutional torts.[5]

Ultimately, this Court has a duty to protect the state constitutional rights of Michiganders. The judiciary serves as a check on our coequal branches of government and ensures that their acts are constitutional. See *Marbury v Madison*, 5 US 137, 178; 2 L Ed 60 (1803). I agree with Justice Harlan that "the judiciary has a particular responsibility to assure the vindication of constitutional interests," *Bivens*, 403 US at 407 (Harlan J.,

---

[5] For what it is worth, I do not share Justice VIVIANO's critique of *Bivens*'s foundation. The Supreme Court has a long history of permitting suits for damages against rogue federal officers. See Fallon, *Bidding Farewell to Constitutional Torts*, 107 Calif L Rev 933, 941-946 (2019); see, e.g., *Murray v Schooner Charming Betsy*, 6 US (2 Cranch) 64; 2 L Ed 208 (1804); *Little v Barreme*, 6 US (2 Cranch) 170; 2 L Ed 243 (1804) (affirming tort damages against government officers for ultra vires seizures of vessels); cf. *Armstrong v Exceptional Child Ctr, Inc*, 575 US 320, 327; 135 S Ct 1378; 191 L Ed 2d 471 (2015) (noting the "long history of judicial review of illegal executive action, tracing back to England").

Nor do I share Justice VIVIANO's understanding that "[t]he United States Supreme Court's abandonment of implied causes of action in the statutory context has cast doubt on *Bivens* . . . ." The difference between statutory-based claims and constitutional-tort claims is significant. It makes sense to defer to the Legislature to authorize a cause of action arising under a statute, which exists only by the Legislature's creation, but, as discussed below, I do not believe that the Legislature has exclusive jurisdiction over crafting remedies for violations of the Constitution, which was created by the people, exists independently of the Legislature, and reigns supreme in our system.

concurring in the judgment), and this responsibility is especially true of the state courts. See Hart, *The Power of Congress to Limit the Jurisdiction of Federal Courts: An Exercise in Dialectic*, 66 Harv L Rev 1362, 1401 (1953) ("In the scheme of the Constitution, [state courts] are the primary guarantors of constitutional rights, and in many cases they may be the ultimate ones."). When a fundamental constitutional right has been violated, it falls to the courts to determine what remedy is appropriate to vindicate it.

That the judicial power includes the ability to fashion remedies is a principle as old as our republic. "[W]here federally protected rights have been invaded, it has been the rule from the beginning that courts will be alert to adjust their remedies so as to grant the necessary relief." *Bell v Hood*, 327 US 678, 684; 66 S Ct 773; 90 L Ed 939 (1946). The Constitution does not explicitly authorize the courts to invalidate acts of Congress, issue injunctions, or exclude evidence seized in violation of the Fourth Amendment. Yet in their exercise of the judicial power, the courts have created and applied those remedies. See *Marbury*, 5 US at 177 (the judiciary has the power to void unconstitutional legislation); *Osborn v Bank of US*, 22 US (9 Wheat) 738, 869; 6 L Ed 204 (1824) (power to issue injunctions); *Mapp v Ohio*, 367 US 643, 655; 81 S Ct 1684; 6 L Ed 2d 1081 (1961) (power to order the exclusion of evidence). And monetary damages are an ordinary, long-established remedy. *Bivens*, 403 US at 395 ("That damages may be obtained for injuries consequent upon a violation of the Fourth Amendment by federal officials should hardly seem a surprising proposition. Historically, damages have been regarded as the ordinary remedy for an invasion of personal interests in liberty."). See also Nordstrom, *Toward a Law of Damages*, 18 Case W Res L Rev 86, 89 (1966) (tracing the law of damages to "the customs and orders of the Anglo-Saxons, well before the Norman Conquest in 1066 A.D.").

10

Given this understanding of the judicial power, it is not clear to me why authorizing damages for a constitutional-tort action would be *exclusively* a function of the Legislature such that the judiciary is precluded from taking up the task, especially because constitutional rights most often serve to limit the government's power. Chief Justice John Marshall questioned this too: "To what purpose are powers limited, and to what purpose is that limitation committed to writing, if these limits may, at any time, be passed by those intended to be restrained?" *Marbury*, 5 US at 176. And as Justice Harlan observed, "it would be at least anomalous to conclude that the federal judiciary . . . is powerless to accord a damages remedy to vindicate social policies which, by virtue of their inclusion in the Constitution, are aimed predominantly at restraining the Government as an instrument of the popular will." *Bivens*, 403 US at 403-404 (Harlan, J., concurring in the judgment).

*Smith*'s holding that monetary damages are available in the appropriate case is therefore unremarkable. What good is a constitutional right without a remedy? "The very essence of civil liberty certainly consists in the right of every individual to claim the protection of the laws, whenever he receives an injury. . . . The government of the United States has been emphatically termed a government of laws, and not of men. It will certainly cease to deserve this high appellation, if the laws furnish no remedy for the violation of a vested legal right." *Marbury*, 5 US at 163.

Bridget M. McCormack
Megan K. Cavanagh

S T A T E   O F   M I C H I G A N

SUPREME COURT

MELISSA MAYS, MICHAEL ADAM
MAYS, JACQUELINE PEMBERTON,
KEITH JOHN PEMBERTON, ELNORA
CARTHAN, RHONDA KELSO, and ALL
OTHERS SIMILARLY SITUATED,

      Plaintiffs-Appellees,

v                                                                 Nos. 157335-7

GOVERNOR OF MICHIGAN, STATE OF
MICHIGAN, DEPARTMENT OF
ENVIRONMENTAL QUALITY, and
DEPARTMENT OF HEALTH AND
HUMAN SERVICES,

      Defendants-Appellants,

and

DARNELL EARLEY and JERRY
AMBROSE,

      Defendants-Appellees.

_____

MELISSA MAYS, MICHAEL ADAM
MAYS, JACQUELINE PEMBERTON,
KEITH JOHN PEMBERTON, ELNORA
CARTHAN, RHONDA KELSO, and ALL
OTHERS SIMILARLY SITUATED,

      Plaintiffs-Appellees,

v                                                                 Nos. 157340-2

GOVERNOR OF MICHIGAN, STATE OF
MICHIGAN, DEPARTMENT OF
ENVIRONMENTAL QUALITY, and
DEPARTMENT OF HEALTH AND
HUMAN SERVICES,

              Defendants-Appellees,

and

DARNELL EARLEY and JERRY
AMBROSE,

              Defendants-Appellants.

_____

VIVIANO, J. (*concurring in part and dissenting in part*).

I agree with the lead opinion's analysis of plaintiffs' inverse-condemnation claim and remand for further factual development to determine when that claim accrued.[1] But I would reverse the Court of Appeals' denial of defendants' motion for summary disposition concerning plaintiffs' substantive due-process claim for a violation of bodily integrity because I do not believe that substantive due process encompasses a right to be protected from exposure to contaminated water and I do not believe that plaintiffs allege conscience-shocking conduct on the part of defendants. And even if plaintiffs did allege such a

_____

[1] In other words, I join Parts II(A), (B)(1), (B)(2), and (B)(3) of the lead opinion. Because I believe more factual development is needed to determine when plaintiffs' inverse-condemnation claim accrued, I would not yet reach a conclusion as to whether the fraudulent-concealment exception or the harsh-and-unreasonable-consequences exception might apply if the claim is later determined to be untimely.

substantive due-process claim, I would not infer a damages remedy for such a claim in any event.

## I. SUBSTANTIVE DUE PROCESS

The Due Process Clause of the Michigan Constitution provides that "[n]o person shall . . . be deprived of life, liberty or property, without due process of law."[2] Our constitutional provision "is coextensive with its federal counterpart" in the Fourteenth Amendment.[3] We have held that the Due Process Clause offers "two separate types of

---

[2] Const 1963, art 1, § 17.

[3] *Cummins v Robinson Twp*, 283 Mich App 677, 700-701; 770 NW2d 421 (2009). The Due Process Clause of the federal Constitution states, "No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; *nor shall any State deprive any person of life, liberty, or property, without due process of law*; nor deny to any person within its jurisdiction the equal protection of the laws." US Const, Am XIV (emphasis added).

We have held out the possibility that our Due Process Clause grants greater protection than the federal clause. *AFT Mich v Michigan*, 497 Mich 197, 245 n 28; 866 NW2d 782 (2015) ("The portions of Const 1963, art 1, § 17 and US Const, Am XIV addressing due process are worded differently, so they may grant disparate levels of protection. This Court has, on occasion, applied distinctive due process protections under Const 1963, art 1, § 17 broader than have been afforded under US Const, Am XIV."). In general, however, "[w]e have often spoken indistinguishably about the standards governing our respective constitutions and been vague as to which constitution we were interpreting." *Delta Charter Twp v Dinolfo*, 419 Mich 253, 276 n 7; 351 NW2d 831 (1984), citing *Robinson Twp v Knoll*, 410 Mich 293; 302 NW2d 146 (1981); *O'Donnell v State Farm Mut Auto Ins Co*, 404 Mich 524; 273 NW2d 829 (1979); *Advisory Opinion on Constitutionality of 1975 PA 227 (Questions 2-10)*, 396 Mich 465; 242 NW2d 3 (1976); *Manistee Bank & Trust Co v McGowan*, 394 Mich 655; 232 NW2d 636 (1975), overruled on other grounds by *Harvey v Michigan*, 469 Mich 1 (2003). Because plaintiffs do not argue that our state's Constitution provides greater protection in this instance, and because

protections—substantive and procedural[.]"[4]  Procedural due process, which is not at issue in the instant case, requires that before a person is deprived of life, liberty, or property, he or she must be given notice and an opportunity to be heard.[5]

"Textually, only procedural due process is guaranteed by the Fourteenth Amendment [and Const 1963, art 1, § 17]; however, under the aegis of substantive due process, individual liberty interests likewise have been protected against ' "certain government actions regardless of the fairness of the procedures used to implement them." ' "[6]  There are two types of substantive due-process claims—ones that claim an

---

the particular language at issue is identical, it is unnecessary for me to address whether Const 1963, art 1, § 17 offers more protection than its federal counterpart.

[4] *Bonner v Brighton*, 495 Mich 209, 226; 848 NW2d 380 (2014).  See also *Electro-Tech, Inc v H F Campbell Co*, 433 Mich 57, 66 n 9; 445 NW2d 61 (1989) ("The Due Process Clause of the Fourteenth Amendment embodies a dual function.  Not only does it afford *procedural* safeguards to protected life, liberty, and property interests, but it also protects *substantive* aspects of those interests against impermissible governmental restrictions."); *In re Beck*, 287 Mich App 400, 401; 788 NW2d 697 (2010) ("There are two types of due process: procedural and substantive."), aff'd on other grounds 488 Mich 6 (2010).

[5] *Bonner*, 495 Mich at 235 ("[D]ue process of law requires that deprivation of life, liberty, or property by adjudication must be preceded by notice and an opportunity to be heard.  To comport with these procedural safeguards, the opportunity to be heard "must be granted at a meaningful time and in a meaningful manner.") (citations omitted).  See also *In re Beck*, 287 Mich App at 401-402 ("The fundamental requirements of procedural due process are notice and a meaningful opportunity to be heard before an impartial decision maker.").

[6] *People v Sierb*, 456 Mich 519, 522-523; 581 NW2d 219 (1998), quoting *Collins v Harker Hts*, 503 US 115, 125; 112 S Ct 1061; 117 L Ed 2d 261 (1992), in turn quoting *Daniels v Williams*, 474 US 327, 331; 106 S Ct 662; 88 L Ed 2d 662 (1986).  See also *Trellsite Foundry & Stamping Co v Enterprise Foundry*, 365 Mich 209, 214; 112 NW2d 476 (1961) ("The concept of procedural due process was deeply rooted in American jurisprudence

interference with a constitutional right (either an enumerated right or a right deeply rooted in our history and tradition), and ones that allege arbitrary abuses of power.[7]

_____

from an early day, but that of substantive due process appeared in the cases at about the middle of the 19th century.").

Substantive due process has often been criticized because of its lack of textual basis. See, e.g., *TXO Prod Corp v Alliance Resources Corp*, 509 US 443, 470-471; 113 S Ct 2711; 125 L Ed 2d 366 (1993) (Scalia, J., concurring) ("I am willing to accept the proposition that the Due Process Clause of the Fourteenth Amendment, despite its textual limitation to procedure, incorporates certain substantive guarantees specified in the Bill of Rights; but I do not accept the proposition that it is the secret repository of all sorts of other, unenumerated, substantive rights—however fashionable that proposition may have been (even as to economic rights of the sort involved here) at the time of the *Lochner*-era cases the plurality relies upon."); *Albright v Oliver*, 510 US 266, 275; 114 S Ct 807; 127 L Ed 2d 114 (1994) (Scalia, J., concurring) ("I reject the proposition that the Due Process Clause guarantees certain (unspecified) liberties, rather than merely guarantees certain procedures as a prerequisite to deprivation of liberty."); *McDonald v Chicago*, 561 US 742, 791; 130 S Ct 3020; 177 L Ed 2d 894 (2010) (Scalia, J., concurring) (referring to his "misgivings about Substantive Due Process"); Bork, *The Tempting of America: The Political Seduction of the Law* (New York: Touchstone, 1990), p 31 (stating that the "transformation of the due process clause from a procedural to a substantive requirement was an obvious sham"). However, because I find that plaintiffs have not adequately alleged a violation of due process, it is unnecessary for me to address the merits (or lack thereof) of substantive due process generally.

[7] As *Lillard v Shelby Co Bd of Ed*, 76 F3d 716, 724 (CA 6, 1996), explained:

This court has recognized two categories of substantive due process rights:

The first type includes claims asserting denial of a right, privilege, or immunity secured by the Constitution or by federal statute other than procedural claims under "the Fourteenth Amendment *simpliciter*." . . .

The other type of claim is directed at official acts which may not occur regardless of the procedural safeguards accompanying them. The test for substantive due process

I discuss both types of claims below.[8]

> claims of this type is whether the conduct complained of "shocks the conscience" of the court.

*Mertik v. Blalock*, 983 F.2d 1353, 1367–68 (6th Cir.1993). The first type of claim exists, for example, when a plaintiff alleges that his right to be free from unreasonable seizures under the Fourth Amendment was violated. *See Wilson v. Beebe*, 770 F.2d 578, 585–86 (6th Cir.1985) (*en banc*); *see also Braley v. City of Pontiac*, 906 F.2d 220, 225 (6th Cir.1990). The latter type of claim, however, does not "require[] a claim that some specific guarantee of the Constitution apart from the due process clause be violated . . . . This is a substantive due process right akin to the 'fundamental fairness' concept of procedural due process." *Wilson*, 770 F.2d at 586.

Compare *Lillard*, 76 F3d 716, with 1 Bodensteiner & Levinson, State & Local Government Civil Rights Liability (November 2019 update), § 1:16 ("There are three aspects to substantive due process. First, it protects the enumerated rights (Bill of Rights) from state interference. Second, it provides the source for protecting certain, unenumerated, nontextual, yet significant, rights from interference by the legislative branch of government. Third, it prohibits arbitrary abuses of power by government officials."). I point out that it is not entirely clear whether plaintiffs must show both the deprivation of a constitutional right and conscience-shocking behavior, or whether they must only show one or the other. *Guertin v Michigan*, 912 F3d 907, 946 (CA 6, 2019) (McKeague, J., concurring in part and dissenting in part) ("At times we have treated these two elements (deprivation of a constitutional right and conscience-shocking behavior) as separate methods of stating a substantive-due-process claim. *Range v. Douglas*, 763 F.3d 573, 588 (6th Cir. 2014). At other times we have concluded they are both required. See *Am. Express Travel Related Servs. Co., Inc. v. Kentucky*, 641 F.3d 685, 688 (6th Cir. 2011)."). Because I conclude that plaintiffs have shown neither, it is not necessary to decide whether only one would be sufficient.

[8] It is not entirely clear from plaintiffs' amended complaint which type of claim they assert.

## A. THERE IS NO SUBSTANTIVE DUE-PROCESS RIGHT NOT TO BE EXPOSED TO CONTAMINATED WATER

As to the first type of substantive due-process claim, in addition to those rights enumerated in the Constitution, rights have been recognized in " 'matters relating to marriage, family, procreation, and the right to bodily integrity.' "[9] Importantly, a substantive due-process analysis " 'must begin with a careful description of the asserted right,' for there has 'always been reluctan[ce] to expand the concept of substantive due process' given that '[t]he doctrine of judicial self-restraint requires us to exercise the utmost care whenever we are asked to break new ground in this field.' "[10] After formulating a careful description of the right in question, a court must then determine whether that right is deeply rooted in this country's history. As the United States Supreme Court explained in *Washington v Glucksberg*:[11]

> Our established method of substantive-due-process analysis has two primary features: First, we have regularly observed that the Due Process Clause specially protects those fundamental rights and liberties which are, objectively, "deeply rooted in this Nation's history and tradition," and "implicit in the concept of ordered liberty," such that "neither liberty nor justice would exist if they were sacrificed." Second, we have required in substantive-due-process cases a "careful description" of the asserted fundamental liberty interest. Our Nation's history, legal traditions, and practices thus provide the crucial "guideposts for responsible

---

[9] *Sierb*, 456 Mich at 529, quoting *Albright*, 510 US at 272.

[10] *Bonner*, 495 Mich at 226-227, quoting *Reno v Flores*, 507 US 292, 302; 113 S Ct 1439; 123 L Ed 2d 1 (1993), and *Collins*, 503 US at 125 (alterations in original).

[11] *Washington v Glucksberg*, 521 US 702; 117 S Ct 2258; 138 L Ed 2d 772 (1997).

7

decisionmaking" that direct and restrain our exposition of the Due Process Clause.[12]

Importantly, a "careful description" of the right must be sufficiently specific in order to determine whether it is deeply rooted in our nation's history.[13] Notably, " '[T]he Court has always been reluctant to expand the concept of substantive due process because guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended. . . . The doctrine of judicial self-restraint requires us to exercise the utmost care whenever we are asked to break new ground in this field.' "[14]

---

[12] *Id*. at 720-721 (citations omitted).  See also *id*. at 725 (noting that the Court in *Cruzan v Dir, Missouri Dep't of Health*, 497 US 261; 110 S Ct 2841; 111 L Ed 2d 224 (1990), had grounded its decision in "the common-law rule that forced medication was a battery, and the long legal tradition protecting the decision to refuse unwanted medical treatment," not "from abstract concepts of personal autonomy").

[13] See *Glucksberg*, 521 US at 722 ("[T]he development of this Court's substantive-due-process jurisprudence . . . has been a process whereby the outlines of the 'liberty' specially protected by the Fourteenth Amendment—never fully clarified, to be sure, and perhaps not capable of being fully clarified—have at least been carefully refined by concrete examples involving fundamental rights found to be deeply rooted in our legal tradition.") (citation omitted).  For example, in *Glucksberg* the Court clarified that the right at issue was not "a right to die" or "a liberty to choose how to die" but more specifically "a right to commit suicide which itself includes a right to assistance in doing so."  *Id*. at 722-723 (quotation marks and citations omitted).

   Chief Justice MCCORMACK contends that "the viability of *Glucksberg*'s specificity prong is in serious question."  But *Glucksberg* has not been overruled.  And though the majority stated in *Obergefell v Hodges*, 576 US ___, ___; 135 S Ct 2584, 2602; 192 L Ed 2d 609 (2015), that the careful-description approach "is inconsistent with the approach this Court has used in discussing other fundamental rights, including marriage and intimacy," this case, of course, does not involve marriage or intimacy.

[14] *Sierb*, 456 Mich at 528, quoting *Collins*, 503 US at 125.  As Justice Scalia explained in *Michael H v Gerald D*, 491 US 110, 121-123; 109 S Ct 2333; 105 L Ed 2d 91 (1989):

8

Without that core textual meaning as a limitation, defining the scope of the Due Process Clause "has at times been a treacherous field for this Court," giving "reason for concern lest the only limits to . . . judicial intervention become the predilections of those who happen at the time to be Members of this Court." *Moore v. East Cleveland*, 431 U.S. 494, 502[; 97 S Ct 1932; 52 L Ed 2d 531] (1977). The need for restraint has been cogently expressed by Justice WHITE:

> That the Court has ample precedent for the creation of new constitutional rights should not lead it to repeat the process at will. The Judiciary, including this Court, is the most vulnerable and comes nearest to illegitimacy when it deals with judge-made constitutional law having little or no cognizable roots in the language or even the design of the Constitution. Realizing that the present construction of the Due Process Clause represents a major judicial gloss on its terms, as well as on the anticipation of the Framers . . . , the Court should be extremely reluctant to breathe still further substantive content into the Due Process Clause so as to strike down legislation adopted by a State or city to promote its welfare. Whenever the Judiciary does so, it unavoidably pre-empts for itself another part of the governance of the country without express constitutional authority. *Moore*, [431 US] at 544 (dissenting opinion).

In an attempt to limit and guide interpretation of the Clause, we have insisted not merely that the interest denominated as a "liberty" be "fundamental" (a concept that, in isolation, is hard to objectify), but also that it be an interest traditionally protected by our society. As we have put it, the Due Process Clause affords only those protections "so rooted in the traditions and conscience of our people as to be ranked as fundamental." *Snyder v. Massachusetts*, 291 U. S. 97, 105[; 54 S Ct 330; 78 L Ed 674] (1934) (Cardozo, J.). Our cases reflect "continual insistence upon respect for the teachings of history [and] solid recognition of the basic values that underlie our society . . . ." *Griswold v. Connecticut*, 381 U. S. 479, 501[; 85 S Ct 1678; 14 L Ed 2d 510] (1965) (Harlan, J., concurring in judgment).

In this case, then, even assuming that the Due Process Clause in our state's Constitution protects a right to bodily integrity—a conclusion that, until the Court of Appeals decision below, no appellate court in this state had ever reached[15]—plaintiffs must carefully describe a particular right to bodily integrity, and that right must be deeply rooted in the nation's history and tradition.

So what is the right that plaintiffs assert? In their amended complaint, plaintiffs allege that "[d]efendants deliberately and knowingly breached the constitutionally protected bodily integrity of Plaintiffs *by creating and perpetuating the ongoing exposure to contaminated water*, with deliberate indifference to the known risks of harm which said exposure would, and did, cause to Plaintiffs." (Emphasis added.) In other words, the right that plaintiffs allege may carefully be described as a right not to be exposed to contaminated water.[16] With that careful description of the right in mind, we must next determine whether

---

[15] *Mays v Governor*, 323 Mich App 1, 66; 916 NW2d 227 (2018) ("Michigan appellate courts have acknowledged that the substantive component of the federal Due Process Clause protects an individual's right to bodily integrity, but this Court is unaware of any Michigan appellate decision expressly recognizing the same protection under the Due Process Clause of the Michigan Constitution or a stand-alone constitutional tort for violation of the right to bodily integrity.") (citation omitted).

[16] See also *Guertin*, 912 F3d at 956 (McKeague, J., concurring in part and dissenting in part) (describing the right as "protection from exposure to lead-contaminated water allegedly caused by policy or regulatory decisions or statements").

I believe that the majority in *Guertin* erred by describing the right too generally. See *id.* at 921 (opinion of the court) (affirming the district court's conclusion that it is a violation of the substantive due-process right to bodily integrity when a government actor " 'knowingly and intentionally introduc[es] life-threatening substances into individuals without their consent, especially when such substances have zero therapeutic benefit' ").

such a right is " 'deeply rooted in this Nation's history and tradition,' and 'implicit in the concept of ordered liberty,' such that 'neither liberty nor justice would exist if they were sacrificed.' "[17]

Importantly, I am aware of no case holding that such a right is encompassed in substantive due process. In fact, there are several cases explicitly holding that there is no such right to a contaminant-free environment. While considering a challenge to the addition of fluoride to the water supply, one California court stated, "[T]he right to bodily integrity is not coextensive with the right to be free from the introduction of an allegedly contaminated substance in the public drinking water."[18] As Judge McKeague explained in

---

See also *Hootstein v Amherst-Pelham Regional Sch Comm*, 361 F Supp 3d 94 (D Mass, 2019) (relying on *Guertin*).

[17] *Glucksberg*, 521 US 720-721 (citations omitted).

[18] *Coshow v City of Escondido*, 132 Cal App 4th 687, 709-710; 34 Cal Rptr 3d 19 (2005). Several federal courts have similarly held that there is no right to a contaminant-free environment. *S F Chapter of A Philip Randolph Institute v US Environmental Protection Agency*, unpublished opinion of the United States District Court for the Northern District of California, issued March 28, 2008 (Case No. C 07-04936 CRB), pp 6-7 (rejecting the plaintiffs' claim that they had a right to be free from climate-change pollution); *Concerned Citizens of Nebraska v US Nuclear Regulatory Comm*, 970 F2d 421, 426-427 (CA 8, 1992) ("[W]e are unable to conclude that a right to an environment free of any non-natural radiation is so "deeply rooted in this Nation's history and tradition," as to render it fundamental."); *In re "Agent Orange" Prod Liability Litigation*, 475 F Supp 928, 934 (EDNY, 1979) ("Since there is not yet a constitutional right to a healthful environment, there is not yet any constitutional right under the fifth, ninth, or fourteenth amendments to be free of the allegedly toxic chemicals involved in this litigation. Plaintiffs' constitutional claims are dismissed for failure to state a claim.") (citation omitted); *Pinkney v Ohio Environmental Protection Agency*, 375 F Supp 305, 310 (ND Ohio, 1974) ("[T]he Court is unable to rule that the right to a healthful environment is a fundamental right under the Constitution."); *Fed Employees for Non-Smokers' Rights v United States*, 446 F Supp 181,

his partial concurrence and dissent in *Guertin v Michigan*,[19] another case arising from the Flint water crisis, "The mere fact that no court of controlling authority has ever recognized the type of due process right that plaintiffs allege in this case is all we need to conclude the right is not clearly established."[20]

There is no debate to be had on this subject. Because the right to be free from exposure to contaminated water "is neither implicit in the concept of ordered liberty nor deeply rooted in this nation's history and tradition[,] [i]t would be an impermissibly radical

---

184 (DDC, 1978); *Tanner v Armco Steel Corp*, 340 F Supp 532, 537 (SD Tex, 1972) ("[N]o legally enforceable right to a healthful environment, giving rise to an action for damages, is guaranteed by the Fourteenth Amendment or any other provision of the Federal Constitution."); *Ely v Velde*, 451 F2d 1130, 1139 (CA 4, 1971) (holding that there is no constitutional right to a healthful environment). See also Murthy, *A New Constitutive Commitment To Water*, 36 BC J L & Soc Just 159, 159-160 (2016) ("A constitutional right to affordable water for drinking, hygiene, and sanitation does not exist in the United States."); *Mansfield Apartment Owners Ass'n v City of Mansfield*, 988 F2d 1469, 1476 (CA 6, 1993) (holding that the plaintiffs failed to state a claim for violation of substantive due process by challenging the defendants' policy of turning off water to the landlords' real estate when the tenants failed to pay their water bills).

[19] *Guertin v Michigan*, 912 F3d 907 (CA 6, 2019).

[20] *Id*. at 942 (McKeague, J., concurring in part and dissenting in part). As even the majority in *Guertin* recognized: "There is, of course, no fundamental right to water service. Moreover, the Constitution does not guarantee a right to live in a contaminant-free, healthy environment." *Id*. at 921-922 (opinion of the court) (quotation marks and citation omitted), citing *Lake v Southgate*, unpublished opinion of the United States District Court for the Eastern District of Michigan, issued February 28, 2017 (Case No. 16-10251), p 4 (collecting cases).

12

departure from existing tradition, and from the principles that underlie that tradition, to declare that there is such a fundamental right protected by the Due Process Clause."[21]

Nevertheless, the Court of Appeals majority did not begin its analysis with a careful description of the right that plaintiffs assert. It did refer to a right to be free of " 'an egregious, nonconsensual entry into the body which was an exercise of power without any legitimate governmental objective.' "[22] And the majority then summarized plaintiffs' allegations as consisting of "a nonconsensual entry of contaminated and toxic water into [plaintiffs'] bodies as a direct result of defendants' decision to pump water from the Flint

[21] *People v Kevorkian*, 447 Mich 436, 481; 527 NW2d 714 (1994). See also *Sierb*, 456 Mich at 523-524 ("[C]ourts should reject the 'unprincipled creation of state constitutional rights that exceed their federal counterparts.' "), quoting *Sitz v Dep't of State Police*, 443 Mich 744, 763; 506 NW2d 209 (1993).

In fact, there are very few cases in which plaintiffs challenge contaminants in the water, and what few cases exist are relatively recent. See, e.g., *Hootstein*, 361 F Supp 3d 94; *Brown v Detroit Pub Sch Community Dist*, 763 F Appx 497 (CA 6, 2019); *In re Camp Lejeune North Carolina Water Contamination Litigation*, 263 F Supp 3d 1318 (ND Ga, 2016); *Rietcheck v Arlington*, unpublished opinion of the United States District Court for the District of Oregon, issued January 4, 2006 (Case No. 04-CV-1239-BR); *Coshow*, 132 Cal App 4th 687; *City of Austin v Quick*, 930 SW2d 678 (Tex App, 1996); *Ayers v Jackson Twp*, 189 NJ Super 561; 461 A2d 184 (Law Div, 1983). As the United States Supreme Court explained in *Reno*, 507 US at 303, "The mere novelty of such a claim is reason enough to doubt that 'substantive due process' sustains it; the alleged right certainly cannot be considered ' "so rooted in the traditions and conscience of our people as to be ranked as fundamental." ' " (Citation omitted.)

[22] *Mays*, 323 Mich App at 60, quoting *Rogers v Little Rock, Arkansas*, 152 F3d 790, 797 (CA 8, 1998). See also *Guertin*, 912 F3d at 920-921 ("Involuntarily subjecting nonconsenting individuals to foreign substances with no known therapeutic value—often under false pretenses and with deceptive practices hiding the nature of the interference— is a classic example of invading the core of the bodily integrity protection.").

13

River into their homes and defendants' subsequent affirmative act of physically switching the water source."[23]

This general description of a right against nonconsensual entry of substances into the body can be found in other cases, such as *In re Cincinnati Radiation Litigation*.[24] There the defendant physicians experimented on terminal cancer patients by subjecting them to large doses of radiation, all while concealing the nature of the experiment.[25] But the facts in the instant case are very different than those in *In re Cincinnati*. Plaintiffs do not allege that defendants knowingly and secretly performed dangerous experiments on them. Plaintiffs allege that defendants switched the source of Flint's drinking water "despite knowledge of a 2011 study commissioned by Flint officials that cautioned against the use of Flint River water as a source of drinking water and despite the absence of any independent state scientific assessment of the suitability of using water drawn from the Flint River as drinking water" and then engaged in a cover-up.[26] Plaintiffs have made serious accusations about the manner in which these decisions were made and the grave consequences that followed for plaintiffs and other Flint residents. I do not take these allegations lightly. However, I think it is clear that the facts alleged in this case are distinct

---

[23] *Mays*, 323 Mich App at 60.

[24] *In re Cincinnati Radiation Litigation*, 874 F Supp 796 (SD Ohio, 1995).

[25] *Id*. at 800. The United States District Court for the Southern District of Ohio denied the defendants' motion to dismiss the plaintiffs' substantive due-process claim. *Id*. at 801.

[26] *Mays*, 323 Mich App at 20.

from those in *In re Cincinnati*.[27]  As Judge McKeague noted in his partial concurrence in

*Guertin*:

> These cases [like *In re Cincinnati*] delineate the contours of the right to bodily integrity in terms of intrusive searches or forced medication. . . . Even the few district court or sister circuit cases cited by the majority do not clarify the contours of plaintiffs' alleged right.  All except one of those cases deal with medical professionals performing government-sponsored invasive procedures or harmful experiments on unsuspecting patients.  The last one deals with police officers who coerced individuals to ingest marijuana while those individuals were under the officer's control.  So those cases further elaborate the ways in which medical or law enforcement personnel may interfere with an individual's right to bodily integrity.  But they say nothing about how non-custodial policy or regulatory decisions or statements affecting the quality of an environmental resource may do so.  In short, neither our Nation's history and traditions nor governing bodily integrity jurisprudence suggests that the conduct alleged here is comparable to a "forcible physical intrusion[] of the body by the government."  *Planned Parenthood Sw. Ohio Region*, 696 F.3d [490, 506 (CA 6, 2012)].  "The mere novelty of such a claim is reason enough to doubt that 'substantive due process' sustains it."  *Reno v. Flores*, 507 U.S. 292, 303, 113 S.Ct. 1439, 123 L.Ed.2d 1 (1993)."[28]

I believe the Court of Appeals erred by describing the right so generally that it encompasses

cases with very different facts.

---

[27] So are other cases involving forced medication.  See, e.g., *Washington v Harper*, 494 US 210, 221-222; 110 S Ct 1028; 108 L Ed 2d 178 (1990) (stating that the inmate "possess[ed] a significant liberty interest in avoiding unwanted administration of antipsychotic drugs under the Due Process Clause of the Fourteenth Amendment"); *Cruzan*, 497 US at 278 (stating that the Fourteenth Amendment encompasses "[t]he principle that a competent person has a constitutionally protected liberty interest in refusing unwanted medical treatment").

[28] *Guertin*, 912 F3d at 956-957 (McKeague, J., concurring in part and dissenting in part).

A right to be free from contaminated public water is clearly not " 'deeply rooted in this Nation's history and tradition,' and 'implicit in the concept of ordered liberty . . . .' "[29] Like Justice Scalia, I "believe[] that the text of the Constitution, and our traditions, say what they say and there is no fiddling with them."[30] There is simply no historical support for a right to receive public water free from contaminants.[31] It is "judicial usurpation," as Justice Scalia called it, to use substantive due process to add the rights we prefer to those explicitly set forth in the Constitution or protected by longstanding history and tradition.[32]

---

[29] *Glucksberg*, 521 US at 721 (citations omitted). See also *Cruzan*, 497 US at 294 (Scalia, J., concurring) ("It is at least true that no 'substantive due process' claim can be maintained unless the claimant demonstrates that the State has deprived him of a right historically and traditionally protected against state interference.").

[30] *Planned Parenthood of Southeastern Pennsylvania v Casey*, 505 US 833, 998; 112 S Ct 2791; 120 L Ed 2d 674 (1992) (Scalia, J., concurring in part and dissenting in part).

[31] That there is no constitutional right does not mean that our citizens should not expect and demand to receive public water free from contaminants or hold their public officials accountable for providing contaminated water (whether at the ballot box or by asserting other viable legal claims, which plaintiffs have done here and in a number of other related suits arising out of the Flint water crisis).

[32] *Chicago v Morales*, 527 US 41, 85; 119 S Ct 1849; 144 L Ed 2d 67 (1999) (Scalia, J., dissenting). See also *Webster v Reproductive Health Servs*, 492 US 490, 532; 109 S Ct 3040; 106 L Ed 2d 410 (1989) (Scalia, J., concurring in part and concurring in the judgment) ("The outcome of today's case will doubtless be heralded as a triumph of judicial statesmanship. It is not that, unless it is statesmanlike needlessly to prolong this Court's self-awarded sovereignty over a field where it has little proper business since the answers to most of the cruel questions posed are political and not juridical—a sovereignty which therefore quite properly, but to the great damage of the Court, makes it the object of the sort of organized public pressure that political institutions in a democracy ought to receive."); *Casey*, 505 US at 980 (Scalia, J., concurring in the judgment in part and dissenting in part) ("The issue is whether it is a liberty protected by the Constitution of the United States. I am sure it is not. I reach that conclusion not because of anything so exalted

By neglecting both to formulate a careful description of the right that plaintiffs assert and to take notice of the readily apparent fact that there have been no historical or legal protections for it, this Court, by leaving in place the Court of Appeals majority opinion, has discarded the tether that "sought to limit the damage" of our Court's " 'right-making' power."[33]

---

as my views concerning the 'concept of existence, of meaning, of the universe, and of the mystery of human life.' Rather, I reach it for the same reason I reach the conclusion that bigamy is not constitutionally protected—because of two simple facts: (1) the Constitution says absolutely nothing about it, and (2) the longstanding traditions of American society have permitted it to be legally proscribed.") (citation omitted); *Cruzan*, 497 US at 293 (Scalia, J., concurring) ("I would have preferred that we announce, clearly and promptly, that the federal courts have no business in this field; that American law has always accorded the State the power to prevent, by force if necessary, suicide—including suicide by refusing to take appropriate measures necessary to preserve one's life; that the point at which life becomes 'worthless,' and the point at which the means necessary to preserve it become 'extraordinary' or 'inappropriate,' are neither set forth in the Constitution nor known to the nine Justices of this Court any better than they are known to nine people picked at random from the Kansas City telephone directory; and hence, that even when it *is* demonstrated by clear and convincing evidence that a patient no longer wishes certain measures to be taken to preserve his or her life, it is up to the citizens of Missouri to decide, through their elected representatives, whether that wish will be honored. It is quite impossible (because the Constitution says nothing about the matter) that those citizens will decide upon a line less lawful than the one we would choose; and it is unlikely (because we know no more about 'life and death' than they do) that they will decide upon a line less reasonable."); *Obergefell*, 576 US at ___; 135 S Ct at 2627 (Scalia, J., dissenting) ("The opinion in these cases is the furthest extension in fact—and the furthest extension one can even imagine—of the Court's claimed power to create 'liberties' that the Constitution and its Amendments neglect to mention. This practice of constitutional revision by an unelected committee of nine, always accompanied (as it is today) by extravagant praise of liberty, robs the People of the most important liberty they asserted in the Declaration of Independence and won in the Revolution of 1776: the freedom to govern themselves.").

[33] *Morales*, 527 US at 85 (Scalia, J., dissenting).

## B. DEFENDANTS' ACTIONS DO NOT SHOCK THE CONSCIENCE

Alternatively, if a plaintiff does not claim a violation of a right that is deeply rooted in our nation's history and tradition, there may still be a due-process violation if defendants' conduct shocked the conscience. The Court of Appeals correctly recounted the requirement that a plaintiff allege conscience-shocking behavior in order to plead a violation of substantive due process:

> Violation of the right to bodily integrity involves "an egregious, nonconsensual entry into the body which was an exercise of power without any legitimate governmental objective." *Rogers v Little Rock, Arkansas*, 152 F3d 790, 797 (CA 8, 1998), citing *Sacramento Co v Lewis*, 523 US 833, 847 n 8; 118 S Ct 1708; 140 L Ed 2d 1043 (1998). . . . [T]o survive dismissal, the alleged "violation of the right to bodily integrity must be so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *Villanueva v City of Scottsbluff*, 779 F3d 507, 513 (CA 8, 2015) (quotation marks and citation omitted); see also *Mettler Walloon, LLC v Melrose Twp*, 281 Mich App 184, 198; 761 NW2d 293 (2008) (explaining that in the context of individual governmental actions or actors, to establish a substantive due-process violation, "the governmental conduct must be so arbitrary and capricious as to shock the conscience").

> "Conduct that is merely negligent does not shock the conscience, but 'conduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level.' " *Votta v Castellani*, 600 F Appx 16, 18 (CA 2, 2015), quoting *Sacramento Co*, 523 US at 849. At a minimum, proof of deliberate indifference is required. *McClendon v City of Columbia*, 305 F3d 314, 326 (CA 5, 2002). A state actor's failure to alleviate "a significant risk that he should have perceived but did not" does not rise to the level of deliberate indifference. *Farmer v Brennan*, 511 US 825, 838; 114 S Ct 1970; 128 L Ed 2d 811 (1994). To act with deliberate indifference, a state actor must " 'know[] of and disregard[] an excessive risk to [the complainant's] health or safety.' " *Ewolski v City of Brunswick*, 287 F3d 492, 513 (CA 6, 2002), quoting *Farmer*, 511 US at 837. "The case law . . . recognizes official conduct may be more egregious in circumstances allowing for

deliberation . . . than in circumstances calling for quick decisions . . . ." *Williams v Berney*, 519 F3d 1216, 1220-1221 (CA 10, 2008).[34]

If the above quote is not sufficiently clear, the bar for conduct that "shock[s] the conscience" is so high that it has been described as "virtually insurmountable."[35]

---

[34] *Mays*, 323 Mich App at 60-61. See also *In re Beck*, 287 Mich App at 402 (" '[T]he essence of a substantive due process claim is the arbitrary deprivation of liberty or property interests.' A person claiming a deprivation of substantive due process 'must show that the action was so arbitrary (in the constitutional sense) as to shock the conscience.' ") (citations omitted).

[35] *Rimmer-Bey v Brown*, 62 F3d 789, 791 n 4 (CA 6, 1995) (describing the task of showing conscience-shocking conduct as "a virtually insurmountable uphill struggle"). See also *Cruz v Puerto Rico Power Auth*, 878 F Supp 2d 316, 328 (D Puerto Rico, 2012) (" 'The burden to show state conduct that "shocks the conscience" is extremely high, requiring "stunning" evidence of "arbitrariness and caprice" that extends beyond "[m]ere violations of state law, even violations resulting from bad faith" to "something more egregious and more extreme." ' "), quoting *J R v Gloria*, 593 F3d 73, 80 (CA 1, 2010), in turn quoting *DePoutot v Raffaelly*, 424 F3d 112, 119 (CA 1, 2005); *Al-Ami'n v Clarke*, unpublished opinion of the United States District Court for the Eastern District of Virginia, issued February 11, 2014 (Case No. 2:13cv167), p 3 ("This standard is very high and difficult to meet[.]"); *Uhlrig v Harder*, 64 F3d 567, 574 (CA 10, 1995) ("[T]he 'shock the conscience' standard requires a high level of outrageousness . . . ."); 16B Am Jur 2d, Constitutional Law (July 2020 update), § 960 ("State conduct offends substantive due process when it shocks the conscience, constitutes a force that is so brutal as to offend even hardened sensibilities, or is offensive to human dignity. In fact, only a substantial infringement of state law prompted by personal or group animus or a deliberate flouting of the law that trammels significant personal or property rights is a substantive due-process violation. . . . [A] mere violation of state law is not the kind of truly irrational governmental action which gives rise to a substantive due-process claim.") (citations omitted).

In fact, the "deliberate indifference" standard was borrowed from Eighth Amendment jurisprudence. See *Sacramento Co*, 523 US at 849-850. In the Eighth Amendment context, deliberate indifference is also an extremely high standard. See, e.g., *Arenas v Calhoun*, 922 F3d 616, 620 (CA 5, 2019) (" 'Deliberate indifference is an extremely high standard to meet.' "), quoting *Domino v Texas Dep't of Criminal Justice*, 239 F3d 752, 756 (CA 5, 2001); *Battista v Clarke*, 645 F3d 449, 453 (CA 1, 2011) (stating that the deliberate-indifference standard "leave[s] ample room for professional judgment,

Plaintiffs allege that defendants switched Flint's water source despite a 2011 study cautioning against the use of water from the Flint River and warning that the Flint Water Treatment Plant needed upgrades.[36]  Following that study, there was continuing debate about whether the water source should be switched, with some additional studies indicating it should not, but with other individuals arguing that those studies were not reliable.  After switching water sources, certain experts continued to warn about the dangers associated with the water from the Flint River.  Almost immediately, plaintiffs and other Flint residents began to complain about the quality of the water.  As time went on, there were more and more indications that the water was not safe, including various large public and private entities deciding to switch water sources, an outbreak of Legionnaires' disease, and medical testing indicating that children had increased levels of lead in their blood.  While

---

constraints presented by the institutional setting, and the need to give latitude to administrators who have to make difficult trade-offs as to risks and resources").

[36] ROWE Professional Services Company & Lockwood, Andrews & Newnam, Inc, *Analysis of the Flint River as a Permanent Water Supply for the City of Flint* (July 2011), available at <https://www.greatlakeslaw.org/Flint/LAN_2011_Report_with_Appendices.pdf> (accessed July 13, 2020) [https://perma.cc/KJ8F-PNU8].  This study did conclude that there would "need to be some modifications to existing facilities, operating agreements, and permits" if the Flint River was to be used for the water supply. *Id*. at 12.  It then suggested various modifications that would be needed to meet expected future demand but stated that without those modifications the river could supply approximately $2/3$ of the expected daily demand. *Id*.  In another section, the study stated: "Preliminary analysis indicates that water from the river can be treated to meet current regulations; however, additional treatment will be required than for [sic] Lake Huron water.  This results in higher operating costs than the alternative of a new Lake Huron supply." *Id*. at 7.  But I see nothing in this particular study that clearly indicates that using the Flint River as a water source would risk a public health crisis.

this evidence mounted, defendants' representatives continued to assure the public that the water was safe. Finally, defendants opted to change back to the previous water source.

I am not convinced that the studies and expert opinions plaintiffs cite in their complaint are sufficient to show that defendants' behavior was deliberately indifferent.[37] In any complex decision, there are many factors and alternatives that must be considered. This is especially true for major decisions like this one—each option will likely present various risks and costs that must be weighed against the potential benefits. Weighing these factors is a difficult task. Though the evidence plaintiffs cite, viewed in isolation and with the benefit of hindsight, certainly provides some indications of the risks associated with switching Flint's water source, plaintiffs themselves also recount that former Governor Snyder testified that he was repeatedly assured by the Department of Environmental Quality that the water was safe. Plaintiffs have not alleged that there was uniform agreement or a broad consensus that using the Flint River as a water source would cause a serious public health crisis. While there were certainly more indications of serious water-

---

[37] Defendants moved for summary disposition regarding plaintiffs' claim of a substantive due-process right to bodily integrity under MCR 2.116(C)(7) and (8). For motions under MCR 2.116(C)(7), "[t]he contents of the complaint are accepted as true unless contradicted by documentation submitted by the movant." *Maiden v Rozwood*, 461 Mich 109, 119; 597 NW2d 817 (1999). Motions under MCR 2.116(C)(8) "test[] the legal sufficiency of the complaint. All well-pleaded factual allegations are accepted as true and construed in a light most favorable to the nonmovant." *Id*. Courts decide motions under MCR 2.116(C)(8) by considering only the pleadings. *Id*. at 119-120. A motion "may be granted only where the claims alleged are 'so clearly unenforceable as a matter of law that no factual development could possibly justify recovery.' " *Id*. at 119, quoting *Wade v Dep't of Corrections*, 439 Mich 158, 163; 483 NW2d 26 (1992).

quality problems as time went on, the initial studies and expert analyses were contradictory concerning the nature and extent of the water-quality problems and whether the problems could be corrected.[38] Defendants continued to gather information regarding the quality of the water and took that information into account when determining their course of action.[39] Defendants then took steps to reduce the health risks, allocated funds to improve Flint's water quality, appointed a Flint Water Advisory Task Force, and ultimately reconnected to the Detroit water system.

---

[38] For example, the high incidence of Legionnaires' disease was, at first, only noted as having a "possible connection to [the] water supply." There was also disagreement among experts regarding the quality of the water. After Agent Miguel Del Toral of the Environmental Protection Agency (EPA) prepared a memorandum stating that there were high levels of lead, EPA Region 5 Director Dr. Susan Hedman told Mayor Dwayne Walling that "what he was given was a preliminary draft [of the memorandum] and that it would be premature to draw any conclusions based on that draft." Specifically regarding studies of blood lead levels in children, plaintiffs recount that though the Michigan Department of Health and Human Services had data showing elevated blood lead levels, others at the Childhood Lead Poisoning Prevention Program disputed that the water was the cause or that there even were elevated blood lead levels. In sum, despite the various signs that the water posed health risks, plaintiffs cite the Task Force Report, which recounts that there were "repeated assurances that the water was safe."

[39] As to gathering information, plaintiffs note that in January 2015, "[s]taff from Genesee County hospitals, [the Michigan Department of Health and Human Services (MDHHS)], [the Michigan Department of Environmental Quality (MDEQ)] and [the Genesee County Health Department (GCHD)] [met], and MDHHS Director Nick Lyon direct[ed] GCHD to conduct and complete its evaluation of the causes of the increased Legionellosis cases that had begun to occur in 2014." And on January 30, 2015, "Brad Wurfel/MDEQ e-mail[ed] Dave Murray, Governor Snyder's deputy press secretary, re: Legionella, saying said [sic] he didn't want MDEQ Director Wyant 'to say publicly that the water in Flint is safe until we get the results of some county health department traceback work on 42 cases of Legionellosis disease in Genesee County since last May.' "

While hindsight shows that defendants' decision to switch Flint's water source has had tragic consequences, I do not believe that plaintiffs have shown that defendants were deliberately indifferent in their decision to supply Flint residents with an alternative water source.[40] While defendants may have failed to perceive "a significant risk that [they] should have perceived," that does not constitute deliberate indifference.[41] Consequently, while it is clear that mistakes were made, I do not believe that plaintiffs have alleged actions on the part of defendants that surmount the high bar of conscience-shocking behavior.[42]

In sum, even if there were a substantive due-process right to bodily integrity, I do not believe that plaintiffs have alleged the facts necessary to show either that defendants interfered with a deeply rooted right or that defendants' conduct was conscience-shocking.[43] I would reverse the Court of Appeals and grant defendants' motion for summary disposition regarding plaintiffs' substantive due-process claim alleging a violation of their right to bodily integrity.

---

[40] *Votta*, 600 F Appx at 18.

[41] *Farmer*, 511 US at 838.

[42] Judge McKeague reached the same conclusion regarding the plaintiffs' allegations in *Guertin*. *Guertin*, 912 F3d at 947 (McKeague, J., concurring in part and dissenting in part) ("[T]he conduct alleged fails to meet the 'high' conscience-shocking standard.").

[43] In light of my conclusion that plaintiffs failed to allege a claim for a violation of substantive due process because the right they assert is not deeply rooted in our nation's history and they have not alleged conscience-shocking conduct on behalf of defendants, I need not reach the issue whether defendants acted pursuant to a custom or policy.

## II. THE AVAILABILITY OF A DAMAGES REMEDY UNDER *SMITH v DEPARTMENT OF PUBLIC HEALTH*[44]

Even if substantive due process did encompass a right not to be exposed to contaminated water, I would conclude that there is no damages remedy for such a constitutional violation. There are two reasons why I would reach this conclusion. First, even if *Smith v Dep't of Pub Health* applies, the factors Justice BOYLE lists in her partial concurrence weigh against creation of a claim for damages. Second, I have doubts about whether *Smith* was correctly decided and, in any event, whether it should be extended.

### A. THERE IS NO DAMAGES REMEDY UNDER *SMITH*

As the lead opinion recognizes, in *Smith v Dep't of Pub Health*, the Court held that "[a] claim for damages against the state arising from violation by the state of the Michigan Constitution may be recognized in appropriate cases."[45] *Smith* consolidated two cases, *Smith v Michigan*[46] and *Will v Dep't of Civil Serv*.[47] In *Smith*, the plaintiff was living at a state orphanage when the superintendent of his school, mistakenly believing that the

---

[44] *Smith v Dep't of Pub Health*, 428 Mich 540; 410 NW2d 749 (1987).

[45] *Id*. at 544. *Smith* addressed several issues—namely, "(1) whether the state is a 'person' for purposes of a damage suit under 42 USC 1983; (2) whether a state official, sued in an official capacity, is a 'person' for purposes of a damage suit under 42 USC 1983; (3) whether there is an 'intentional tort' exception to governmental immunity; and (4) whether a plaintiff may sue the state for damages for violations of the Michigan Constitution." *Id*. But I focus only on the latter issue and the related holding above.

[46] *Smith v Michigan*, 122 Mich App 340; 333 NW2d 50 (1983).

[47] *Will v Dep't of Civil Serv*, 145 Mich App 214; 377 NW2d 826 (1985).

plaintiff had a mental disability, had him transferred to an institution for people with mental disabilities.[48] The plaintiff lived there for 38 years. He then filed a complaint claiming, in relevant part, that the Department of Health and Human Services had violated his due-process and equal-protection rights under the state Constitution by improperly committing him to the institution.[49] In *Will*, the plaintiff was a state employee who had sought to be promoted to a data systems analyst. He was rejected for the position when the defendant, the Department of State Police, learned of his brother's political activities.[50] The plaintiff sued, claiming that the defendant's refusal to promote him based on his brother's political activities violated his due-process rights.[51]

*Smith* was a fractured decision with four different opinions.[52] Justice BOYLE put forward the following factors to determine whether courts should infer a damages remedy:

---

[48] *Smith*, 428 Mich at 550 (opinion by BRICKLEY, J.).

[49] *Id*. at 551.

[50] *Id*. at 546.

[51] *Id*. at 547.

[52] Justice BRICKLEY, joined by Justice RILEY, "decline[d] to infer any right to sue the state for damages on the basis of violations" that the plaintiff in *Smith* alleged. *Id*. at 612-613 (opinion by BRICKLEY, J.). Justice BOYLE, joined by Justice CAVANAGH, concurred in part and dissented in part. Justice BOYLE said that she would remand the Court of Appeals decision in *Smith* to the Court of Claims for further proceedings, namely, to determine whether the constitutional violation occurred by virtue of a governmental custom or policy and, if so, whether there would be a damages remedy for such a violation. *Id*. at 652 (BOYLE, J., concurring in part and dissenting in part). She proceeded to explain that "[w]e would recognize the propriety of an inferred damage remedy arising directly from violations of the Michigan Constitution in certain cases." *Id*. at 647. Justice ARCHER, joined by Justice LEVIN, dissented on other grounds not relevant to the purposes of this

25

(1) the existence and clarity of the constitutional violation itself, (2) the degree of specificity of the constitutional protection, (3) support for the propriety of a judicially inferred damages remedy in any "text, history, and previous interpretations of the specific provision," (4) "the availability of another remedy," and (5) "various other factors" militating against a judicially inferred damages remedy.[53]

These factors weigh against inferring a damages remedy in this case. First, as explained above, I do not believe that there is a constitutional violation. However, even if there were a clear constitutional violation, the other factors weigh against the creation of a damages remedy. Second, as even the Court of Appeals majority noted, the degree of specificity in the constitutional protection weighs against an inferred damages remedy. As stated, plaintiffs bring a substantive due-process claim under Const 1963, art 1, § 17, our Constitution's parallel provision to the Fourteenth Amendment. But both Justice BRICKLEY and Justice BOYLE noted that Fourteenth Amendment violations are particularly unsuitable for courts to infer a cause of action for damages. Justice BRICKLEY counseled

_____

statement, but he agreed with Justice BOYLE's remand to the Court of Claims. *Id*. at 654-655 (ARCHER, J., dissenting). Justice LEVIN also agreed with Justice ARCHER and concurred in the remand. *Id*. at 652 (LEVIN, J., concurring). Justice GRIFFIN did not participate.

[53] See *id*. at 648-652 (BOYLE, J., concurring in part and dissenting in part). I point out that the Court of Appeals listed the final factors as " 'various other factors' militating for or against a judicially inferred damage remedy." *Mays*, 323 Mich App at 66. But Justice BOYLE instructed courts to consider "various other factors, dependent upon the specific facts and circumstances of a given case, [that] may militate against a judicially inferred damage remedy for violation of a specific constitutional provision." *Smith*, 428 Mich at 651 (BOYLE, J., concurring in part and dissenting in part).

against creating a damages remedy for such a violation, remarking that "the Supreme Court has never extended the reasoning of *Bivens*[54] to violations of the Fourteenth Amendment, and, as Justice Harlan noted in his concurrence in *Bivens*, the appropriateness of money damages for other types of constitutionally protected interests might 'well vary with the nature of the personal interest asserted.' "[55] Justice BOYLE also noted: "Other concerns, such as the degree of specificity of the constitutional protection, should also be considered. For example, there was no question in *Bivens* . . . that the defendants had violated the warrant requirements of the Fourth Amendment. These search and seizure protections are, however, relatively clear-cut in comparison to the Due Process and Equal Protection Clauses."[56]

Third, nothing in the "text, history, and previous interpretations" indicates that there should be a damages remedy here.[57] If anything, that previous interpretations have noted

---

[54] *Bivens v Six Unknown Fed Bureau of Narcotics Agents*, 403 US 388; 91 S Ct 1999; 29 L Ed 2d 619 (1971).

[55] *Smith*, 428 Mich at 628 (opinion by BRICKLEY, J.). See also *id*. at 629-630 ("Therefore, the Supreme Court's hesitation to recognize a *Bivens*-style remedy for violations of the Fourteenth Amendment of the federal constitution suggests caution in recognizing such a novel theory of recovery in our jurisprudence.").

[56] *Id*. at 651 (BOYLE, J., concurring in part and dissenting in part).

[57] Regarding text, this Court and the Court of Appeals have declined to recognize an implied cause of action for damages for a violation of the Equal Protection Clause, Const 1963, art 1, § 2, based on the specific language of that provision. *Cremonte v Mich State Police*, 232 Mich App 240, 252; 591 NW2d 261 (1998) (determining that there is no such cause of action because the Equal Protection Clause, Const 1963, art 1, § 2, states that it shall be implemented by the Legislature); *Lewis v Michigan*, 464 Mich 781, 789; 629 NW2d 868 (2001) ("Given the language of the Michigan Constitution, we hold in this case

there are few " 'guideposts for responsible decisionmaking' " in the realm of substantive due process indicates that courts should not infer a damages remedy.[58]

Fourth, I agree with the lead opinion that it is uncertain whether plaintiffs have alternative remedies at this point, and therefore, this factor is neutral. As Justice BERNSTEIN points out, the state defendants generally have both statutory immunity and Eleventh Amendment immunity. Though plaintiffs seek injunctive relief as well as compensatory and punitive damages against several of the named defendants in a related federal-court action, it is uncertain whether those remedies are available.[59] Moreover, the

that we are without proper authority to recognize a cause of action for money damages or other compensatory relief for past violations of Const 1963, art 1, § 2."). There is no such language in Const 1963, art 1, § 17.

Regarding history, our state's Constitution has guaranteed due process since the 1850 Constitution. Const 1908, art 2, § 16 ("No person shall be compelled in any criminal case to be witness against himself, nor be deprived of life, liberty or property, without due process of law."); Const 1850, art 6, § 32 ("No person shall be compelled, in any criminal case, to be a witness against himself, nor be deprived of life, liberty or property, without due process of law."). When considering whether to add language guaranteeing that no " 'person be held to answer for a criminal offence unless on the presentment or indictment of a grand jury,' " Mr. S. Clark referred to the Due Process Clause, noting that the language came from the Magna Carta. *Report of the Proceedings and Debates in the Convention to Revise the Constitution of the State of Michigan, 1850* (Lansing: R W Ingals, 1850), pp 192-195. But this, of course, does not favor creating or not creating a damages remedy.

[58] *Sierb*, 456 Mich at 528, quoting *Collins*, 503 US at 125.

[59] Though I point out that in *In re Flint Water Cases*, 960 F3d 303, 325 (CA 6, 2020), a case involving some of the same plaintiffs here, the United States Court of Appeals for the Sixth Circuit has recently denied several defendants' motions to dismiss, including those of Darnell Earley and Jerry Ambrose, *id*. at 325, and former Governor Snyder, *id*. at 332. The Sixth Circuit also determined that Flint could not claim Eleventh Amendment immunity. However, the case is still at a relatively early stage, and the Sixth Circuit did not rule out that certain defendants might be immune in the future. See, e.g., *id*. at 324

rights and protections of the federal Safe Drinking Water Act (SDWA), 42 USC 300f *et seq.*, and the Michigan Safe Drinking Water Act, MCL 325.1001 *et seq.*, "are not . . . wholly congruent" with the constitutional rights and protections plaintiffs now allege.[60] Therefore, I agree that this factor is neutral, at least at this time.

Finally, I see no "various other factors," outside of those mentioned above, that militate against an inferred cause of action for damages.[61] In sum, the first, second, and third factors weigh against inferring a cause of action for damages, and the other factors

---

("Some judges of this court have even noted that, because the facts at this stage are yet undeveloped, 'it is generally inappropriate for a district court to grant a 12(b)(6) motion to dismiss on the basis of qualified immunity. Although an officer's entitlement to qualified immunity is a threshold question to be resolved at the earliest possible point, that point is usually summary judgment and not dismissal under Rule 12.' "), quoting *Wesley v Campbell*, 779 F3d 421, 433-434 (CA 6, 2015). Thus, it appears that plaintiffs' federal case might provide an alternative remedy, which would weigh against the creation of a cause of action for damages in this case.

[60] See *Boler v Earley*, 865 F3d 391, 408-409 (CA 6, 2017) (noting that the SDWA protections are not " 'wholly congruent' " with the federal constitutional protections) (citation omitted).

[61] The Court of Appeals noted " 'the degree of outrageousness of the state actors' conduct as alleged by plaintiffs . . . .' " *Mays*, 323 Mich App at 72 (citation omitted). However, as stated above, I do not believe that Justice BOYLE opined that courts should take into account other factors weighing in *favor* of inferring a damages remedy. I recognize that Justice BOYLE's multifactor test is not binding. But even still, I do not believe that, for purposes of determining whether to infer a damages remedy, it is appropriate to consider the degree of outrageousness of the conduct plaintiffs allege. None of the other factors relates to the particular facts at issue; instead, the focus of the analysis is on the nature of the constitutional right at issue, whether it was clearly violated, whether there is any historical support for a damages remedy, and whether another remedy is available. Focusing on the egregiousness of the facts alleged would change the nature of the inquiry and lead to arbitrary outcomes.

29

are, at best, neutral. Considering all the above factors, I believe it is clear that courts should not infer a damages remedy for plaintiffs' claim of a violation of their right to bodily integrity under the Due Process Clause.

## B. THE CONTINUING VIABILITY OF *SMITH*

While I would not recognize a claim for damages here for the reasons stated above, I would also be hesitant to do so in future cases, because I have serious doubts regarding whether *Smith* was correctly decided.[62] As previously explained, there are four opinions in *Smith*. Two of the opinions, Justice BRICKLEY's and Justice BOYLE's, explicitly rely on *Bivens*.[63] Four Justices—Justice BOYLE, Justice RILEY, Justice LEVIN, and Justice ARCHER—voted to remand *Smith v Michigan*[64] to the Court of Claims for that court to determine whether there would be a damages remedy for the constitutional violation.[65]

---

[62] *Smith*, 428 Mich at 544.

[63] *Bivens*, 403 US 388.

[64] *Smith*, 122 Mich App 340.

[65] The plaintiff in *Will* had failed to preserve his claim, and the Court voted to reverse that portion of the Court of Appeals judgment that remanded *Will* to the Court of Claims for further proceedings regarding the liability of the Director of the State Police. *Smith*, 428 Mich at 544-545. Chief Justice MCCORMACK asserts that "it is not at all clear that the relevant holding of *Smith* is at all or exclusively based on *Bivens*." *Smith* is certainly an odd decision, since the Court's opinion was issued as a memorandum opinion consisting only of the issues presented, the Court's holdings, and its disposition of the case. Standing alone, that opinion would appear to lack any substantive legal effect because it violates Const 1963, art 6, § 6, which states that "[d]ecisions of the supreme court . . . shall be in writing and shall contain a concise statement of the facts and reasons for each decision . . . ." See *DeFrain v State Farm Mut Auto Ins Co*, 491 Mich 359, 369; 817 NW2d 504 (2012). However, I think it is clearly apparent from the separate opinions in *Smith* that the Court's holding was based on *Bivens*. Justice BRICKLEY's opinion, which was joined

In *Bivens*, the United States Supreme Court considered "whether violation of [the Fourth Amendment] by a federal agent acting under color of his authority gives rise to a cause of action for damages consequent upon his unconstitutional conduct."[66] The Court held that it did.[67] The petitioner in *Bivens* complained, in relevant part, that federal officers had violated the Fourth Amendment by searching his apartment without a warrant.[68] The respondents argued that the petitioner could only obtain monetary damages under state tort law. But the Court rejected this argument. First, the Court noted that the Fourth Amendment did not preclude only conduct that would be illegal under state law if done by private persons.[69] Second, "[t]he interests protected by state laws . . . , and those protected by the Fourth Amendment's guarantee against unreasonable searches and seizures, may be

---

by Justice RILEY, discussed *Bivens* and its progeny at length, *Smith*, 428 Mich at 613-626 (opinion by BRICKLEY, J.), though it declined to recognize a damages remedy in either of the cases before the Court, *id*. at 626. Justice BOYLE's partial concurrence, which was joined by Justice CAVANAGH, also very clearly relied on *Bivens* to support the conclusion that damages were possible and that *Smith* should be remanded to determine whether such a remedy was proper. *Id*. at 645-648 (BOYLE, J., concurring in part and dissenting in part). In other words, four of the six justices explicitly considered *Bivens*. Though Justice ARCHER and Justice LEVIN wrote separate opinions, they concurred in Justice BOYLE's remand, *id*. at 652 (opinion by LEVIN, J.); *id*. at 658 (ARCHER, J., dissenting), and, presumably, her discussion of *Bivens* since the opinion did not provide any other rationale in support of Justice BOYLE's remand.

[66] *Bivens*, 403 US at 389.

[67] *Id*.

[68] *Id*.

[69] *Id*. at 392.

31

inconsistent or even hostile."[70]  Third, damages are considered an ordinary remedy, so allowing damages for a Fourth Amendment violation was "hardly . . . a surprising proposition."[71]  In sum, the Court concluded that the petitioner had stated a cause of action and that he was "entitled to recover money damages for any injuries he has suffered as a result of the agents' violation of the Amendment."[72]

But *Bivens* was criticized from the outset as posing separation-of-powers concerns.[73]  Justice Rehnquist strongly voiced these concerns regarding *Bivens* in his dissent in *Carlson v Green*:

---

[70] *Id*. at 394.

[71] *Id*. at 395.

[72] *Id*. at 397.  Chief Justice MCCORMACK states that "[t]he Supreme Court has a long history of permitting suits for damages against rogue federal officers."  However, the cases she cites are not examples of courts awarding damages for constitutional violations but rather involve common-law tort and statutory violations.  Fallon, *Bidding Farewell to Constitutional Torts*, 107 Calif L Rev 933, 943 (2019) (discussing *Little v Barreme*, 6 US (2 Cranch) 170; 2 L Ed 243 (1804), and noting that "Barreme sought to recover by bringing a common law trespass action"); *Murray v Schooner Charming Betsy*, 6 US (2 Cranch) 64, 64-65; 2 L Ed 208 (1804) ("An American vessel . . . was not liable to seizure under the non-intercourse law of 27th of February 1800.  If there was no reasonable ground of suspicion that she was a vessel trading contrary to that law, the commander of a *United States* ship of war, who seizes and sends her in, is liable for damages.").  Indeed, it is undisputed that *Bivens* broke new ground in inferring causes of action for damages for constitutional violations.  See *Bell v Hood*, 327 US 678, 684; 66 S Ct 773; 90 L Ed 939 (1946) (noting that the issue "whether federal courts can grant money recovery for damages said to have been suffered as a result of federal officers violating the Fourth and Fifth Amendments . . . has never been specifically decided by this Court").  And, not surprisingly, I am unaware of any binding precedent from our Court or the Court of Appeals implying a cause of action for damages for state constitutional violations prior to *Smith*.

[73] *Bivens*, 403 US at 411-412 (Burger, C.J., dissenting) ("We would more surely preserve the important values of the doctrine of separation of powers—and perhaps get a better

---

32

Although ordinarily this Court should exercise judicial restraint in attempting to attain a wise accommodation between liberty and order under the Constitution, to dispose of this case as if *Bivens* were rightly decided would in the words of Mr. Justice Frankfurter be to start with an "unreality." *Bivens* is a decision "by a closely divided court, unsupported by the confirmation of time," and, as a result of its weak precedential and doctrinal foundation, it cannot be viewed as a check on "the living process of striking a wise balance between liberty and order as new cases come here for adjudication."

\* \* \*

In my view, it is "an exercise of power that the Constitution does not give us" for this Court to infer a private civil damages remedy from the Eighth Amendment or any other constitutional provision. The creation of such remedies is a task that is more appropriately viewed as falling within the legislative sphere of authority.

\* \* \*

result—by recommending a solution to the Congress as the branch of government in which the Constitution has vested the legislative power. Legislation is the business of the Congress, and it has the facilities and competence for that task—as we do not."); *id*. at 427-428 (Black, J., dissenting) ("There can be no doubt that Congress could create a federal cause of action for damages for an unreasonable search in violation of the Fourth Amendment. Although Congress has created such a federal cause of action against *state* officials acting under color of state law [in 42 USC 1983], it has never created such a cause of action against federal officials. If it wanted to do so, Congress could, of course, create a remedy against federal officials who violate the Fourth Amendment in the performance of their duties. But the point of this case and the fatal weakness in the Court's judgment is that neither Congress nor the State of New York has enacted legislation creating such a right of action. For us to do so is, in my judgment, an exercise of power that the Constitution does not give us."); *id*. at 430 (Blackmun, J., dissenting) (referring to the majority opinion as "judicial legislation"). See also Chemerinsky, Federal Jurisdiction (7th ed), § 9.1.2, p 652 (discussing whether *Bivens* offends separation-of-powers principles). See generally Jellum, *"Which Is to Be Master," the Judiciary or the Legislature? When Statutory Directives Violate Separation of Powers*, 56 UCLA L Rev 837, 865 (2009) ("Thus, legislative acts—enacting, amending, and repealing statutes—are those acts that alter the rights, duties, or responsibilities of those outside the legislature. When a branch other than Congress . . . legislates, that branch violates formalist separation of powers.").

33

. . . [C]ongressional authority here may all too easily be undermined when the judiciary, under the guise of exercising its authority to fashion appropriate relief, creates expansive damages remedies that have not been authorized by Congress. Just as there are some tasks that Congress may *not* impose on an Art. III court, there are others that an Art. III court may not simply seize for itself without congressional authorization.[74]

More recently, the United States Supreme Court has recognized these separation-of-powers concerns while noting that it is generally up to Congress to create a cause of action for a constitutional violation.

When a party seeks to assert an implied cause of action under the Constitution itself, just as when a party seeks to assert an implied cause of action under a federal statute, separation-of-powers principles are or should be central to the analysis. The question is "who should decide" whether to provide for a damages remedy, Congress or the courts?

The answer most often will be Congress. When an issue " 'involves a host of considerations that must be weighed and appraised,' " it should be committed to " 'those who write the laws' " rather than " 'those who interpret them.' "[75]

Moreover, when *Bivens* was decided, the United States Supreme Court was willing to create causes of action in the statutory context. *Bivens* went further by allowing courts to create causes of action in the constitutional context. But in *Alexander v Sandoval*,[76] the Court definitively signaled that it would no longer create such causes of action in the

---

[74] *Carlson v Green*, 446 US 14, 32, 34, 37; 100 S Ct 1468; 64 L Ed 2d 15 (1980) (Rehnquist, J., dissenting) (citations omitted).

[75] *Ziglar v Abbasi*, 582 US ___, ___; 137 S Ct 1843, 1857; 198 L Ed 2d 290 (2017) (citations omitted).

[76] *Alexander v Sandoval*, 532 US 275; 121 S Ct 1511; 149 L Ed 2d 517 (2001).

34

statutory context, saying, "[P]rivate rights of action to enforce federal law must be created by Congress."[77]  Justice Scalia, joined by Justice Thomas, explained the implications of this new refusal to create statutory causes of action for *Bivens*:

> *Bivens* is a relic of the heady days in which this Court assumed common-law powers to create causes of action—decreeing them to be "implied" by the mere existence of a statutory or constitutional prohibition.  As the Court points out, we have abandoned that power to invent "implications" in the statutory field.  There is even greater reason to abandon it in the constitutional field, since an "implication" imagined in the Constitution can presumably not even be repudiated by Congress.[78]

---

[77] *Id*. at 286.  See also *Office Planning Group, Inc v Baraga-Houghton-Keweenaw Child Dev Bd*, 472 Mich 479, 496-497; 697 NW2d 871 (2005) ("Although the United States Supreme Court in the last century embraced a short-lived willingness to create remedies to enforce private rights, the Court 'abandoned' that approach to statutory remedies in *Cort v Ash*[, 422 US 66; 95 S Ct 2080; 45 L Ed 2d 26 (1975),] and '[has] not returned to it since.' ") (citations omitted); *Office Planning Group*, 472 Mich at 496-500 (explaining that *Cort* set forth a test for determining whether a court may imply a cause of action from a statute and stating that since "*Alexander*, the Court appears to have abandoned the *Cort* inquiry altogether in favor of a completely textual analysis in determining whether a private remedy exists under a particular statute"); *Hernandez v Mesa*, 589 US ___, ___; 140 S Ct 735, 750-751; 206 L Ed 2d 29 (2020) (Thomas, J., concurring) ("In the decade preceding *Bivens*, the Court believed that it had a duty 'to be alert to provide such remedies as are necessary to make effective' Congress' purposes in enacting a statute.  Accordingly, the Court freely created implied private causes of action for damages under federal statutes.  This misguided approach to implied causes of action in the statutory context formed the backdrop of the Court's decision in *Bivens*. . . .  The Court, however, eventually corrected course.  In the statutory context, the Court 'retreated from [its] previous willingness to imply a cause of action where Congress has not provided one.' ") (citations omitted).

[78] *Correctional Servs Corp v Malesko*, 534 US 61, 75; 122 S Ct 515; 151 L Ed 2d 456 (2001) (Scalia, J., concurring) (citations omitted).

Perhaps because of its shaky grounding, the United States Supreme Court has only recognized a *Bivens*-style remedy in two cases—*Davis v Passman*[79] and *Carlson*.[80]  The Court recently voiced its doubts regarding *Bivens* in *Hernandez v Mesa*,[81] stating as follows:

> We have stated that expansion of *Bivens* is "a 'disfavored' judicial activity," and have gone so far as to observe that if "the Court's three *Bivens* cases [had] been . . . decided today," it is doubtful that we would have reached the same result.  And for almost 40 years, we have consistently rebuffed requests to add to the claims allowed under *Bivens*.[82]

---

[79] *Davis v Passman*, 442 US 228; 99 S Ct 2264; 60 L Ed 2d 846 (1979).

[80] *Carlson*, 446 US 14.  See also *Correctional Servs Corp*, 534 US at 70 ("In 30 years of *Bivens* jurisprudence we have extended its holding only twice, to provide an otherwise nonexistent cause of action against *individual officers* alleged to have acted unconstitutionally," i.e., *Carlson*, "or to provide a cause of action for a plaintiff who lacked *any alternative remedy* for harms caused by an individual officer's unconstitutional conduct," i.e., *Davis*.  "Where such circumstances are not present, we have consistently rejected invitations to extend *Bivens*, often for reasons that foreclose its extension here.").

Though lower federal courts have often refused to extend *Bivens*, see, e.g., *Turpin v Mailet*, 591 F2d 426, 427 (CA 2, 1979); *Arar v Ashcroft*, 585 F3d 559, 581 (CA 2, 2009); *De La Paz v Coy*, 786 F3d 367, 375 (CA 5, 2015); *Vanderklok v United States*, 868 F3d 189, 209 (CA 3, 2017); *Tun-Cos v Perrotte*, 922 F3d 514, 517-518 (CA 4, 2019), some lower federal courts have extended *Bivens*, see Chemerinsky, § 9.1.2, p 651 ("Lower federal courts have recognized *Bivens* suits for violations of the First, Fourth, Fifth, Eighth, Ninth, and Fourteenth Amendments.") (citations omitted).

[81] *Hernandez v Mesa*, 589 US ___; 140 S Ct 735; 206 L Ed 2d 29 (2020).

[82] *Id*. at 742-743 (citations omitted).  See also *Ziglar*, 582 US at ___; 137 S Ct at 1857 ("Given the notable change in the Court's approach to recognizing implied causes of action, however, the Court has made clear that expanding the *Bivens* remedy is now a 'disfavored' judicial activity.  This is in accord with the Court's observation that it has 'consistently refused to extend *Bivens* to any new context or new category of defendants.'  Indeed, the Court has refused to do so for the past 30 years.") (citations omitted);

Relatedly, some justices have called for *Bivens* not to be extended in future cases. For example, Justice Scalia stated that he "would limit *Bivens* and its two follow-on cases ([*Davis*] and [*Carlson*]) to the precise circumstances that they involved."[83] Justice Thomas, joined by Justice Gorsuch, has gone even further and called for *Bivens* to be overturned:

> I write separately because, in my view, the time has come to consider discarding the *Bivens* doctrine altogether. The foundation for *Bivens*—the practice of creating implied causes of action in the statutory context—has already been abandoned. And the Court has consistently refused to extend the *Bivens* doctrine for nearly 40 years, even going so far as to suggest that *Bivens* and its progeny were wrongly decided. *Stare decisis* provides no "veneer of respectability to our continued application of [these] demonstrably incorrect precedents." To ensure that we are not "perpetuat[ing] a usurpation of the legislative power," we should reevaluate our continued recognition of even a limited form of the *Bivens* doctrine.[84]

I agree with the persistent criticism of *Bivens*. In light of the United States Supreme Court's rejection of implied causes of action in the statutory context, it makes little sense to continue implying them in the constitutional context. Doing so raises serious separation-

---

*Ashcroft v Iqbal*, 556 US 662, 675; 129 S Ct 1937; 173 L Ed 2d 868 (2009) ("Because implied causes of action are disfavored, the Court has been reluctant to extend *Bivens* liability 'to any new context or new category of defendants.' ") (citation omitted).

[83] *Correctional Servs Corp*, 534 US at 75 (Scalia, J., concurring). See also *Minneci v Pollard*, 565 US 118, 131; 132 S Ct 617; 181 L Ed 2d 606 (2012) (Scalia, J., concurring); *Wilkie v Robbins*, 551 US 537, 568; 127 S Ct 2588; 168 L Ed 2d 389 (2007) (Thomas, J., concurring) ("I write separately because I would not extend *Bivens* even if its reasoning logically applied to this case.").

[84] *Hernandez*, 589 US at ___; 140 S Ct at 750 (Thomas, J., concurring) (citations omitted).

of-powers concerns. Supporters of *Bivens* argue that its remedy is constitutionally required "in the sense that no other remedial scheme could possibly prevent the substantive constitutional requirements from becoming a 'mere form of words . . . .' "[85] However, I am skeptical that such a remedy is required when the text of neither the United States nor the Michigan Constitution mentions it. Rather, both Constitutions vest their respective legislative branches with the legislative power.[86] This power encompasses the power to create causes of action.[87] While there may be a narrow category of cases for which there is no state tort law cause of action and for which damages appear to be the only effective remedy, I am skeptical that these practical concerns justify allowing the courts to exercise the legislative power by implying causes of action when the Legislature has not seen fit to create a statutory cause of action.[88]

---

[85] Dellinger, *Of Rights and Remedies: The Constitution as a Sword*, 85 Harv L Rev 1532, 1548-1549 (1972), quoting *Mapp v Ohio*, 367 US 643, 655; 81 S Ct 1684; 6 L Ed 2d 1081 (1961). See also Steinman, *Backing Off* Bivens *and the Ramifications of This Retreat for the Vindication of First Amendment Rights*, 83 Mich L Rev 269 (1984).

[86] US Const, art I, § 1 ("All legislative Powers herein granted shall be vested in a Congress of the United States, which shall consist of a Senate and House of Representatives."); Const 1963, art 4, § 1 ("Except to the extent limited or abrogated by article IV, section 6 or article V, section 2, the legislative power of the State of Michigan is vested in a senate and a house of representatives.").

[87] See *Mintz v Jacob*, 163 Mich 280, 283; 128 NW 211 (1910).

[88] Cooley, Constitutional Limitations (5th ed), pp 86-87 n 3 (" 'It is highly probable that inconveniences will result from following the Constitution as it is written. But that consideration can have no force with me. . . . I have never yielded to considerations of expediency in expounding it [i.e., the fundamental law]. There is always some plausible

The critiques of *Bivens* apply equally to *Smith*. By holding, as *Bivens* did, that courts may imply a cause of action for damages from violation of a constitutional provision, *Smith* poses the same separation-of-powers concerns that *Bivens* does. The United States Supreme Court's abandonment of implied causes of action in the statutory context has cast doubt on *Bivens*, which, in turn, undermines our reliance on that case in *Smith*.[89] Perhaps

reason for latitudinarian constructions . . . .' "), quoting *Oakley v Aspinwall*, 3 NY 547, 568 (1850).

In addition to the separation-of-powers concerns, I believe that there are practical problems with charging courts with deciding when to extend *Bivens* as well. As Justice Rehnquist explained:

> Because the judgments that must be made here involve many "competing policies, goals, and priorities" that are not well suited for evaluation by the Judicial Branch, in my view "[t]he task of evaluating the pros and cons of creating judicial remedies for particular wrongs is a matter for Congress and the legislatures of the States." [*Carlson*, 446 US at 36 (Rehnquist, J., dissenting) (citation omitted).]

[89] Like the United States Supreme Court, our Court has declined in recent decades to imply statutory causes of action. In *B F Farnell Co v Monahan*, 377 Mich 552, 555-556; 141 NW2d 58 (1966), this Court noted the " 'general rule' " that there would be a private cause of action under a statute: " 'where a statute imposes upon any person a specific duty for the protection or benefit of others, if he neglects or refuses to perform such duty, he is liable for any injury or detriment caused by such neglect or refusal, if such injury or hurt is of the kind which the statute was intended to prevent; nor is it necessary in such a case as this to declare upon or refer to the statute.' " (Citation omitted.) In *Pompey v Gen Motors Corp*, 385 Mich 537, 552; 189 NW2d 243 (1971), though the Court recognized "[t]he general rule . . . that where a new right is created or a new duty is imposed by statute, the remedy provided for enforcement of that right by the statute for its violation and nonperformance is exclusive," the Court noted "two important qualifications to this rule of statutory construction: In the absence of a pre-existent common law remedy, the statutory remedy is not deemed exclusive if such remedy is plainly inadequate, or unless a contrary intent clearly appears," *id*. at 552 n 14 (citations omitted). Later, the Court set forth a test to determine whether to create a new cause of action. *Gardner v Wood*, 429 Mich 290, 302;

414 NW2d 706 (1987) ("In the interest of public policy, this Court has created a new cause of action to redress the violation of a penal statute and, pursuant to the following test, incorporated the statute as the specific standard of care: 'The court may adopt as the standard conduct of a reasonable man the requirements of a legislative enactment or an administrative regulation whose purpose is found to be exclusively or in part (a) to protect a class of persons which includes the one whose interest is invaded, and (b) to protect the particular interest which is invaded, and (c) to protect that interest against the kind of harm which has resulted, and (d) to protect that interest against the particular hazard from which the harm results.' ") (quotation marks and citation omitted).

However, the Court later disavowed *Pompey*'s two qualifications to the general rule that when a statute creates a new duty or a new right, the statutory remedy is exclusive. *Lash v Traverse City*, 479 Mich 180, 192 n 19; 735 NW2d 628 (2007) ("We need not address the dictum in the *Pompey* footnote that some quantum of additional remedy is permitted where a statutory remedy is 'plainly inadequate.' We do note that this principle, which has never since been cited in any majority opinion of this Court, appears inconsistent with subsequent caselaw."). Finally, though *Lash*, *id*. at 192-193, did cite the test from *Gardner*, 429 Mich at 302, to determine if the Court may create a new cause of action, only a week before *Lash* was issued, the Court issued *South Haven v Van Buren Co Bd of Comm'rs*, 478 Mich 518; 734 NW2d 533 (2007). In that case, the Court reaffirmed the more recent trend in our cases, which emphasizes that it is the Legislature's intent and the statutory language that control whether a party may pursue a particular remedy:

> "It is well settled that when a statute provides a remedy, a court should enforce the legislative remedy rather than one the court prefers." To determine whether a plaintiff may bring a cause of action for a specific remedy, this Court "must determine whether [the Legislature] intended to create such a cause of action." " ' "Where a statute gives new rights and prescribes new remedies, such remedies must be strictly pursued; and a party seeking a remedy under the act is confined to the remedy conferred thereby and to that only." ' " Accordingly, this Court has previously declined to establish a remedy that the Legislature has not provided. [*Id*. at 528-529, quoting *Roberts v Mecosta Co Gen Hosp*, 466 Mich 57, 66 n 5; 642 NW2d 663 (2002); *Office Planning Group*, 472 Mich at 496; *McClements v Ford Motor Co*, 473 Mich 373, 382; 702 NW2d 166 (2005), quoting *Monroe Beverage Co, Inc v Stroh Brewery Co*, 454 Mich 41, 45; 559 NW2d 297 (1997), in turn quoting *Lafayette Transfer & Storage Co v Pub Utilities Comm*, 287 Mich 488, 491; 283 NW 659 (1939).]

taking our cue from the United States Supreme Court,[90] our Court has never extended

*Smith*, and the Court of Appeals has only done so in one other unpublished case.[91]

---

See also *Mich Ass'n of Home Builders v City of Troy*, 504 Mich 204, 225; 934 NW2d 713 (2019) (citing *Lash* for the conclusion that though the plaintiffs could not bring a cause of action for damages when the statute created a new right but did not provide an express cause of action, the plaintiffs could seek injunctive or declaratory relief).

[90] Chief Justice MCCORMACK argues that the fact that the United States Supreme Court now looks askance at *Bivens* should not lead us to question *Smith* because "we are separate sovereigns. We decide the meaning of the Michigan Constitution and do not take our cue from any other court, including the highest Court in the land." Of course, I agree that we are separate sovereigns and that we alone are tasked with interpreting our Constitution. However, it would hardly be a mark of our independence to continue to follow *Bivens*, which, although it has been cabined, remains the governing federal precedent.

[91] In *Jo-Dan, Ltd v Detroit Bd of Ed*, unpublished per curiam opinion of the Court of Appeals, issued July 14, 2000 (Docket No. 201406), p 16, the Court of Appeals held, "If the finder of fact in the trial court determines that a plaintiff sustained his, her, or its burden of proving that the defendant violated the fair and just treatment clause, the full panoply of remedies are available. Those remedies include, but are not limited to, monetary damages when 'appropriate' according to *Smith* . . . ." But there, the Detroit Board of Education did not argue that monetary damages were inappropriate. *Id*. at 16 n 13. And, of course, the decision is unpublished, and therefore it is not precedentially binding. MCR 7.215(C)(1).

The Court of Appeals has repeatedly noted *Smith*'s holding that there may be an implied cause of action for damages for state constitutional violations. In most cases, findings that there was no constitutional violation, or that the violation did not occur as a result of a custom or policy, have precluded the Court of Appeals from recognizing such a cause of action. See, e.g., *Champion's Auto Ferry, Inc v Pub Serv Comm*, 231 Mich App 699, 717; 588 NW2d 153 (1998) (citing *Smith* in support of the conclusion that "[i]f and when [the plaintiff] can establish that its authorized rates are in fact confiscatory, it may sue in the Court of Claims for just compensation on a theory of constitutional tort," but also stating that the plaintiff "ha[d] failed to establish that any . . . taking has occurred"); see also *Marlin v Detroit*, 177 Mich App 108; 441 NW2d 45 (1989); *Johnson v Wayne Co*, 213 Mich App 143; 540 NW2d 66 (1995); *Carlton v Dep't of Corrections*, 215 Mich App 490; 546 NW2d 671 (1996); *Jones v Powell*, 227 Mich App 662; 577 NW2d 130 (1998), aff'd 462 Mich 329 (2000); *Reid v Michigan*, 239 Mich App 621; 609 NW2d 215 (2000); *LM v Michigan*, 307 Mich App 685; 862 NW2d 246 (2014). Before *Smith* was decided,

For these reasons, I believe that like *Bivens*, *Smith*'s holding that there may be an implied claim for damages arising from a state constitutional violation raises serious separation-of-powers concerns. Additionally, given the United States Supreme Court's recent refusal to imply causes of action in the statutory context, *Bivens*'s holding that such causes of action may be implied in the constitutional context rests on shaky ground. Consequently, and particularly in light of our Court's similar trend, so does *Smith*'s. As a result, I question whether *Smith* was correctly decided on this point, and I would be willing to reconsider *Smith* in an appropriate future case. At a minimum, I believe that the Court should carefully weigh these points before extending *Smith* to any further constitutional violations.[92]

---

the Court of Appeals also relied on *Bivens* in *Kewin v Melvindale Northern Allen Park Pub Sch Bd of Ed*, 65 Mich App 472; 237 NW2d 514 (1975), in which it recognized a damages award for a violation of the Fourteenth Amendment. Though this decision is published, it was issued prior to November 1, 1990, so it is not precedential. MCR 7.215(J)(1).

Other states remain split on whether to recognize a *Bivens*-style remedy for state constitutional violations. See 74 Am Jur 2d, Torts (May 2020 update), § 44 (recounting that some states allow an implied cause of action for unconstitutional searches, while others do not). However, in recent years, state courts have recognized fewer *Bivens*-style remedies. 75 ALR5th 619 lists 25 cases in which an implied cause of action was recognized under an analogy to *Bivens* and 61 cases in which the cause of action was not recognized. Every case decided after 2000 declined to recognize a *Bivens*-style remedy.

[92] To be clear, limiting *Smith* to the due-process and equal-protection claims at issue in that case would mean declining to recognize a claim for monetary damages under Const 1963, art 1, § 11, our state Constitution's parallel provision to the Fourth Amendment, even though that would be similar to the type of claim recognized in *Bivens* itself.

III.  CONCLUSION

I would reverse the Court of Appeals' ruling on plaintiffs' substantive due-process claim for a violation of bodily integrity and would instead grant summary disposition in favor of defendants.  The right that plaintiffs claim—a right not to be exposed to contaminated water—is not deeply rooted in our nation's history and tradition, and plaintiffs have not alleged conduct on behalf of defendants that shocks the conscience. Even if plaintiffs had alleged a substantive due-process claim for a violation of bodily integrity, under *Smith* there would be no damages remedy.  Moreover, I have serious doubts as to whether *Smith* was correct in holding that "[a] claim for damages against the state arising from violation by the state of the Michigan Constitution may be recognized in appropriate cases."[93]  For this reason, I would be willing to reconsider *Smith* in an appropriate future case.  At a minimum, I believe the Court should carefully weigh the above points before extending *Smith* to any further constitutional violations.

David F. Viviano

---

[93] *Smith*, 428 Mich at 544.

STATE OF MICHIGAN

SUPREME COURT

MELISSA MAYS, MICHAEL ADAM
MAYS, JACQUELINE PEMBERTON,
KEITH JOHN PEMBERTON, ELNORA
CARTHAN, RHONDA KELSO, and ALL
OTHERS SIMILARLY SITUATED,

        Plaintiffs-Appellees,

v                                     Nos. 157335-7

GOVERNOR OF MICHIGAN, STATE OF
MICHIGAN, DEPARTMENT OF
ENVIRONMENTAL QUALITY, and
DEPARTMENT OF HEALTH AND
HUMAN SERVICES,

        Defendants-Appellants,

and

DARNELL EARLEY and JERRY
AMBROSE,

        Defendants-Appellees.

_____

MELISSA MAYS, MICHAEL ADAM
MAYS, JACQUELINE PEMBERTON,
KEITH JOHN PEMBERTON, ELNORA
CARTHAN, RHONDA KELSO, and ALL
OTHERS SIMILARLY SITUATED,

        Plaintiffs-Appellees,

v                                     Nos. 157340-2

GOVERNOR OF MICHIGAN, STATE OF MICHIGAN, DEPARTMENT OF ENVIRONMENTAL QUALITY, and DEPARTMENT OF HEALTH AND HUMAN SERVICES,

        Defendants-Appellees,

and

DARNELL EARLEY and JERRY AMBROSE,

        Defendants-Appellants.

_____

MARKMAN, J. (*dissenting*).

In response to the Flint water crisis, plaintiffs filed this putative class-action lawsuit against former Governor Rick Snyder, the state of Michigan, the Michigan Department of Environmental Quality (MDEQ), the Michigan Department of Health and Human Services and former Flint emergency managers Darnell Earley and Jerry Ambrose. The complaint alleged a violation of Const 1963, art 1, § 17 (substantive due-process right to bodily integrity) and a violation of Const 1963, art 10, § 2 (inverse condemnation). The state defendants and the former emergency managers separately moved for summary disposition. The Court of Claims denied defendants' motions for summary disposition on those two claims, and in a published and split decision, the Court of Appeals affirmed. *Mays v Governor*, 323 Mich App 1; 916 NW2d 227 (2018). This Court subsequently granted leave to appeal, *Mays v Governor*, 503 Mich 1030 (2019), and heard oral argument on March 4, 2020. A majority of this Court now affirms the Court of Appeals' conclusion with regard to plaintiffs' inverse-condemnation claim but affirms only by equal division

2

with regard to plaintiffs' violation-of-bodily-integrity claim. Because I conclude that plaintiffs failed to comply with MCL 600.6431(3), the notice provision of the Court of Claims Act, MCL 600.6401 *et seq.*, I would reverse the Court of Appeals and remand to the Court of Claims for entry of an order disposing of all of plaintiffs' claims and dismissing the case.[1]

## I. ANALYSIS

### A. LEGAL BACKGROUND

MCL 600.6452 provides, in pertinent part:

> (1) Every claim against the state, cognizable by the court of claims, shall be forever barred unless the claim is filed with the clerk of the court or suit instituted thereon in federal court as authorized in section 6440, within 3 years after the claim first accrues.

> (2) Except as modified by this section, the provisions of [Revised Judicature Act (RJA)] chapter 58, relative to the limitation of actions, shall also be applicable to the limitation prescribed in this section.

MCL 600.6431 provides, in pertinent part:

> (1) No claim may be maintained against the state unless the claimant, within 1 year after such claim has accrued, files in the office of the clerk of the court of claims either a written claim or a written notice of intention to file a claim against the state or any of its departments, commissions, boards, institutions, arms or agencies, stating the time when and the place where such

---

[1] Justice BERNSTEIN is certainly correct that what occurred to the people of Flint was appalling. But he is, with all respect, incorrect in his characterization of the instant analysis as "highly legalistic." Relevant law *requires* plaintiffs to "file with the clerk of the court of claims a notice of intention to file a claim or the claim itself within 6 months following the happening of the event giving rise to the cause of action," MCL 600.6431(3), and plaintiffs did not do this. Mine is a wholly legal, not a "legalistic," analysis.

3

claim arose and in detail the nature of the same and of the items of damage alleged or claimed to have been sustained, which claim or notice shall be signed and verified by the claimant before an officer authorized to administer oaths.

\* \* \*

(3) In all actions for property damage or personal injuries, claimant shall file with the clerk of the court of claims a notice of intention to file a claim or the claim itself within 6 months following the happening of the event giving rise to the cause of action.

And MCL 600.5855 of the RJA, MCL 600.101 *et seq*., provides:

If a person who is or may be liable for any claim fraudulently conceals the existence of the claim or the identity of any person who is liable for the claim from the knowledge of the person entitled to sue on the claim, the action may be commenced at any time within 2 years after the person who is entitled to bring the action discovers, or should have discovered, the existence of the claim or the identity of the person who is liable for the claim, although the action would otherwise be barred by the period of limitations.

Furthermore, MCL 600.5827 provides, in pertinent part, that "the claim accrues at the time the wrong upon which the claim is based was done regardless of the time when damage results." "The wrong is done when the plaintiff is harmed rather than when the defendant acted." *Boyle v Gen Motors Corp*, 468 Mich 226, 231 n 5; 661 NW2d 557 (2003). In other words, "the 'wrong' in MCL 600.5827 is the date on which the defendant's breach harmed the plaintiff, as opposed to the date on which defendant breached his duty." *Frank v Linkner*, 500 Mich 133, 147; 894 NW2d 574 (2017) (quotation marks and citation omitted). "The relevant 'harms' for that purpose are the actionable harms alleged in plaintiff's cause of action." *Id*. at 150. "Additional damages resulting from the same harm do not reset the accrual date or give rise to a new cause of action." *Id*. at 155.

4

In *Trentadue*, 479 Mich at 391-392, this Court held that "courts may not employ an extrastatutory discovery rule to toll accrual in avoidance of the plain language of MCL 600.5827 . . . ." That is, *Trentadue* abrogated the common-law discovery rule, which had "allow[ed] tolling of the statutory period of limitations when a plaintiff could not have reasonably discovered the elements of a cause of action within the limitations period . . . ." *Id*. at 382. Therefore, in the absence of an applicable statutory discovery rule, an action accrues not when the plaintiff discovers the cause of action, but when the defendant's breach harmed the plaintiff. In other words, the period of limitations begins to run when a plaintiff suffers harm, not when a plaintiff first learns of that harm. *Trentadue* declined the plaintiff's request to make an "equitable" exception on her behalf, explaining:

> [I]f courts are free to cast aside a plain statute in the name of equity, even in such a tragic case as this, then immeasurable damage will be caused to the separation of powers mandated by our Constitution. Statutes lose their meaning if an aggrieved party need only convince a willing judge to rewrite the statute under the name of equity. Significantly, such unrestrained use of equity also undermines consistency and predictability for plaintiffs and defendants alike. [*Id*. at 406-407 (quotation marks and citations omitted).]

In *Rowland v Washtenaw Co Rd Comm*, 477 Mich 197, 200, 213; 731 NW2d 41 (2007), this Court further held that failure to comply with the notice provision applicable to the defective-highway exception to governmental immunity gives rise to a bar to claims filed pursuant to the defective-highway exception, regardless of whether the governmental agency suffered actual prejudice, because this Court lacks the authority to incorporate an actual-prejudice requirement into the statute.

Similarly, in *McCahan v Brennan*, 492 Mich 730, 733; 822 NW2d 747 (2012), we held that the notice provision of the Court of Claims Act, MCL 600.6431, "must be

interpreted and enforced as plainly written and that no judicially created saving construction is permitted to avoid a clear statutory mandate." More specifically, we held that "when the Legislature conditions the ability to pursue a claim against the state on a plaintiff's having filed specific statutory notice, the courts may not engraft an 'actual prejudice' component onto the statute as a precondition to enforcing the legislative prohibition." *Id*. at 732-733. We further held that

> MCL 600.6431(1) details the notice requirements that must be met in order to pursue a claim against the state, including a general deadline of one year after accrual of the claim. MCL 600.6431(3) then modifies only the deadline requirement for a specific class of claims—those involving personal injury or property damage—replacing the one-year deadline with a six-month deadline. Thus, subsections (1) and (3) together provide that in all actions for personal injuries, "[n]o claim may be maintained against the state" unless the claimant files with the Clerk of the Court of Claims the required notice of intent to file a claim or the claim itself within six months. [*Id*. at 744-745.]

That is, "the only substantive change effectuated in subsection (3) is a reduction in the timing requirement for specifically designated cases." *Id*. at 741.

In *Bauserman v Unemployment Ins Agency*, 503 Mich 169, 173; 931 NW2d 539 (2019), this Court held that under MCL 600.6431(3), "the 'happening of the event giving rise to the cause of action' for a claim seeking monetary relief is when the claim accrues . . . ." We also held that "there is no meaningful distinction between 'the happening of the event giving rise to [a] cause of action' seeking monetary relief under MCL 600.6431(3) and when such a claim accrues under MCL 600.5827." *Id*. at 184.[2]

---

[2] This Court noted that "[b]ecause the issue is uncontested, we presume, without deciding, that the definition of 'accrual' in MCL 600.5827 applies equivalently to MCL 600.6431." *Id*. at 183 n 8. We also noted that even if we were to apply the common-law definition of

6

In *Rusha v Dep't of Corrections*, 307 Mich App 300; 859 NW2d 735 (2014), the Court of Appeals rejected the defendant's argument that MCL 600.6431 does not apply to constitutional torts. The Court of Appeals held that the Legislature possesses the authority to enact procedural rules governing constitutional claims as long as the rules do not place an undue burden on a constitutional right. *Id*. at 307-308. In other words, the rules cannot be "so harsh and unreasonable in their consequences that they effectively divest plaintiffs of the access to the courts intended by the grant of the substantive right." *Id*. at 311 (quotation marks and citation omitted). See also *Taxpayers Allied for Constitutional Taxation v Wayne Co*, 450 Mich 119, 125-126; 537 NW2d 596 (1995) ("The one-year limitation is not in the class of limitation periods that are 'so harsh and unreasonable in their consequences that they effectively divest plaintiffs of the access to the courts intended by the grant of the substantive right.' "), quoting *Forest v Parmalee*, 402 Mich 348, 359; 262 NW2d 653 (1978). The Court of Appeals held that MCL 600.6431 places a "reasonable, albeit minimal, burden on a plaintiff to advise the state of potential claims." *Rusha*, 307 Mich App at 313. This Court denied leave to appeal in *Rusha*. *Rusha v Dep't of Corrections*, 498 Mich 860 (2015).

---

"accrual," the outcome would not be any different. *Id*. "Under the common law, a claim generally accrues 'when all of the elements of the cause of action have occurred and can be alleged in a proper complaint.' " *Id*., quoting *Connelly v Paul Ruddy's Equip Repair & Serv Co*, 388 Mich 146, 150; 200 NW2d 70 (1972). Similarly, in the instant case, because the issue is uncontested, I presume, without deciding, that the definition of "accrual" in MCL 600.5827 applies equivalently to MCL 600.6431. In addition, as discussed in more detail later, application of the common-law definition of "accrual" would not alter my conclusion that plaintiffs' complaint was not timely filed.

7

## B. TIMELINESS

Plaintiffs here failed to file a notice of intention to file a claim. They filed their complaint on January 21, 2016, and thus the event giving rise to the cause of action must have happened on or after July 21, 2015, in order for plaintiffs' action to have been filed in a timely manner. Accordingly, if the event giving rise to the cause of action was the switching of the water supply on April 25, 2014, plaintiffs' action is untimely.

The Court of Appeals held that "genuine issues of material fact still exist regarding whether plaintiffs satisfied the statutory notice requirements of MCL 600.6431." *Mays*, 323 Mich App at 25. It also held that "the harsh-and-unreasonable-consequences exception relieves plaintiffs from the statutory notice requirements and . . . the fraudulent-concealment exception of MCL 600.5855 may provide an alternative basis to affirm the court's denial of summary disposition." *Id.* I respectfully disagree with each of these conclusions.

## 1. ACCRUAL

In an action against the state for property damage or personal injuries, the "claimant shall file with the clerk of the court of claims a notice of intention to file a claim or the claim itself within 6 months following the happening of the event giving rise to the cause of action." MCL 600.6431(3). This Court recently held that "there is no meaningful distinction between 'the happening of the event giving rise to [a] cause of action' seeking monetary relief under MCL 600.6431(3) and when such a claim accrues under MCL

600.5827." *Bauserman*, 503 Mich at 184.[3] A claim accrues under MCL 600.5827 "at the time the wrong upon which the claim is based was done regardless of the time when damage results." "We have explained that the date of the 'wrong' referred to in MCL 600.5827 is the date on which the defendant's breach harmed the plaintiff, as opposed to the date on which defendant breached his duty," *Bauserman*, 503 Mich at 183 (quotation marks and citation omitted), or the date on which the plaintiff discovered the harm, *Trentadue*, 479 Mich at 391-392. "The relevant 'harms' for that purpose are the actionable harms alleged in plaintiff's cause of action." *Frank*, 500 Mich at 150. "Additional damages resulting from the same harm do not reset the accrual date or give rise to a new cause of action." *Id*. at 155.

Accordingly, "we are called upon to 'determine the date on which plaintiffs first incurred the harms they assert' by looking to the 'actionable harms' alleged in plaintiffs' complaint." *Bauserman*, 503 Mich at 184-185, quoting *Frank*, 500 Mich at 150. Plaintiff's original complaint alleges the following:

- Plaintiffs "from April 25, 2014 to the present, have experienced and will continue to experience serious personal injury and property damage caused by

---

[3] The Court of Appeals opinion in the instant case preceded this Court's opinion in *Bauserman*. The Court of Appeals dissent concluded that the common-law definition of accrual was applicable, including the common-law discovery rule. *Mays*, 323 Mich App at 98 (RIORDAN, J., dissenting). Nevertheless, the dissent concluded that the action was not timely filed because plaintiffs knew or should have known of their cause of action significantly longer than six months before they filed this cause of action. *Id*. at 99. Assuming for the sake of argument that the common-law definition of accrual, including the common-law discovery rule, *does* apply here, I agree with the dissenting judge that the action was not timely filed because plaintiffs knew or should have known of their cause of action more than six months before they filed the cause of action, as will be discussed in greater detail later.

9

Defendants' deliberately indifferent decision to expose them to the extreme toxicity of water pumped from the Flint River into their homes, schools, hospitals, correctional facilities, workplaces and public places."

- Defendants "deprived Plaintiffs of life, liberty and property without due process of law when they knowingly took from Plaintiffs safe drinking water and replaced it with what they knew to be a highly toxic alternative solely for fiscal purposes."

- Plaintiffs "since April 25, 2014, were and continue to be exposed to highly dangerous conditions created, caused and knowingly prolonged by Defendants' deliberately indifferent and shocking decision to replace safe drinking water supplied by the City of Detroit's water system with extremely toxic water pumped from the Flint River[.]"

- "Within days after the switch, Defendant State, through its Defendant agencies, departments and/or officials, began receiving complaints from water users, including Plaintiffs and/or Plaintiff Class members, that the water was cloudy and foul in appearance, taste and odor."

- "By August, 2014, Flint water tested positive for *E. coli.* and several 'boil water' advisories were issued by the City of Flint through September, 2014."

- "During the next eight (8) months, Flint water users, including Plaintiffs and/or Plaintiff Class members, expressed their concerns about water quality in multiple ways, including letters, emails and telephone calls to Flint and MDEQ officials, the media and through well publicized demonstrations on the streets of Flint."

- "On January 20, 2015, citizen protests mounted fueled in part by encouragement from environmental activist Erin Brockovich and her associate, water expert Bob Bowcock."

- "On February 17, 2015, Flint water users staged public demonstrations demanding that Flint re-connect with Detroit."

- "This action is brought by the named Plaintiffs on behalf of individuals who from April 25, 2014 to present were exposed to toxic Flint water and experienced an injury to their person and/or property and/or who in the future will be so injured."

Plaintiffs' amended complaint alleges the following:

- "This constitutional tort class action is pursued on behalf of Flint water users and property owners from April 25, 2014 to the present, which include but are not limited to, tens of thousands of individuals and businesses, who have experienced and will continue to experience serious personal injury and property damage caused by Defendants' deliberately indifferent decision to expose them to the extreme toxicity of water pumped from the Flint River into their homes, schools, hospitals, businesses, correctional facilities, workplaces and public places . . . ."

- Plaintiffs "since April 25, 2014, were and continue to be injured in person and property because they were exposed to highly dangerous conditions created, caused and knowingly prolonged by Defendants' conduct . . . ."

- "In June 2014, citizen complaints about contaminated water continued without the State doing anything to address these complaints. Many Flint water users reported that the water was making them ill."

- "The Governor's office received citizen complaints and was well aware of numerous press stories about water quality problems as early as May 2014 and continuing throughout 2015."

- "On February 17, 2015, Flint water users staged public demonstrations demanding that Flint re-connect with [the Detroit Water and Sewerage Department]."

The actionable harm alleged in plaintiffs' two complaints consists of the exposure to the toxic water from the Flint River, which began on April 25, 2014. Simply put, plaintiffs did not file a notice of intention to file a claim or the claim itself within six months of that date; therefore, their claim is barred by MCL 600.6431(3).

In an order in *Henry v Dow Chem Co*, 501 Mich 965, 965 (2018), this Court held that the action therein accrued when the dioxins reached the plaintiffs' property, not when the plaintiffs first became aware of the damage to their property nor when they became aware of the extent of the damage to their property. Our order was issued the day before the Court of Appeals issued its opinion in the instant case, in which the Court of Appeals

11

cited its very decision in *Henry*, which this Court had just reversed. The Court of Appeals' holding in this case that "the date on which defendants acted to switch the water is not necessarily the date on which plaintiffs suffered the harm giving rise to their causes of action," *Mays*, 323 Mich App at 28, and the lead opinion's not dissimilar conclusion are both inconsistent with our holding in *Henry* that plaintiffs in that case were allegedly harmed once the dioxins reached their property. Just as the plaintiffs were allegedly harmed once the dioxins reached their property in *Henry*, plaintiffs in this case were allegedly harmed once the Flint River water reached their property.[4]

The lead opinion concludes that "questions of fact remain as to when plaintiffs suffered injury to person and property . . . ." However, plaintiffs' complaint and amended complaint very clearly allege that plaintiffs were harmed beginning on April 25, 2014, when they were first exposed to the contaminated water of the Flint River. Although plaintiffs claim that they *continued* over time to be harmed by such exposure, "[a]dditional damages resulting from the same harm do not reset the accrual date or give rise to a new cause of action." *Frank*, 500 Mich at 155. See also *Connelly v Paul Ruddy's Equip Repair*

_____

[4] The lead opinion concludes that *Henry* is distinguishable because plaintiffs in the instant case "do not allege that their claimed harms resulted *at the time* Flint's water source was switched." However, plaintiffs' original complaint alleges that plaintiffs "*from April 25, 2014* to the present, have experienced and will continue to experience serious personal injury and property damage caused by Defendants' deliberately indifferent decision to expose them to the extreme toxicity of water pumped from the Flint River into their homes, schools, hospitals, correctional facilities, workplaces and public places." (Emphasis added.) Similarly, plaintiffs' amended complaint alleges that plaintiffs "*since April 25, 2014*, were and continue to be injured in person and property because they were exposed to highly dangerous conditions created, caused and knowingly prolonged by Defendants' conduct . . . ." (Emphasis added.)

12

*& Serv Co*, 388 Mich 146, 151; 200 NW2d 70 (1972) ("Once all of the elements of an action for personal injury, including the element of damage, are present, the claim accrues and the statute of limitations begins to run. Later damages may result, but they give rise to no new cause of action, nor does the statute of limitations begin to run anew as each item of damage is incurred.").[5]

Plaintiffs rely on *Hart v Detroit*, 416 Mich 488; 331 NW2d 438 (1982), to argue in particular that their inverse-condemnation claim was timely filed. *Hart* held:

> The time of "taking" in an inverse condemnation action is not necessarily coincidental with the time plaintiff's cause of action accrues. . . . It is common for such actions to involve a continuous wrong by the condemnor rather than a single act. In an inverse condemnation action such as the present one, in which plaintiffs claim a continuous wrong by the condemnor, it is well-settled that the statute of limitations does not begin to run until the consequences of the condemnor's actions have stabilized. [*Id.* at 503-504.]

However, *Hart* is no longer good law because this Court in *Garg v Macomb Co Community Mental Health Servs*, 472 Mich 263; 696 NW2d 646 (2005), later abolished the "continuing violations" doctrine because it was inconsistent with the language of the statute of limitations. As this Court explained:

> [T]he statute simply states that a plaintiff "shall not" bring a claim for injuries outside the limitations period. Nothing in these provisions permits a plaintiff to recover for injuries outside the limitations period when they are

---

[5] The lead opinion states that "[p]laintiffs have also alleged injuries that might include plaintiffs who suffered in vitro exposure to toxic water" and therefore "[i]t would simply be illogical to foreclose a plaintiff's suit if the plaintiff had been exposed to the Flint water in the womb and thus suffered harm but had not yet been born as of April 2014." However, plaintiffs' complaints do not say anything at all concerning in vitro exposure to toxic water; therefore, that issue is simply not before this Court.

susceptible to being characterized as "continuing violations." To allow recovery for such claims is simply to extend the limitations period beyond that which was expressly established by the Legislature. [*Id*. at 282.]

The same proposition is true here. MCL 600.6431 provides that "[n]o claim may be maintained against the state . . . for property damage or personal injuries [unless the] claimant . . . file[s] with the clerk of the court of claims a notice of intention to file a claim or the claim itself within 6 months following the happening of the event giving rise to the cause of action."[6] As discussed earlier, the event giving rise to the cause of action at issue here was the exposure to the toxic water, which initially occurred on April 25, 2014.[7]

---

[6] The lead opinion is correct that *Hart* involved an inverse-condemnation claim, while *Garg* involved a discrimination claim. However, the issue in both those cases was essentially the same: whether the statute of limitations permits a plaintiff to recover for injuries suffered outside the limitations period where those injuries are susceptible to being characterized as "continuing violations." *Garg*, the later-in-time decision, answered that question in the negative, and I see no logical reason why its reasoning would not apply in other contexts, including, in particular, in the context of an inverse-condemnation claim. Although this Court did not expressly overrule *Hart* in *Garg*, I do not see how the reasoning of *Hart* conceivably could survive the reasoning of *Garg*.

[7] Although *Henry* did not involve an inverse-condemnation claim, it did involve a similar claim of contamination that allegedly resulted in a diminution of property value. And this Court held that the claim accrued when the dioxin reached the plaintiffs' property, "regardless of whether it was possible at that time to calculate the level of monetary damage." *Henry v Dow Chem Co,* 319 Mich App 704, 736; 905 NW2d 422 (2017) (GADOLA, P.J., dissenting); *Henry*, 501 Mich at 965 (reversing part of the opinion of the Court of Appeals "for the reasons stated in the Court of Appeals dissenting opinion").

The lead opinion concludes that "[t]he economic damage plaintiffs allege from the diminution of their properties' value could not have occurred on the date the water source was switched." Instead, it asserts, "[p]laintiffs' property diminished in value at a later date, yet to be determined, when a buyer or bank had the requisite information to be disinclined to buy or finance the purchase of property in Flint." But this Court rejected a similar argument in *Henry* when it adopted Judge GADOLA's dissent. In *Henry*, the Court of Appeals held that the plaintiffs' action did not accrue until the MDEQ revealed to the public that elevated dioxin concentrations were pervasive in the Tittabawassee river floodplain

Plaintiffs did not file a notice of intention to file a claim or the claim itself within six months of April 25, 2014, and therefore their claims are barred. Once again, "[a]dditional damages resulting from the same harm do not reset the accrual date or give rise to a new cause of action." *Frank*, 500 Mich at 155.[8]

---

and restricted the property owners' rights to use their property. Judge GADOLA concluded that the plaintiffs' action accrued when the dioxins reached the plaintiffs' property, explaining that "[i]t may be true that the value of plaintiffs' property changed when the MDEQ published its 2002 bulletin, but plaintiffs' discovery in 2002 that their damages were greater than originally supposed when the dioxin was deposited on their properties, possibly as early as the 1970s, did not create a new accrual date for plaintiffs' claims. Such reasoning overlooks the clear directive of MCL 600.5827 that 'the claim accrues at the time the wrong upon which the claim is based was done *regardless of the time when damage results*.' (Emphasis added.)" *Henry*, 319 Mich App at 735 (GADOLA, P.J., dissenting). As already noted, this Court reversed the Court of Appeals in *Henry* "for the reasons stated in the Court of Appeals dissenting opinion." *Henry*, 501 Mich at 965. As a result, pursuant to *Henry*, plaintiffs' action here accrued when the Flint River water reached plaintiffs' property, without regard to when "a buyer or bank had the requisite information to be disinclined to buy or finance the purchase of property in Flint."

[8] Moreover, I question whether plaintiffs have even adequately alleged a claim of inverse condemnation. "The right to just compensation, in the context of an inverse condemnation suit for diminution in value . . . exists only where the landowner can allege a unique or special injury, that is, an injury that is different in kind, not simply in degree, from the harm suffered by all persons similarly situated." *Spiek v Dep't of Transp*, 456 Mich 331, 348; 572 NW2d 201 (1998). As we have explained:

> Where harm is shared in common by many members of the public, the appropriate remedy lies with the legislative branch and the regulatory bodies created thereby . . . . Only where the harm is peculiar or unique in this context does the judicial remedy become appropriate. [*Id*. at 349.]

Concerning the meaning of "similarly situated," the lead opinion is correct that *Spiek* compared the plaintiffs to other persons who "reside near *a* public highway," rather than the specific highway that the plaintiffs resided near. *Id*. at 350 (emphasis added). However, in discussing this requirement in general, *Spiek* expressly indicated that a plaintiff's alleged damage must not be "common to all property in the neighborhood" or "common [to] all lands in the vicinity." *Id*. at 346, 348 n 14 (quotation marks and citation

## 2. HARSH & UNREASONABLE CONSEQUENCES

The Court of Appeals also held that "the harsh-and-unreasonable-consequences exception relieves plaintiffs from the statutory notice requirements," *Mays*, 323 Mich App at 25, and Justice BERNSTEIN agrees.[9]  However, that conclusion is simply inconsistent

---

omitted).  In addition, contrary to the approach of the majority, this Court in *Hill v State Hwy Comm*, 382 Mich 398; 170 NW2d 18 (1969), compared the plaintiffs in that case with those whose property was also affected by the specific construction at issue.  See *id*. at 404 ("[P]laintiffs make no showing that they are differently treated from other members of the traveling public or property owners whose use of these streets has been restricted by the construction of the limited access expressway.").  Accordingly, I question whether the majority is correct in holding that the pertinent inquiry is whether plaintiffs are similarly situated to municipal water users generally rather than with other Flint water users.

Assuming that the latter defines the pertinent inquiry, plaintiffs have not alleged that they have suffered a unique or special injury that is any different in kind from the harm suffered by all persons similarly situated.  Indeed, plaintiffs claim to represent all the Flint water users that suffered personal injuries and property damage from the water.  That is, plaintiffs claim to represent all persons similarly situated.  Therefore, arguably by *definition*, plaintiffs have not alleged an injury that is any different in kind from those suffered by all persons similarly situated.  Because the harm that plaintiffs alleged is shared in common by many members of the public, the appropriate remedy arguably lies with the legislative branch and the regulatory bodies created thereby.  That is, it is not necessarily that there is no remedy available to persons injured but that the remedy is more properly fashioned by a different agency of government.  However, given that I conclude that plaintiffs here failed to comply with the notice provision of the Court of Claims Act, it is unnecessary for me to decide whether plaintiffs have adequately alleged a claim of inverse condemnation.  Similarly, it is unnecessary for me to address the merits of plaintiffs' substantive due-process claim, so I will merely observe that I find Justice VIVIANO's opinion to be highly estimable and share a good many of his concerns.

[9] The Court of Claims also relied on the harsh-and-unreasonable-consequences exception to deny defendants' motions for summary disposition.  The Court of Appeals dissent concluded that the harsh-and-unreasonable-consequences exception was abrogated by *McCahan* and *Rowland* because in those cases this Court held that no judicially created savings construction is permitted to avoid a clear statutory mandate.  However, those cases involved statutory claims, and we held that because the Legislature could completely abolish those claims, it could obviously place restrictions on such claims.  The instant case

16

with the Court of Appeals' decision in *Rusha*, 307 Mich App at 310, that the "six-month filing deadline" is a "minimal imposition, especially considering that § 6431 allows the filing of statutory notice in lieu of filing an entire claim." MCL 600.6431(3) "merely . . . place[s] a reasonable, albeit minimal, burden on a plaintiff to advise the state of potential claims." *Id*. at 313. Therefore, "the statutory notice requirement of § 6431(3) is reasonable and [does] not . . . deprive [a] plaintiff of any substantive, constitutional right." *Id*. Requiring parties who wish to sue the state for alleged constitutional violations to file a notice of intention to file a claim within six months following the happening of the event giving rise to the cause of action does not place an undue burden on such parties. They do not have to actually file a complaint within six months but simply have to file a *notice* of an intention to file a claim. As the Court of Appeals itself recognized, "[A] claimant requires only minimal information to file a notice of intent and . . . the knowledge required distinguishes a notice of intent from a legal complaint." *Mays*, 323 Mich App at 42 n 10. And once a claimant files a notice of intent, the claimant has three years after the claim has accrued to file a complaint. MCL 600.6452(1).

---

involves constitutional claims that the Legislature lacks the authority to completely abolish (at least with regard to inverse condemnation), and this Court has long held that the Legislature cannot enact limitation periods that "are so harsh and unreasonable in their consequences that they effectively divest plaintiffs of the access to the courts intended by the grant of the substantive right." *Forest*, 402 Mich at 359. For example, the Legislature could not enact a statute that requires a claimant to file a takings action within one day of the alleged taking. The Court of Appeals dissent also concluded that application of the notice provision would not be harsh or unreasonable given that plaintiffs had numerous indications that they were suffering harm within six months of the water-source switch and so could have reasonably filed their notice of intent in a timely fashion. I fully agree with this conclusion.

17

With regard to this particular case, it would not have been at all difficult for plaintiffs to comply with the six-month notice provision because, based on their *own* complaints, it is clear that plaintiffs were well aware of their possible cause of action within six months of the event giving rise to their cause of action. As discussed earlier, this event was the actual exposure to the toxic water, which began on April 25, 2014. Within days after this event, plaintiffs complained that the water was cloudy and foul in appearance, taste, and odor. By May 2014, there had been numerous press accounts about the water quality problems in Flint. By June 2014, many Flint water users reported that the water was making them ill. And by August 2014, several boil-water advisories had been issued. Plaintiffs had been presented with numerous indications that they were suffering harm within six months of the water-source switch and so could have easily filed their notice of intent in a timely manner.

Moreover, plaintiffs were certainly well aware of their possible cause of action more than six months before they filed suit on January 21, 2016, given that on January 20, 2015, citizen protests mounted about the water and on February 17, 2015, there were public demonstrations demanding that Flint reconnect with the Detroit Water and Sewerage Department. Indeed, plaintiff Melissa Mays actually filed two complaints based on the very same set of facts as in the instant case-- one in Genesee Circuit Court on June 5, 2015, and the other in the United States District Court for the Eastern District of Michigan on July 6, 2015-- well before the instant complaint was filed. Plaintiffs did not even file their complaint in the instant case within six months of filing those complaints.

For these reasons, I conclude that the harsh-and-unreasonable-consequences exception does not relieve plaintiffs from the statutory notice requirements.

## 3. FRAUDULENT CONCEALMENT

The Court of Appeals also held that "the fraudulent-concealment exception of MCL 600.5855 may provide an alternative basis to affirm the court's denial of [defendants' motions for] summary disposition," *Mays*, 323 Mich App at 25, and Justice BERNSTEIN agrees.[10] Again, I respectfully disagree. The fraudulent-concealment statute only constitutes an exception to *statutes of limitations* and does not constitute an exception to the statutory notice provision at issue here.[11] The fraudulent-concealment statute itself asserts that it allows an action to be brought under certain circumstances "although the action would otherwise be barred by the period of limitations," MCL 600.5855; it does not state that an action can be brought although the action would otherwise be barred by the statutory notice provision. Therefore, the fraudulent-concealment statute simply does not pertain in the present context. See *Zelek v Michigan*, unpublished per curiam opinion of the Court of Appeals, issued October 16, 2012 (Docket No. 305191), p 2 ("The Court of Claims notice provision has no effect on the limitation period and is not subject to the tolling provisions of MCL 600.5855."); *Brewer v Central Mich Univ Bd of Trustees*,

---

[10] The Court of Claims rejected plaintiffs' argument that the fraudulent-concealment statute should be applied in this case. The Court of Appeals dissent also concluded that the fraudulent-concealment statute does not apply.

[11] The fraudulent-concealment statute, MCL 600.5855, provides:

> If a person who is or may be liable for any claim fraudulently conceals the existence of the claim or the identity of any person who is liable for the claim from the knowledge of the person entitled to sue on the claim, the action may be commenced at any time within 2 years after the person who is entitled to bring the action discovers, or should have discovered, the existence of the claim or the identity of the person who is liable for the claim, although the action would otherwise be barred by the period of limitations.

unpublished per curiam opinion of the Court of Appeals, issued November 21, 2013 (Docket No. 312374), p 2 ("[P]laintiff's arguments are premised on exceptions to the statute of limitations. . . . Yet, the notice requirement of MCL 600.6431(3) is not a statute of limitations, a savings provision, or a tolling provision. Instead, it is a condition precedent to sue the state.") (quotation marks and citation omitted).

This is further evidenced by the fact that the Legislature incorporated the fraudulent-concealment exception into the statute-of-limitations provision of the Court of Claims Act, but not into its statutory notice provision. MCL 600.6452(1) of the Court of Claims Act provides that the statute of limitations is three years in an action against the state. MCL 600.6452(2) of the Court of Claims Act provides that "[e]xcept as modified by this section, the provisions of RJA chapter 58, relative to the limitation of actions, shall also be applicable to the limitation prescribed in this section." The fraudulent-concealment statute, MCL 600.5855, is a "provision[] of RJA chapter 58, relative to the limitation of actions," and thus is applicable to the statute-of-limitations provision of the Court of Claims Act. On the other hand, the statutory notice provision of the Court of Claims Act does not similarly incorporate the fraudulent-concealment statute. Given that the Legislature chose to incorporate the fraudulent-concealment statute into the statute of limitations but not into the statutory notice provision, we should presume absent evidence to the contrary that this was purposeful and should not summarily incorporate the fraudulent-concealment statute where it has not been placed by the lawmaking body of our state government.[12]

---

[12] Justice BERNSTEIN recognizes that "[t]he Legislature did not create a fraudulent-concealment exception for the statutory *notice* provision in the [Court of Claims Act]."

Furthermore, even assuming that the fraudulent-concealment statute *does* apply to MCL 600.6431(3), for the same reasons that I conclude that the harsh-and-unreasonable-consequences exception does not relieve plaintiffs from the statutory notice requirements, I conclude that the fraudulent-concealment statute also does not relieve plaintiffs from the statutory notice requirements-- namely, it is clear that plaintiffs were well aware of their possible cause of action well within six months of the event giving rise to their cause of action and thus the existence of their cause of action was not fraudulently concealed from them. Once again, they could have easily filed the required notice of intent within six months of the event giving rise to their cause of action.

For these reasons, I conclude that the fraudulent-concealment exception of MCL 600.5855 does not provide a basis to affirm the trial court's denial of summary disposition.

---

Yet, he reads such an exception into the statutory notice provision of the Court of Claims Act because its absence there is "not reconcilable with the Legislature's intent to provide claimants with two years from the date of discovery to bring suit for harm that was fraudulently concealed, as expressed in MCL 600.6452(2)." However, this is simply inconsistent with the plainest expression of the Legislature's actual intention, i.e., the law enacted. See *Mayor of Lansing v Pub Serv Comm*, 470 Mich 154, 161; 680 NW2d 840 (2004).

Justice BERNSTEIN also asserts that failing to read a fraudulent-concealment exception into the statutory notice provision "would result in reading out MCL 600.6452(2) entirely, because plaintiffs would never be able to utilize the fraudulent-concealment exception." I respectfully disagree. MCL 600.6452(2) does more than incorporate the fraudulent-concealment statute into the statute-of-limitations provision of the Court of Claims Act; rather, it incorporates *all* the "provisions of RJA chapter 58, relative to the limitation of actions" into the statute-of-limitations provision of the Court of Claims Act. Therefore, failing to read a fraudulent-concealment exception into the statutory notice provision of the Court of Claims Act would not "entirely" result in reading out MCL 600.6452(2).

## II. CONCLUSION

Because plaintiffs did not file a notice of intent to file a claim or the claim itself within six months following the happening of the event giving rise to the cause of action, this Court should reverse the Court of Appeals and remand this case to the Court of Claims for it to enter an order granting defendants' motions for summary disposition.

Stephen J. Markman
Brian K. Zahra

CLEMENT, J., did not participate because of her prior involvement as chief legal counsel for Governor Rick Snyder.

22